# No. 19-761

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

UNITED STATES OF AMERICA,

*Appellee,*

v.

CHI PING PATRICK HO, *A/K/A* PATRICK C.P. HO,

*Defendant-Appellant.*

On Appeal from the United States District Court for the Southern District of
New York, No. 1:17-cr-779, Hon. Loretta A. Preska

**BRIEF OF DEFENDANT-APPELLANT
CHI PING PATRICK HO**

EDWARD Y. KIM
JONATHAN F. BOLZ
KRIEGER KIM & LEWIN LLP
500 Fifth Avenue, 34th Floor
New York, New York 10110
Tel.: (212) 390-9550

BENJAMIN E. ROSENBERG
KATHERINE M. WYMAN
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3622

*Attorneys for Chi Ping Patrick Ho*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................1

STATEMENT OF THE CASE.................................................................4

    A.    Background ...............................................................................4

    B.    Procedural History ..................................................................6

    C.    Trial .........................................................................................7

    D.    Verdict and Sentence.............................................................17

SUMMARY OF THE ARGUMENT .....................................................17

ARGUMENT ..........................................................................................19

POINT I

    HO'S CONVICTIONS ON COUNTS 2 AND 3 MUST BE
    VACATED BECAUSE THERE WAS NO EVIDENCE THAT HE
    ACTED ON BEHALF OF A DOMESTIC CONCERN.........................19

POINT II

    HO'S CONVICTIONS ON COUNTS 6 AND 8 MUST BE
    VACATED BECAUSE THE JURY WAS ERRONEOUSLY
    CHARGED ON SPECIFIED UNLAWFUL ACTIVITIES AND
    THE STATUTE DOES NOT COVER THE WIRES AT ISSUE .......244

    A.    A Violation of § 78dd-3 Does Not Qualify as a Specified
        Unlawful Activity.................................................................24

    B.    A Wire that Merely Passes Through the United States Is Not
        Covered by § 1956(a)(2)(A) ...............................................29

        1.    Established Principles of Statutory Interpretation
            Show that the Wire from Hong Kong to Uganda Is
            Outside the Ambit of § 1956(a)(2)(A)................................30

        2.    *United States v. Harris* Confirms This Interpretation ........33

    C.    The Legal Defects Underlying Count 8 Are Fatal to Count 6 ......36

**TABLE OF CONTENTS**
(continued)

Page

POINT III

    THE TRIAL COURT MADE EVIDENTIARY ERRORS THAT
    REQUIRE REVERSAL OF HO'S CONVICTIONS ON ALL
    COUNTS ...................................................................................37

    A.    The District Court Erroneously Admitted Three Critical
        Pieces of Evidence ........................................................38

        1.    Déby's Two Out-Of-Court Statements About Cash
            Payments ...............................................................38

        2.    Boubker's Text Message ....................................40

        3.    The Government's Summary Charts ..................41

    B.    The Evidentiary Errors Were Not Harmless ................44

POINT IV

    COUNTS 1, 4 AND 5 SHOULD HAVE BEEN STRICKEN
    BECAUSE THEY ARE LEGALLY DEFECTIVE ...............................49

    A.    The Indictment Was Repugnant Because It Charged that Ho
        Was, and Was Not, a "Domestic Concern" ..................50

    B.    Sections 78dd-2 and 78dd-3 Are Mutually Exclusive .................52

    C.    The Legal Defects Underlying Counts 4 and 5 Are Fatal to
        Count 1 .........................................................................55

CONCLUSION ....................................................................................56

# TABLE OF AUTHORITIES

**CASES**

*Asgrow Seed Co. v. Winterboer*,
  513 U.S. 179 (1995) .................................................................. 30

*Baugh ex rel. Baugh v. Cuprum S.A. de C.V.*,
  730 F.3d 701 (7th Cir. 2013) ................................................ 43, 49

*Boutros v. Avis Rent A Car Sys., LLC*,
  802 F.3d 918 (7th Cir. 2015) ....................................................... 41

*Crockett Telephone Co. v. FCC*,
  963 F.2d 1564 (D.C. Cir. 1992) ................................................... 31

*Curtis Ambulance of Florida v. Board of County Comm'rs*,
  811 F.2d 1371 (10th Cir. 1987) ................................................... 26

*Gebardi v. United States*,
  287 U.S. 112 (1932) .................................................................. 53

*Griffin v. United States*,
  502 U.S. 46 (1991) .............................................................. 28, 37

*Gross v. FBL Fin. Servs.*,
  557 U.S. 167 (2009) .................................................................. 30

*Hassett v. Welch*,
  303 U.S. 303 (1938) .................................................................. 25

*Jackson v. Virginia*,
  443 U.S. 307 (1979) .................................................................. 20

*Jam v. Int'l Fin. Corp.*,
  --- U.S. ---, 139 S. Ct. 759 (2019) ............................................. 25

*Manley v. AmBase Corp.*,
  337 F.3d 237 (2d Cir. 2003) ........................................................ 37

*Moskal v. United States*,
  498 U.S. 103 (1990) .................................................................. 54

*Nat'l Bank of N.A. v. Cinco Investors, Inc.*,
 610 F.2d 89 (2d Cir. 1979) ................................................39

*Nwozuzu v. Holder*,
 726 F.3d 323 (2d Cir. 2013) ............................................32

*Roach v. Morse*,
 440 F.3d 53 (2d Cir. 2006) ..............................................29

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,
 563 U.S. 401 (2011) .........................................................30

*Sheng v. M&TBank Corp.*,
 848 F.3d 78 (2d Cir. 2017) ..............................................46

*Stromberg v. California*,
 283 U.S. 359 (1931) .........................................................28

*United States v. Agosto-Vega*,
 617 F. 3d 541 (1st Cir. 2010) ..........................................54

*United States v. Al-Moayad*,
 545 F.3d 139 (2d Cir. 2008) ............................................44

*United States v. Bethea*,
 483 F.2d 1024 (4th Cir. 1973) .........................................51

*United States v. Bradley*,
 869 F.2d 121 (2d Cir. 1989) ............................................43

*United States v. Bray*,
 139 F.3d 1104 (6th Cir. 1998) .........................................49

*United States v. Cisneros*,
 26 F. Supp. 2d 24 (D.C. Cir. 1998) .................................51

*United States v. Cummings*,
 858 F.3d 763 (2d Cir. 2017) ............................................37

*United States v. Daccarett*,
 6 F.3d 37 (2d Cir. 1993) ..................................................35

*United States v. Dinero Express, Inc.*,
  313 F.3d 803 (2d Cir. 2002) ................................................................34

*United States v. Dukagjini*,
  326 F.3d 45 (2d Cir. 2003) ...........................................................44, 45

*United States v. Garcia*,
  992 F.2d 409 (2d Cir. 1993) .........................................................28, 37

*United States v. Greenberg*,
  835 F.3d 295 (2d Cir. 2016) ................................................................50

*United States v. Harris*,
  79 F.3d 223 (2d Cir. 1996) .........................................................*passim*

*United States v. Harrison*,
  296 F.3d 994 (10th Cir. 2002) ............................................................39

*United States v. Hawit*,
  No. 15-cr-252, 2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) ............34

*United States v. Hoskins*,
  902 F.3d 69 (2d Cir. 2018) ...........................................................53, 54

*United States v. Ionia Mgmt., SA*,
  555 F.3d 303 (2d Cir. 2009) ................................................................54

*United States v. Janati*,
  374 F.3d 263 (4th Cir. 2004) .......................................................42, 43

*United States v. Kumar*,
  617 F.3d 612 (2d Cir. 2010) ................................................................51

*United States v. Moloney*,
  287 F.3d 236 (2d Cir. 2002) ................................................................34

*United States v. Natal*,
  849 F.3d 530 (2d Cir. 2017) ................................................................45

*United States v. Okatan*,
  728 F.3d 111 (2d Cir. 2013) ................................................................46

*United States v. Peterson*,
    394 F.3d 98 (2d Cir. 2005) ................................................................32

*United States v. Pinto*,
    850 F.2d 927 (2d Cir. 1988) ..............................................................43

*United States v. Santos*,
    553 U.S. 507 (2008)............................................................................33

*United States v. Stewart*,
    907 F.3d 677 (2d Cir. 2018) ..............................................................44

*United States v. Taylor*,
    210 F.3d 311 (5th Cir. 2000) .............................................................42

*United States v. Truesdale*,
    152 F.3d 443 (5th Cir. 1998) .............................................................29

*United States v. Twentieth Century Fox Film Corp.*,
    882 F.2d 656 (2d Cir. 1989) ..............................................................54

*United States v. Valle*,
    807 F.3d 508 (2d Cir. 2015) ..............................................................55

*United States v. Walker*,
    191 F.3d 326 (2d Cir. 1999) ................................................................7

*United States v. White*,
    737 F.3d 1121 (7th Cir. 2013) ...........................................................42

*Williams v. N. Carolina*,
    317 U.S. 287 (1942)............................................................................28

*Yates v. United States*,
    354 U.S. 298 (1957)............................................................................28

## STATUTES

15 U.S.C. § 78dd-2.......................................................................*passim*

15 U.S.C. § 78dd-3.......................................................................*passim*

18 U.S.C. § 1956..........................................................................*passim*

American Home Ownership and Economic Opportunity Act of 2000,
Pub. L. No. 106-569, 114 Stat. 2944 (2000) ......................................27

An Act to Amend Section 451 of the Tariff Act of 1930,
Pub. L. No. 78-328, 58 Stat. 269 (1944) ...........................................26

An Act to Amend Sections 4, 7, and 17 of the Reclamation Project
Act of 1939,
Pub. L. No. 79-39, 59 Stat. 75 (1945)................................................26

Foreign Corrupt Practices Act of 1977,
Pub. L. No. 95-213, 91 Stat. 1494 (1977) .........................................52

Housing and Community Development Act Of 1992,
Pub. L. No. 102-550, 106 Stat. 3672 (1992) .....................................25

International Anti–Bribery and Fair Competition Act of 1998,
Pub. L. No. 105-366, 112 Stat. 3302 (1998) .....................................25

North Korea Sanctions and Policy Enhancement Act of 2016,
Pub. L. No. 114-122, 130 Stat. 93 (2016) .........................................27

Trafficking Victims Protection Reauthorization Act of 2005,
Pub. L. No. 109-164, 119 Stat. 3558 (2005) .....................................27

USA Patriot Act of 2001,
Pub. L. No. 107-56, 115 Stat. 272 (2001) .........................................27

**OTHER AUTHORITIES**

American Heritage College Dictionary (4th ed. 2004)....................30, 31

Fed. R. Crim. P. 7...............................................................................51

Fed. R. Evid. 106 ...............................................................................41

Fed. R. Evid. 801 ...............................................................................39

Fed. R. Evid. 1006 .............................................................................42

S. Rep. No. 105-277 (1998) ...........................................................52, 53

Webster's Ninth New Collegiate Dictionary (1988) .........................30, 31

## Introduction

This appeal arises out of the prosecution of Dr. Patrick Ho, a citizen of Hong Kong, for alleged bribe payments made to leaders of Chad and Uganda on behalf of a conglomerate based in mainland China. Ho was convicted at trial of multiple violations of two provisions of the Foreign Corrupt Practices Act (the "FCPA"), 15 U.S.C. §§ 78dd-2 and 78dd-3; of one substantive count of promotional money laundering in violation of 18 U.S.C. § 1956(a)(2)(A); and of conspiracies to commit violations of the FCPA and the money laundering statute. But the government's theory of the case was internally inconsistent and legally insufficient. Moreover, its case at trial relied heavily on inadmissible hearsay and government-crafted summary charts that were erroneously submitted to the jury. Evaluated under the proper legal framework, none of Ho's convictions can stand.

## Jurisdictional Statement

The district court had jurisdiction pursuant to 28 U.S.C. § 3231. It entered a final judgment of conviction on March 27, 2019. SPA1. Ho filed a timely notice of appeal the same day. A876. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## Statement of Issues Presented for Review

1.      Whether the government, which repeatedly argued that Ho paid bribes on behalf of a Chinese company, presented legally sufficient evidence that he acted

on behalf of a "domestic concern," as required for a conviction under 15 U.S.C. § 78dd-2.

2.    Whether a defendant may be convicted for violating 18 U.S.C. § 1956(a)(2)(A), even though:

    a.    The jury was improperly instructed that 15 U.S.C. § 78dd-3 was a specified unlawful activity under 18 U.S.C. § 1956(c)(7)(D), even though § 1956(c)(7)(D)'s reference to the "Foreign Corrupt Practices Act" was inserted six years before § 78dd-3 was enacted.

    b.    Section 1956(a)(2)(A) makes it a crime to transfer funds by wire *from* the United States *to* a place outside the United States, or *to* a place in the United States *from* a place outside the United States, in order to promote specified unlawful activities, but the wire in question went neither *from*, nor *to*, but only *through*, the United States.

3.    Whether the trial court erred in admitting, over objection:

    a.    Testimony regarding two out-of-court statements referring to the payment of cash, on the grounds that they were adopted admissions of the defendant—even though the first statement

was made outside of the defendant's presence, and he never adopted the second statement.

b.  A text message sent by a non-testifying third party characterizing the payment as attempted bribery, on the grounds: (i) that it was a prior consistent statement—even though it was not a statement made by the witness, and (ii) that its admission was necessary to "complete" other evidence offered by the government—even though the rule of completeness is available only to the party adverse to the proponent of incomplete evidence.

c.  Two summary charts pursuant to Federal Rule of Evidence 1006, inviting the jury to rely on the charts in its deliberations rather than the emails and text messages paraphrased therein—even though the underlying documents were not voluminous, and were in evidence and readily available for the jury's review.

4.  Whether a defendant may be prosecuted for violating § 78dd-3 where (a) the grand jury determined that he was a "domestic concern," but § 78dd-3 expressly does not apply to domestic concerns, and (b) the defendant was also indicted for violating § 78dd-2, but §§ 78dd-2 and 78dd-3 are mutually exclusive.

3

**Statement of the Case**

This case arises out of a judgment of conviction entered by the United States District Court for the Southern District of New York (Preska, J.) after a jury trial. SPA1. The relevant rulings are unreported.

## A.    Background

Defendant Patrick Ho was the principal director of a not-for-profit think tank known as CEFC Limited or China Energy Fund Committee ("CEFC"), organized and headquartered in Hong Kong, whose mission included energy security and public diplomacy. *See* A731-33, A761-830; *see also* A141-42, A176-77, A197-98. CEFC was fully-funded by China CEFC Energy Company Limited ("CEFC Energy"), a for-profit conglomerate based in Shanghai, China. A144-45, A159, A177, A194-95. CEFC also funded a not-for-profit entity incorporated in Virginia, China Energy Fund Committee (USA) Inc. ("CEFC-USA"). *See* A749-60.

Ho's job was to lead CEFC and to make contacts that could be helpful in advancing the commercial interests of CEFC Energy. *See, e.g.*, A149-50, A176-78, A197-98, A224-25. In connection with his work for CEFC, he frequently visited the United Nations and had contact with high-ranking officials, including several Presidents of the General Assembly ("PGAs"). *See, e.g.*, A133-36, A140-42, A171.

The government alleged the existence of two "schemes": the Chad Scheme and the Uganda Scheme. The Chad Scheme was allegedly initiated in September

4

2014, when an official at CEFC Energy asked Ho if he had any contacts who could arrange a meeting with the President of Chad, Idriss Déby.  *See* A589.  The purpose was to help a Chinese national energy company that faced a large fine in Chad arising out of its operations there; CEFC Energy hoped to collaborate on that company's project in Chad.  A555-56, A265.  Ho was introduced by former PGA Vuk Jeremić to Cheikh Gadio, a former Foreign Minister of Senegal, who agreed to set up meetings between CEFC Energy and President Déby.  A168-69, A249-50, A557-59.  The government sought to prove that CEFC Energy paid a bribe to Déby, and that the bribe was related to the company's interest in a block of undeveloped oil resources in Chad.  CEFC Energy never invested in the oil block.

The Uganda Scheme also allegedly began in September 2014, when Ho sought a brief meeting with the incoming PGA, Sam Kutesa.  A590.  Kutesa was the Foreign Minister of Uganda, and he held that position through his term at the UN.  A173-74, A190, A604.  At the end of Kutesa's term, in September 2015, Kutesa returned to Uganda, still serving as Foreign Minister.  A663.  Several months later, Kutesa's wife requested that the Chairman of CEFC Energy make a contribution to Kutesa's charity, which Ho arranged to be paid.  Around the same time, Ho arranged for a delegation of CEFC and CEFC Energy representatives to attend the inauguration of the President of Uganda, Yoweri Museveni, and meet with Ugandan officials.  *See* A654, A673-75.  The government sought to prove that the payment to

Kutesa's charity was a bribe connected to CEFC Energy's interest in energy resources or banking in Uganda. CEFC Energy made no investments in Uganda.

## B. **Procedural History**

Ho was indicted in a one-defendant indictment that set forth eight counts. A85-102. Count 1 charged a conspiracy in violation of 18 U.S.C. § 371. A85-89. It identified as objects of the conspiracy two sections of the FCPA, 15 U.S.C. §§ 78dd-2 and 78dd-3. A85-88. Count 2 alleged a violation of § 78dd-2 in connection with the Chad Scheme, A90-91; Count 3 alleged a violation of the same statute in connection with the Uganda Scheme, A91-93. Count 4 alleged a violation of § 78dd-3 in connection with the Chad Scheme, A93-94, and Count 5 alleged a violation of § 78dd-3 in connection with the Uganda Scheme, A94-95. Count 6 alleged a conspiracy to engage in money laundering (18 U.S.C. § 1956(h)), A96-97, and Counts 7 and 8 alleged substantive money laundering charges in violation of 18 U.S.C. § 1956(a)(2)(A), with respect to the Chad and Uganda Schemes, A97-99.

Ho's motions to dismiss Counts 1 and 4 through 8 (leaving only Counts 2 and 3), Dkt.62-64, as well as his motions to suppress certain of the evidence obtained by search warrants served on internet service providers, Dkt.69-71, were denied. The motions to suppress are not relevant to this appeal; the motions to dismiss are discussed below, where relevant.

6

C.    **Trial**[1]

The government called six witnesses.

1.    Vuk Jeremić, a former Minister of Foreign Affairs of Serbia and former PGA, testified about the role of the PGA within the UN, and how, while serving in that position, he came to meet Ho at an event hosted by CEFC.  A130-35, A140-42, A176-77.  Jeremić explained that he learned from Ho that CEFC was sponsored by CEFC Energy, and that in addition to leading CEFC, Ho worked to help CEFC Energy find business opportunities.  A149-50, A177-78.  He testified about his interactions with Ho during his term as PGA, as well as his work as an international consultant to CEFC Energy after his term ended.  *See* A143-52, A155-58, A175-89. Jeremić testified that when Ho told Jeremić that he needed to find someone who could arrange a meeting between CEFC Energy and the president of Chad, he put Ho in touch with Gadio.  A160-69.  He also testified that he set up a meeting between Ho and Kutesa.  A170-71.  He made these introductions in his role as a consultant to CEFC Energy.  A188-90.

2.    David Riccardi-Zhu testified that from the fall of 2014 through July 2017 he worked as a volunteer and then an employee at the "CEFC NGO," which

---

[1]    On this appeal, the Court "review[s] all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Walker*, 191 F.3d 326, 333 (2d Cir. 1999) (internal quotation marks omitted).

7

he identified as a "not-for-profit" company based in Hong Kong. A194-95, 198. In those roles, Riccardi-Zhu wrote editorials, speeches, and press releases for Ho and helped to organize events. A209, A224-25. Riccardi-Zhu explained that Ho was the secretary-general of the organization and ran its day-to-day operations, that Ho was based in Hong Kong, and that he visited New York about six times a year. A197-98, A209, A224-25. He reviewed the corporate records of CEFC Limited, incorporated in Hong Kong, and CEFC-USA, incorporated in Virginia, and noted that CEFC-USA was "the NGO that I worked for." A199-204; *see* A761-830, A749-60. Riccardi-Zhu testified that he had never attended meetings with Ho related to CEFC Energy and was not aware of an official connection between the work of the CEFC-USA and CEFC Energy. A210-11.

3.     The government's most significant witness was Cheikh Gadio. Initially charged as a defendant and co-conspirator, *see* A31-39, A41, A43-66, Gadio testified pursuant to a non-prosecution agreement and denied having solicited a bribe or participated in a conspiracy to bribe any official in Chad. A848-51, A231-33, A363-71; *see also* A235, A294-96, A350-51. Gadio testified that he was contacted by Jeremić, who introduced him to Ho. A249-51. Gadio and Ho met, and Ho explained that CEFC Energy wanted an introduction to President Déby of Chad, because the company was interested in Chadian oil. A230-31, A253-58. Gadio came to understand that Chad had imposed a multi-billion dollar fine on a Chinese

8

national petroleum company that had operations in Chad, and CEFC Energy wanted to intercede to attempt to reduce the fine. A265.

Gadio further testified that he met with Déby, and arranged a meeting for himself, Déby, and a delegation from CEFC Energy, including Ho, in Chad. A260-64, A271-74, *see* A563-64. By the time the meeting took place, on November 11 or 12, 2014, the Chinese national petroleum company had resolved its fine with Chad. A267-68, A560. The delegation from CEFC Energy and Déby discussed other opportunities for CEFC Energy to do business in Chad—including an undeveloped oil field known as "Block H"—and, through Gadio, CEFC Energy set up a second visit. A275-78, A281, A574, A734. That visit, which took place on December 8-9, was the climax of the alleged Chad Scheme.

### (a) The events of December 8

According to Gadio, he, along with several representatives of CEFC Energy, including Ho, met with Déby in the afternoon of December 8. A282-84. Gadio testified that the participants at the meeting discussed in general terms CEFC Energy's interest in Block H, and Déby's interest in partnering on infrastructure projects. A285-87, A343-46. Gadio recalled that at the end of the meeting, a woman from CEFC Energy reminded the delegation to present their gifts to Déby, whose security team then brought in several ceremonially-wrapped gift boxes. A289-91, A346. The boxes were not opened, and the Chinese delegation, along with Gadio,

9

left.  A291-92, A346-47.  There was no evidence that Ho was aware of the contents of the boxes.

Gadio testified that later that night, he received a call, summoning him to the presidential compound.  A292, A347-48.  He further testified that at the compound he met with Déby, who asked whether Gadio knew that some of the gift boxes contained cash, and stated that his security had counted $2 million.[2]  A293-95.  It was unclear whether at the time of his statement Déby had in fact seen any cash or whether he had been told by his staff that they had found cash in the gift boxes.  *See* A295, A300.  When Gadio disclaimed knowledge of the cash, Déby resolved to meet with the CEFC Energy delegation the next day.  A294-96, A350, A352-53.

(b)  *The events of December 9*

The next morning, the CEFC Energy delegation was recalled to the presidential compound.  A735, A298-99, A353.  Gadio testified that Déby stated that after the delegation left the prior evening, his security informed him that some of the gift boxes contained $2 million in cash.  A300.  Gadio testified that Déby lectured the delegation, expressing his anger that people so often assumed that all African leaders were corrupt.  A300-01, A358-59.

---

[2]  Gadio's testimony about Déby's statements made in their December 8 meeting and about Déby's statements made on December 9 were the subject of a pretrial *in limine* motion that was denied.  Dkt.170-71, SPA19-21, SPA22.

10

Gadio further testified that when Déby finished speaking, Ho spoke, and stated that he was "impressed" with Déby's reaction, and that it showed that Chad was the right choice for CEFC Energy's entry point to Africa. A301. Gadio further testified that Zang Jianjun, a high-ranking CEFC Energy executive (*see* A269-70, A328), then spoke on behalf of the CEFC Energy delegation, apologizing and explaining that whatever the delegation was trying to achieve, they did it poorly, and that the cash was intended as a donation to the country. A301-03, A359. The parties to the conversation communicated through translation: Déby spoke French, Gadio spoke French and English, Ho spoke English and Chinese, and Zang spoke only Chinese. *See* A301-03, A359; *see also* A237, A258-59.

According to Gadio, at the end of the meeting, it was agreed that CEFC Energy would provide a formal letter of donation. A305-06, A359-61. The letter, which was the product of several authors, including Ho and Gadio, was signed by Zang, and stated that CEFC Energy "would like to express its sincere support for [Déby's] development policies by making available to [him] a donation of two million US dollars intended for [his] social actions for the most vulnerable groups (children, the disabled, refugees, and others)." A582-85; *see also* A575-81. The letter stated that the allocation of the funds was Déby's "sovereign and discretionary decision" since he knew best the needs of the Chadian people, and requested that Déby "accept this donation on behalf of the Republic of Chad." A585.

11

(c)    *The text message from Gadio's son, Boubker Gadio*

The government also proffered, through Gadio, a text message sent to Gadio by his son, Boubker Gadio, a few weeks after the meeting between Déby and the CEFC Energy delegation.  A308-10, A239-44.  In the challenged text message, Boubker stated, referring to the Chinese delegation from CEFC, "their attempt to buy the president to put us to the side did not work."  A736.  Even though Gadio had not authored the text message, the government argued that it was a prior consistent statement that should be admitted because the defense was expected to attack Gadio's credibility, A243, and it "put into context" an earlier, admissible, text message, A245.[3]  Ho objected that the message was hearsay and it could not be admitted as a prior consistent statement because Boubker was not a testifying witness.  A244.  Ho also objected that it was unduly prejudicial under Rule 403.  *Id.* (In addition, Boubker was not present at either of the December 8 or 9 meetings at which the cash payment was discussed.  *See* A293, A299-300.)  The Court admitted

---

[3]    In that preceding message, Gadio reported to his son that "our Chinese friends" had not yet provided feedback on a proposed contract with Gadio's company, and that if they failed to do so in the next week, Gadio would, "go to Chad early January and destroy their reputation and strategies in Chad!" A736; *see also* A307-08.

Boubker's message on the grounds of completeness and as a prior consistent statement.  SPA31-32.[4]

4.    FBI Special Agent Melissa Galicia testified that she reviewed two summary charts related to the Chad Scheme and the Uganda Scheme, in the form of timelines created by the government, in order to confirm that the information in the timelines correctly reflected the content of certain text messages, emails, and other documents that were admitted into evidence by stipulation during her testimony. A374, A376-77, A831-36, A837-47.

The text messages, emails, and documents were the only evidence of the Uganda Scheme, as there were no percipient witnesses.  Those materials established that Ho met with Kutesa and his wife several times in 2014 and 2015, and recommended Uganda to the chairman of CEFC Energy as a place where the company might make investments.  *See* A591-617.  In or about August 2015, the chairman of CEFC Energy agreed to make a $500,000 campaign contribution to the president of Uganda, a known political ally of Kutesa, but the Ugandan election occurred and the president won re-election before the donation was made.  *See* A662-63.  In February 2016, Kutesa's wife contacted Ho, referring to the chairman's

---

[4]    Following the December 9 meeting, although discussions between CEFC Energy and Chadian officials regarding investment in other energy resources continued for some time, no agreement was reached.  *See* A316-21, A323-41, A586-88, A862-72, A723.

promise of the donation, and stated that she was seeking a contribution to a foundation that Kutesa was setting up. A654. Ho referred the request to the chairman, A660-65, and had several further communications with Kutesa and his wife, in which business opportunities in Uganda were discussed, and in which Ho sought an invitation to the Uganda president's inauguration on May 12, 2016, and meetings for CEFC Energy officials, and himself, when they attended the inauguration. A655-59, A673-79.

The documentary materials further established that Ho received authorization from the chairman to make the contribution, A666-72, and on May 5, 2016, Ho caused a wire for $500,000 to be sent as directed by Kutesa's wife, to an account belonging to the Food Security and Sustainable Energy Foundation at Stanbic Bank in Kampala, Uganda. *See* A684-91. Ho and a delegation from CEFC Energy attended the inauguration on May 12, 2016, and met with Ugandan officials and private businesses, including Kutesa, his wife, and the Ugandan president, before and after the ceremonies. *See* A692-722.

Galicia testified that she had confirmed that the entries in the timelines were "accurate reflections of portions of the exhibits" referenced therein, and that the entries were only a "brief summary of a portion or portions of the underlying exhibit" that did not capture all details about it. A379-80, *see also* A387, A391-92. She also testified that she had not reviewed all of the emails and text messages in the case,

14

and that she did not decide which emails and text messages to include in the timelines. A377, A380, A391-92. The government showed the charts to the jury, asked Galicia to read some of the entries to the jury, and presented some of the cited exhibits to the jury. *See, e.g.*, A379-84, 387-88.[5]

Ho did not object to the government's use of the summary charts as demonstratives, and he conceded that the charts accurately quoted the underlying emails and text messages. However, he objected to their admission as evidence the jury could refer to during its deliberations. A312-13; Dkt.196. The District Court overruled the objection. SPA34-35. During its deliberations, the jury requested and received the summary charts. A552-53. The jury requested only four of the underlying documents. A554.

5. Carol Calabrese, an employee in the department of HSBC Bank USA, N.A. ("HSBC USA") involved in processing U.S. dollar wire payments, A394-95, testified that HSBC USA sometimes acts as a correspondent bank, or a "conduit to transfer transactions between institutions that do not hold a direct relationship," and that when HSBC USA processes U.S. dollar transactions, the processing may take place "all around the world." A395-96. She reviewed wire records relating to a May

---

[5]     In addition to the testimony discussed above, Galicia also testified about certain CEFC and CEFC Energy websites, about the dates and durations of Ho's visits to the United States, and about certain 404(b) evidence.

6, 2016 transfer of $500,000 from the account of CEFC at HSBC Bank in Hong Kong, to the account belonging to the Food Security and Sustainable Energy Foundation at Stanbic Bank in Kampala, Uganda. A400-01, A745-48. She confirmed that HSBC USA acted as a U.S. correspondent bank and processed the May 6, 2012 transaction in the United States. A400-01. She also reviewed a chart prepared by the government that illustrated the wire transactions pictorially. A401; A855-57.

6.    Special Agent Deleassa Penland, from the United States Attorney's office, testified regarding her review of certain bank and financial records provided to her by the government trial team. A402-07. Penland reviewed a "purchase package" for an apartment in Trump Tower by Hong Kong Huaxin Petroleum Limited, described as a "wholly owned subsidiary of CEFC Shanghai Group Company Limited," A404-06, and an application for an employer identification number by "Huaxin Petroleum (USA) LLC." A406. She also reviewed a number of bank records and testified that they showed that (1) CEFC received a $500,000 wire from "Shanghai Huaxin Group" on May 4, 2016, A407-08; (2) CEFC initiated a $500,000 wire to the Food Security and Sustainable Energy Foundation on May 6, 2016, A408-10; (3) CEFC-USA received deposits from CEFC on various dates, A410-12; (4) Ho received recurring monthly deposits of approximately $40,000 from CEFC, A413-18; and (5) Ho received two payments of approximately

16

$650,000 from China Ocean Fuel Oil, on November 14, 2014 and February 23, 2016. A421-22, A425-26. Penland was not involved in the investigation of the case and had not explored why any of the payments were made. A424.

## D. **Verdict and Sentence**

Following a seven-day trial, on December 5, 2018, the jury returned a verdict of guilty on Counts 1 through 6 and 8, acquitting Ho on Count 7, which alleged money laundering in connection with the Chad Scheme. A873-75. On March 25, 2019, the Court sentenced Ho to 36 months' incarceration and a $400,000 fine. The judgment of conviction was filed two days later, and Ho filed a notice of appeal from the conviction the same day. SPA1, A876.

## Summary of the Argument

Ho's convictions under § 78dd-2 (Counts 2 and 3) are fatally flawed because the government failed to present any evidence of one of its essential elements: that Ho was acting on behalf of a domestic concern. On the contrary, as the government stated again and again at trial, at all relevant times Ho was acting on behalf of entities based in Shanghai and Hong Kong. The government's repeated statements refuting its own case must be given conclusive weight. Because the government's own theory was that Ho was not acting for a domestic concern, his convictions on Counts 2 and 3 cannot stand.

17

Ho was also convicted of one count (Count 8) of promotional money-laundering in violation of 18 U.S.C. § 1956(a)(2)(A). But the jury was erroneously instructed that a violation of § 78dd-3 is a "specified unlawful activity" under the money laundering statute. It is not, and that error requires reversal. The money laundering conviction must be reversed for another reason, as well: the wire transfer on which it was based went neither **to** the United States, nor **from** it, as is required by the statute. The wire went **through** the United States. The clear language of § 1956(a)(2)(A) and this Court's decision in *United States v. Harris*, 79 F.3d 223 (2d Cir. 1996), *cert. denied*, 519 U.S. 851 (1996), establish that such a wire does not suffice.

Each count of conviction was undermined by the erroneous admission of critical evidence. The most damning evidence cited by the government at trial was a transfer of $2 million in cash to a foreign official. The government's sole evidence of the conveyance of cash was Gadio's hearsay testimony. The improper admission of that testimony was exacerbated by the erroneous admission of Boubker Gadio's text message to Gadio, which referred to an alleged bribe payment. The text was the most important piece of corroboration for Gadio, the government's key witness, and the government referred to the testimony and the text in its summation and again in its rebuttal.

18

As it related to the alleged bribery payment in Uganda, no percipient witness testified. Instead, the government relied entirely upon emails, text messages, and other documentary evidence. These materials were summarized in a timeline presenting snippets of the documents selected by the government, which the jury reviewed in its deliberations, instead of examining the underlying documents.

Finally, Ho's convictions for violating § 78dd-3 (Counts 4 and 5) were also fatally flawed because the indictment was defective: It included a finding by the grand jury that Ho was a "domestic concern," but § 78dd-3 does not apply to domestic concerns. Furthermore, the indictment charged Ho with violating both § 78dd-2 and § 78dd-3, but the two are mutually exclusive.

## <u>Argument</u>

### POINT I

### HO'S CONVICTIONS ON COUNTS 2 AND 3 MUST BE VACATED BECAUSE THERE WAS NO EVIDENCE THAT HE ACTED ON BEHALF OF A DOMESTIC CONCERN

Counts 2 and 3 charged Ho with violating § 78dd-2 in connection with the Chad and Uganda schemes, respectively. Section 78dd-2 makes it a crime to engage in certain actions "in order to assist [a] domestic concern in obtaining or retaining business for or with, or directing business to, any person."[6] A "domestic concern"

---

[6]     15 U.S.C. § 78dd-2 states that it shall be a crime

for any domestic concern, . . . . or for any officer, director, employee, or agent of such domestic concern or any stockholder thereof acting on

19

is an individual who is a citizen, national, or resident of the United States, or an entity organized under the laws of a state or federal territory, or having its principal place of business in the United States.[7]

Here, no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," because there was no evidence that Ho was acting to assist any domestic concern. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The government repeatedly emphasized throughout its case that Ho's actions were undertaken to benefit foreign, not domestic, concerns, and the testimony at trial established that while Ho wore different hats at different entities, *see, e.g.*, A177-78, all of his actions relevant to this case were undertaken for two foreign entities, CEFC

---

behalf of such domestic concern, to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of payment . . . to . . . any foreign official for purposes of [improperly influencing the foreign official] . . . ***in order to assist such domestic concern*** in obtaining or retaining business for or with, or directing business to, any person. [Emphasis added.]

[7]    "Domestic concern" is defined in § 78dd-2(h)(1) as:

(A)    any individual who is a citizen, national, or resident of the United States; and

(B)    any corporation, partnership, association, joint-stock company, business trust, unincorporated organization, or sole proprietorship which has its principal place of business in the United States, or which is organized under the laws of a State of the United States or a territory, possession, or commonwealth of the United States.

20

Energy and CEFC, which were based in Shanghai and Hong Kong, respectively, and which were not domestic concerns. The government cannot have it both ways, and its own theory of the case precluded a conviction under § 78dd-2.

The government's evidence comes nowhere close to proving that Ho acted to assist a domestic concern. Granting the government the benefit of all reasonable inferences, at most a reasonable juror could find that (1) Ho worked for CEFC (the Hong Kong-based not-for-profit entity—not a domestic concern), to arrange meetings between Ugandan officials and representatives of CEFC and CEFC Energy (the Shanghai-based for-profit entity—also not a domestic concern), with CEFC making a payment of $500,000 in the process, *see, e.g.*, A726-30 (press release posted on CEFC's Chinese language website reporting the CEFC delegation's visit to Uganda); A686-91 (emails among CEFC personnel regarding a transfer of funds from CEFC's Hong Kong bank account to the Kutesa foundation); and (2) Ho worked on behalf of CEFC Energy to facilitate a sale of oil resources to CEFC Energy, with CEFC Energy making a payment of $2 million in the process, *see, e.g.*, A253-54 (Gadio testifying that in connection with the donation in Chad, Ho was working on behalf of the for-profit CEFC Energy). *See also* A230, 266, 272 (same); A192 (Jeremić testifying that he had "no doubt" that Ho's interest in a meeting with the president of Chad "was to expand the business of the energy company"); A386

21

(Galicia testifying that the donation letter addressed to Déby was written on behalf of CEFC Energy).

The government offered no evidence establishing that any of Ho's allegedly criminal actions were on behalf of any entity organized or based in the U.S. Although the government occasionally referred to CEFC-USA (the not-for-profit registered in Virginia, for which Ho was a director, A749, A752, A754), it offered no proof that CEFC-USA had any involvement or interest in Chad or Uganda—or, indeed, that it did anything relevant to the allegations in the case.

The government's opening and closing statements demonstrate that the government had neither the intention nor the evidence to establish that Ho's actions were undertaken "in order to assist [a] domestic concern." To the contrary, the government repeatedly asserted that Ho worked to "obtain business *for a multibillion-dollar Chinese oil company*"—that is, CEFC Energy. A109 (emphasis added); *see also, e.g.,* A109 (government opening: "The defendant schemed to pay them millions of dollars of cash and wire transfers, along with offering them a cut of future profits -- again, all *in an effort to obtain business for the Chinese oil company*." (emphasis added)); A111 (government opening: "You'll learn that the defendant is a citizen of China, and during these schemes *he was working on behalf of a multibillion-dollar Chinese company called CEFC China Energy*, or just CEFC for short." (emphasis added)). *See also* A436 (government closing: "The

defendant also made this clear in email after email. *He referred to 'we,' CEFC China Energy Company*." (emphasis added)); A438 (government closing: "A few months later the defendant summarized another meeting with Kutesa, again here in New York, and he emphasized that Kutesa is more than happy to assist us, *meaning the CEFC oil company* . . . ." (emphasis added)); A438 (government closing: "So there just cannot be any dispute that *the defendant's interests*, focused in both Chad and Uganda, *was exclusively on business and business for CEFC*" (emphasis added)); A440 (government closing: "He wanted to influence the top officials of both countries to take actions *for CEFC's benefit*. Not in dispute." (emphasis added)); A470 (government closing: "About a week later the defendant *and others at CEFC* had considered that menu of Uganda options, and they had decided that *CEFC's first priority* would be to buy a bank." (emphasis added)). Not once did the government identify a domestic concern that Ho allegedly assisted to obtain or retain business. The government's theory of the case *foreclosed* a conviction under § 78dd-2.

Because there was no evidence that Ho's allegedly wrongful actions were taken "in order to assist" any domestic concern, and the government's own theory, repeatedly argued to the jury, was that he had acted to assist CEFC Energy, the convictions on Counts 2 and 3 for violating § 78dd-2 must be vacated.

**POINT II**

**HO'S CONVICTIONS ON COUNTS 6 AND 8 MUST BE VACATED BECAUSE THE JURY WAS ERRONEOUSLY CHARGED ON SPECIFIED UNLAWFUL ACTIVITIES AND THE STATUTE DOES NOT COVER THE WIRES AT ISSUE**

The money laundering convictions also fail as a matter of law because the jury may have relied on an offense that is not a specified unlawful activity under the statute, and because the convictions are based on a transaction that does not satisfy the statutory requirement that funds be transferred *to* or *from* a place in the United States.

**A. A Violation of § 78dd-3 Does Not Qualify as a Specified Unlawful Activity**

Count 8 alleged that Ho violated 18 U.S.C. § 1956(a)(2)(A) in connection with the Uganda Scheme. Section 1956(a)(2)(A) makes it a crime to transmit funds "with the intent to promote the carrying on of ***specified unlawful activity*** . . . ." (Emphasis added.) Section 1956(c)(7) defines "specified unlawful activity" to include "(D) . . . any felony violation of the Foreign Corrupt Practices Act." Count 8 identified the specified unlawful activity as "(a) the violations of the Foreign Corrupt Practices Act charged in Counts Three and Five of this indictment, and (b) offenses against a foreign nation (Uganda) involving bribery of a public official." *See* A98-99 ¶ 12.

24

Ho's conviction under Count 8 cannot stand because the offense charged in Count 5, a violation of § 78dd-3, is not a specified unlawful activity under § 1956(c)(7). In 1992, when Congress amended § 1956(c)(7) to add the Foreign Corrupt Practices Act as a specified unlawful activity (Pub. L. No. 102-550, § 1534, 106 Stat. 3672 (1992)), Congress was referring only to §§ 78dd-1 and 78dd-2—not § 78dd-3, which was added to the Foreign Corrupt Practices Act six years later, in 1998. *See* International Anti–Bribery and Fair Competition Act of 1998, Pub. L. No. 105-366, § 4, 112 Stat. 3302 (1998). Under the longstanding principles of the reference canon, § 1956(c)(7)'s reference to the Foreign Corrupt Practices Act means the Act as it existed when that reference was written. As stated by the Supreme Court in *Jam v. Int'l Fin. Corp.*, --- U.S. ---, 139 S. Ct. 759, 769 (2019), which was decided after the trial in this case:

> According to the "reference" canon, when a statute refers to a general subject, the statute adopts the law on that subject as it exists whenever a question under the statute arises. 2 J. Sutherland, Statutory Construction §§ 5207-5208 (3d ed. 1943). . . . In contrast, ***a statute that refers to another statute by specific title or section number in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted, without any subsequent amendments.*** [Citation omitted.] [Emphasis added.]

*See also, e.g., Hassett v. Welch*, 303 U.S. 303, 314 (1938) (referring to the "well settled canon" of construction that "[w]here one statute adopts the particular provisions of another by a specific and descriptive reference to the statute or provisions adopted, . . . [s]uch adoption takes the statute as it exists at the time of

25

adoption and does not include subsequent additions or modifications [of] the statute so taken unless it does so by express intent.") (internal quotations and citations omitted); *Curtis Ambulance of Florida v. Board of County Comm'rs*, 811 F.2d 1371, 1378-79 (10th Cir. 1987) (applying same rule and citing authority).

The reference canon thus establishes that a violation of § 78dd-3 is not a specified unlawful activity for purposes of § 1956(a)(2), because Congress's specific reference to the Foreign Corrupt Practices Act in § 1956(c)(7) manifested an intention to incorporate the FCPA as it existed in 1992, when the reference was added to the statute. Had Congress intended to incorporate future amendments to the FCPA, it had ample means to do so—but it did not. Congress might have specified that it was referring to the Foreign Corrupt Practices Act "as it may be amended from time to time."[8] Or, it might have amended § 1956(c)(7) at a later date

---

[8]     Congress has done precisely this in other contexts. *See, e.g.*, An Act to Amend Sections 4, 7, and 17 of the Reclamation Project Act of 1939, Pub. L. No. 79-39, § 2, 59 Stat. 75 (1945) (amending § 7(c) of the Reclamation Project Act of 1939 to indicate that "amendments providing for repayment of construction charges in a period of years longer than authorized by this Act, *as it may be amended*, shall be effective only when approved by Congress."); Pub. L. No. 78-328, § 9, 58 Stat. 269 (1944), An Act to Amend Section 451 of the Tariff Act of 1930, and for other purposes ("Any company or any agent or broker guilty of violating any of the provisions of this Act shall be subject to the provisions of sections 3 and 36, respectively, and *as may be amended*, of Chapter II, Public, Numbered 824, Seventy–sixth Congress, known as the Fire and Casualty Act, approved October 9, 1940 (54 Stat. 1066 and 1079 . . .)").

to include § 78dd-3.[9]  Or, it might have added title and section numbers, so that the definition of "specified unlawful activity" would be clear.  (Most of the specified unlawful activities are designated by section numbers.  *See* § 1956(c)(7).)  Congress did none of these, and § 1956(c)(7)'s reference to the Foreign Corrupt Practices Act cannot be stretched to refer to provisions that did not exist when Congress enacted that reference.

The jury was charged that to find Ho guilty under Count 8, it had to find beyond a reasonable doubt that he acted with the intent to promote the carrying on of specified unlawful activity, and that the "specified unlawful activity" could include Count 5.  A550.  Ho objected to the inclusion of Count 5 in the instruction. *See* A427-28, A430; Dkt.169 at 2-3; Dkt.200 at 4; *see* SPA38-39 (overruling Ho's objection).  The jury may have reached its verdict on the legally erroneous theory that the wire promoted a violation of § 78dd-3.

---

[9]     Congress has amended § 1956(c)(7) thirteen times since enacting § 78dd-3, often adding new specified unlawful activities.  *See, e.g.*, American Home Ownership and Economic Opportunity Act of 2000, Pub. L. No. 106-569, § 709(a), 114 Stat. 2944 (2000) (adding "any violation of section 543(a)(1) of the Housing Act of 1949 (relating to equity skimming)"); USA Patriot Act of 2001, Pub. L. No. 107-56, § 315, 115 Stat. 272 (2001) (amending § 1956(c)(7) by adding several specified unlawful activities); Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. No. 109-164, § 103(b)(3), 119 Stat. 3558 (2006) (same); North Korea Sanctions and Policy Enhancement Act of 2016, Pub. L. No. 114-122, § 105(c)(2), 130 Stat. 93 (2016) (same).

Just as a conviction for a conspiracy that has multiple objects, at least one of which is legally defective, cannot stand, even though there would be sufficient evidence to uphold the verdict on the other, legally valid, objects, *see, e.g.*, *Yates v. United States*, 354 U.S. 298, 312 (1957); *Williams v. N. Carolina*, 317 U.S. 287, 292 (1942); *Stromberg v. California*, 283 U.S. 359, 368 (1931); *see also Griffin v. United States*, 502 U.S. 46, 53-56 (1991); *United States v. Garcia*, 992 F.2d 409, 415-16 (2d Cir. 1993), a conviction for money laundering that has legally defective specified unlawful activities is fatally flawed. As this Court explained in *Garcia*:

> [W]hen disjunctive theories are submitted to the jury and the jury renders a general verdict of guilty, appeals based on evidentiary deficiencies must be treated differently than those based on legal deficiencies. If the challenge is evidentiary, as long as there was sufficient evidence to support one of the theories presented, then the verdict should be affirmed. However, if the challenge is legal and any of the theories was legally insufficient, then the verdict must be reversed.

992 F.2d at 416. *Garcia* applies four-square here. There were disjunctive theories submitted to the jury—that the wire was in furtherance of violations of (i) § 78dd-2, (ii) § 78dd-3, and (iii) Ugandan bribery law—and the jury was told that it could convict if it found the wire was in furtherance of any one of them. At least the second was legally deficient, because § 78dd-3 is not a specified unlawful activity. The conviction must therefore be reversed.[10]

---

[10]     If the Court agrees that the conviction for violation of § 78dd-2 with respect to the Ugandan Scheme (*i.e.*, Count 3) must be vacated, *see supra* Point I, then

**B.      A Wire that Merely Passes Through the United States Is Not Covered by § 1956(a)(2)(A)[11]**

Ho's conviction under Count 8 cannot stand for a second reason:  The government failed to prove that the relevant wire transfer was either "to" or "from" the United States.  Section 1956(a)(2)(A) only applies to the transmission of funds (a) "*from* a place in the United States to or through a place outside the United States" or (b) "*to* a place in the United States from or through a place outside the United States."  (Emphasis added.)  Under § 1956, "a transfer of funds from [one] place to another, by wire or any other means, shall constitute a single, continuing transaction."  18 U.S.C. § 1956(i)(3).  Under the plain terms of the statute, a transfer of funds does not violate § 1956(a)(2)(A) if it merely passes "through" the United States.  That is precisely what occurred here, where the $500,000 wire to the Ugandan charity was a single, continuing, transaction from Hong Kong to Uganda, which does not satisfy § 1956(a)(2)(A)'s requirements.

---

Count 3 could not serve as a specified unlawful activity for Count 8.  *See United States v. Truesdale*, 152 F.3d 443, 449 (5th Cir. 1998) (money laundering convictions must be reversed if they require proof that money was proceeds of gambling scheme in violation of § 1955 and the § 1955 conviction is reversed for lack of proof that there was any violation of that statute).

[11]      Ho moved to dismiss the money laundering counts both before and after trial.  *See* Dkt.62-64, Dkt.218.  As the facts about the wires were not in dispute, this was entirely an argument about the meaning of § 1956(a)(2)(A).  The Court's review of the district court's decisions is therefore *de novo*.  *See, e.g.*, *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006) ("We review questions of statutory interpretation de novo.").

1.    Established Principles of Statutory Interpretation Show that the Wire
     from Hong Kong to Uganda Is Outside the Ambit of § 1956(a)(2)(A)

The wire transfer from Hong Kong to Uganda was neither "to" nor "from" the

United States.  Words in a statute must be given their ordinary meaning.  *See, e.g.*,

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 407 (2011); *Gross v.*

*FBL Fin. Servs.*, 557 U.S. 167, 175 (2009) ("Statutory construction must begin with

the language employed by Congress and the assumption that the ordinary meaning

of that language accurately expresses the legislative purpose") (internal quotation

marks omitted); *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("When

terms used in a statute are undefined, we give them their ordinary meaning.").

Passing "through" a correspondent bank in the United States is not the same

as coming "from" or going "to" the United States.  Dictionary definitions establish

the distinct meanings of "from," "to," and "through."  "From" indicates a starting

point, not a midpoint.  *See, e.g.*, *The American Heritage College Dictionary* 557 (4th

ed. 2004) (first definition of "from": "Used to indicate a specified place or time ***as a***

***starting point***: walked home from the station") (emphasis added); *Webster's Ninth*

*New Collegiate Dictionary* 490 (1988) (first definition of "from": "used . . . to

indicate a ***starting point***: as (1) a place where a physical movement begins")

(emphasis added).  "To" indicates movement toward and reaching, not passing,

another point.  *The American Heritage College Dictionary* 1445 (4th ed. 2004) (first

definition of "to": "[i]n a direction toward ***so as to reach***.") (emphasis added);

30

*Webster's Ninth New Collegiate Dictionary* 1238 (1988) (first definition of "to": "used . . . to indicate movement . . . toward a place . . . or thing ***reached***") (emphasis added).

By contrast, "through" denotes continuing movement. *The American Heritage College Dictionary* 1436 (4th ed. 2004) ("through": "[i]n one side and out the opposite or another side" or "[b]y way of."); *Webster's Ninth New Collegiate Dictionary* 1230 (1988) ("used . . . to indicate movement into at one side or point and out at another"; "by way of"). One would not say that one was coming "from New York" when one's train from Boston to Washington stops in New York along the way; rather one would say that one was going "from" Boston, "to" Washington, and "through" New York.

That § 1956(a)(2)(A) uses all three terms in the very same clause shows that they have distinct meanings, and that Congress specifically intended those terms to signify distinct situations. *See, e.g.*, *Crockett Telephone Co. v. FCC*, 963 F.2d 1564, 1570 (D.C. Cir. 1992) (concluding use of different words "may" and "shall" in same sentence of statutory provision confirms they have different meanings). Section 1956(a)(2)(A) proscribes certain wires going "from" a place in the United States "to or ***through***" a place outside the United States, and it proscribes certain wires going "to" a place in the United States "from or ***through***" a place outside of the United

31

States.  The use of these three words in the same statute, indeed, the same clause, establishes that they have separate meanings.

The government's alternative interpretation—that anytime a transfer goes "through" the United States, it also goes "to" it and "from" it—would render the term "through" superfluous, and thereby "violate[] the well-known canon of statutory construction that a statute should not be construed to render a word or clause inoperative." *United States v. Peterson*, 394 F.3d 98, 106 (2d Cir. 2005). "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *See Nwozuzu v. Holder*, 726 F.3d 323, 327 (2d Cir. 2013) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987)).  It is thus significant that § 1956(a)(1), which is part of the same act of Congress as § 1956(a)(2), does apply to transfers that merely pass "through" a financial institution in the United States.  Section 1956(a)(1) proscribes certain types of "transaction[s]," a term defined in § 1956(c)(3) to include a "payment, transfer, or delivery by, ***through***, or to a financial institution."  18 U.S.C. § 1956(c)(3) (emphasis added).  Unlike § 1956(a)(1), § 1956(a)(2)(A) applies only to transfers "to" or "from" the United States and not to transfers that are "through" a U.S. financial institution.

32

If there were any ambiguity in the statute, the rule of lenity in the interpretation of criminal statutes would require the ambiguity to be resolved in the defendant's favor. *See generally United States v. Santos*, 553 U.S. 507, 514 (2008) (applying rule of lenity to interpretation of the Money Laundering Control Act with respect to interpretation of the term "proceeds": "From the face of the statute, there is no more reason to think that 'proceeds' means 'receipts' than there is to think that 'proceeds' means 'profits.' Under a long line of our decisions, the tie must go to the defendant.").

      2.    *United States v. Harris* Confirms This Interpretation

This application of established principles of statutory interpretation is reinforced by this Court's decision in *United States v. Harris*, 79 F.3d 223 (2d Cir. 1996). The defendant in that case was charged with violating § 1956(a)(2)(B)(i), which prohibits international transfers made to conceal funds, and shares the same "from a place in the United States . . . or to a place in the United States" language found in § 1956(a)(2). The defendant argued that a transfer of funds via wire from an account in New York to an account in Connecticut, and then from the account in Connecticut to an account in Switzerland, should be regarded as two separate transfers. If viewed as separate, neither transfer violated the statute, because the first transfer was entirely domestic (from a place in the United States and to a place in the United States) and the second was not made for the purpose of concealing the

33

funds. The Second Circuit rejected that theory, explaining that because the two wires were merely "stages" in "a single plan to transfer funds," the transfer was "from New York to Switzerland." *Harris,* 79 F.3d at 231; *see also United States v. Dinero Express, Inc.*, 313 F.3d 803, 806 (2d Cir. 2002) ("a multi-step plan to transfer money from one location to another should be viewed as a single 'transfer' under § 1956(a)(2)") (citing *Harris*); *United States v. Moloney*, 287 F.3d 236, 241 (2d Cir. 2002) ("We have previously held that sequences of steps taken as part of a common scheme constitute one transaction for purposes of the money laundering statute.") (citing *Harris*); *United States v. Hawit*, No. 15-cr-252, 2017 WL 663542, at *8 n.12 (E.D.N.Y. Feb. 17, 2017) ("Section 1956(a)(2) . . . by its terms applies to money laundering transactions that ***originate*** or ***terminate*** in the United States . . . ." (emphasis added)). The same analysis applies here: The alleged transfers were parts of a single plan arising from a single customer instruction directing money ***from*** Hong Kong ***to*** Uganda. Although the transfer briefly passed ***through*** the United States, it was neither ***to*** it nor ***from*** it under § 1956(a)(2)(A).

The defendant in *Harris* was making precisely the argument that the government makes here, seeking the opposite outcome. In *Harris*, the defendant sought to divide one transfer into two separate transactions to avoid § 1956, because if so divided, the first transaction (from New York to Connecticut) was entirely domestic, and the second transaction (from Connecticut to Switzerland) was made

without the requisite intent.  The Second Circuit rejected that argument.  Here, the government seeks to divide one transfer into two separate transactions to fit into § 1956, because if so divided, the first transaction would qualify as "to" the United States, and the second transaction would qualify as "from" the United States.  But just as this Court rejected the defendant's theory in *Harris*, it should reject the government's identical theory here: the wire transfer was "a single plan to transfer funds" that does not satisfy the statute.

The district court relied on *United States v. Daccarett*, 6 F.3d 37 (2d Cir. 1993), to reach the opposite conclusion.  *See* SPA13 (ruling that the allegations were "clearly sufficient" under *Daccarett*, and stating that in that case "[t]he Court, in the analogous context of a civil forfeiture proceeding, found that correspondent bank wires involved discrete financial transactions 'to' and 'from' the United States rejecting the argument made here that such wires merely pass 'through the United States.'").  But, rather than interpreting § 1956(a)(2)'s specific language, *Daccarett* interpreted the forfeiture statutes to hold that electronic funds transfers ("EFTs") were "seizable properties" under 21 U.S.C. § 881(6), and 18 U.S.C. § 981(a)(1)(A). *Daccarett* stated that "[w]ith each EFT at least two separate transactions occurred: first, funds moved from the originating bank to the intermediary bank; then the intermediary bank was to transfer the funds to the destination bank."  6 F.3d at 54. That process was relevant in *Daccarett* to the issue of whether the funds were present

in the United States, even temporarily, so that they could be seized. But the question in this case is not how EFT transactions work, or whether an EFT is a *res* for purposes of the forfeiture statutes, but whether a wire transfer from Hong Kong to Kampala that passes through correspondent banks in the United States constitutes a transaction "to" and "from" the United States under § 1956(a)(2). *Daccarett* has nothing to say on that matter. *Harris* does.

The district court declined to follow *Harris*, *see* SPA16, but its reason for doing so was wrong. The district court ruled that *Harris* "does not particularly support [the defendant's] position," because in *Harris* "the Court was attributing the defendant's intent to conceal to both legs of the transaction. It wasn't really considering the argument that the defendant makes here." *Id.* But *Harris* expressly addressed the issue here—whether to view a wire from point A to point C, that stops on the way at point B, as a single transaction or as two separate transactions—and stated that it did not view the transaction as having two "legs" that could be analyzed separately: "[W]e do not interpret the movements of funds from New York to Connecticut and then from Connecticut to Switzerland as two separate events." 79 F.3d at 231.

## C.  The Legal Defects Underlying Count 8 Are Fatal to Count 6

Count 6 alleged a conspiracy to engage in money laundering, in violation of 18 U.S.C. § 1956(h), and the specified unlawful activities identified in Count 6

included the charged violations of Counts 4 and 5. As set forth above, the inclusion of Counts 4 and 5—which charge violations of § 78dd-3 with respect to the Chad and Uganda schemes, respectively—as specified unlawful activities for purposes of § 1956(a)(2)(A) constituted a legal error, and a legal error in an object of a conspiracy renders the conspiracy conviction invalid. *See, e.g.*, *Griffin,* 502 U.S. at 53-56; *Garcia*, 992 F.2d at 415-16.

## POINT III

### THE TRIAL COURT MADE EVIDENTIARY ERRORS THAT REQUIRE REVERSAL OF HO'S CONVICTIONS ON ALL COUNTS

The defense's theory of the case focused on Ho's *mens rea*. The defense argued that to the extent that Ho was aware of the alleged payments (the evidence was clear that he was aware of the payment underlying the Uganda Scheme, but it was not at all clear with respect to the Chad Scheme payment), he understood each payment to be a legitimate donation to generate goodwill for CEFC Energy, not a *quid pro quo*, as required by the FCPA. The trial court's evidentiary errors doomed that theory.[12]

---

[12] The district court's evidentiary rulings are reviewed under an abuse-of-discretion standard. *See, e.g.*, *United States v. Cummings*, 858 F.3d 763, 771 (2d Cir. 2017); *Manley v. AmBase Corp.*, 337 F.3d 237, 247 (2d Cir. 2003) ("We review a district court's evidentiary rulings for abuse of discretion and will reverse only for manifest error.") (citations omitted).

**A.    The District Court Erroneously Admitted Three Critical Pieces of Evidence**

1.    Déby's Two Out-Of-Court Statements About Cash Payments

That the Chadian president received cash from the CEFC delegation on December 8 was the most damning evidence against Ho, as demonstrated by the prosecutors' repeated emphasis of that allegation in their jury address.  *See, e.g.*, A108-09, A112, A114 (Openings); A433, A440, A443, A446, A452-53, A485 (Summations).  That the payment was in cash, rather than in the form of a wire transfer or check, was critical evidence that it was intended as a bribe rather than a donation because, the government argued, "[t]hat is not how major corporations donate money."  A446; *see also* A453 ("real multimillion dollar donations are sent by wire or check").  But the government offered no admissible evidence to prove that there had been a cash payment.  Lacking admissible evidence, the government instead relied on hearsay improperly to place purported facts before the jury.[13]

The only testimony of a cash payment came from Gadio, but Gadio never saw the cash; he was told of it by Déby, who may have never seen it himself, on

---

[13]    Notably, all of the statements at issue here might plausibly have been offered as co-conspirator statements pursuant to Rule 801(d)(2)(E) under the government's original theory of the case, which alleged that Gadio was a co-conspirator.  The government's decision to offer Gadio a non-prosecution agreement and embrace Gadio's testimony that he had not solicited a bribe created consequences that were perhaps unintended.

December 8 and December 9. *See* A293-95, A300, A350. Ho objected on hearsay grounds to Gadio's testimony about Déby's statements, but the court admitted the testimony on the grounds that Ho adopted the statements made at the December 9 meeting pursuant to Rule 801(d)(2)(B), *see* SPA19, and that Déby's statements to Gadio on December 8 were "in the same bucket because they were the statements of the president that Gadio will testify to. And, the statement that there was cash in the box was eventually adopted by the defendant." SPA21.

For an out-of-court statement to be admissible under Rule 801(d)(2)(B), a party must "manifest[] that it adopted or believed [the statement] to be true." Fed. R. Evid. 801(d)(2)(B). The manifestation must be established by a preponderance of the evidence, *see United States v. Harrison*, 296 F.3d 994, 1001 (10th Cir. 2002) (citing *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987)), and it must be clear. *See, e.g.*, *Nat'l Bank of N.A. v. Cinco Investors, Inc.*, 610 F.2d 89, 93-94 (2d Cir. 1979) (a "general admission that the matter had been mishandled" did not manifest specific belief as to the "truth or falsity" of claim regarding contractual obligation).

Déby's December 8 statement was plainly not admissible as an adoptive admission. There is no theory on which Ho could have manifested a belief in statements that he did not hear or respond to. The district court's finding that the December 8 statement was "in the same bucket" as the December 9 statement, *see*

39

SPA21, is wrong; the admission of the December 8 out-of-court statement cannot be piggybacked into evidence based on the December 9 statement.

As to Déby's December 9 statement: Ho's response to that statement, as relayed in Gadio's testimony, was that he was "impressed" by Déby's "reaction and [his] attitude, [his] rejection of the gift." A301. Ho's response is best interpreted as an effort to smooth things over diplomatically, or as a statement that Ho was and would have been impressed by Déby's rejection of any gift. It does not support an inference by a preponderance of the evidence that Ho adopted Déby's statement that the boxes contained cash. Particularly when coupled with the admission of the December 8 statement, the erroneous introduction of this evidence was prejudicial to Ho.

### 2.   Boubker's Text Message

The government's other critical piece of evidence—Boubker's text message to his father—was also plainly hearsay. The message stated, referring to "our friends in China," that "their attempt to buy the president to put us to the side did not work. Big companies dont like middle men its normal but they dont have a choice with us." A736. This was a classic out-of-court-statement offered for the truth of the matter asserted, and the district court's two rationales for admitting it—under the rule of completeness or as a prior consistent statement—were erroneous. *See* SPA31-32.

40

As to the court's first rationale: The "rule of completeness" on which the district court relied, codified as Federal Rule of Evidence 106, does not apply, because only the party adverse to the party who introduced a document "may require the introduction of any other part . . . that in fairness ought to be considered at the same time." Fed. R. Evid. 106. The rule does not permit the proponent of admissible evidence to bootstrap inadmissible evidence along with it, just so the evidence is "complete." *See id.*; *see also Boutros v. Avis Rent A Car Sys., LLC*, 802 F.3d 918, 925–26 (7th Cir. 2015).

The court's prior consistent statement rationale also fails: Boubker's text was not Gadio's "prior consistent statement," because the text contained Boubker's words, not Gadio's. Rule 801(d)(1)(B) applies only to a witness's prior statement, and Boubker was not a witness. The Rule does not provide an avenue for admitting a third party's (*i.e.,* Boubker's) out-of-court statement that arguably is consistent with the trial testimony of a witness (Gadio). *See id*. The Rule limits admission of a prior consistent statement to instances in which the declarant is available for cross-examination. Ho, however, had no opportunity to cross-examine Boubker.

3. The Government's Summary Charts

The government created two "summary charts," one for the "Chad Scheme," and the other for the "Uganda Scheme," that placed various events allegedly relevant to each scheme on a timeline (not drawn to scale), and summarized or quoted

41

portions of certain emails or text messages, placing them on the timeline, with their corresponding exhibit numbers. *See* A831-36, A837-47. The district court admitted the charts over Ho's objection, pursuant to Rule 1006. SPA34-35.

Rule 1006 permits the admission of charts summarizing admissible evidence that is too voluminous to be directly examined by the jury. *See* Fed. R. Evid. 1006 (summary charts are admissible "to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court"); *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004) ("[T]he purpose of [Rule 1006] is to reduce the volume of written documents that are introduced into evidence . . . ."); *United States v. Taylor*, 210 F.3d 311, 315 (5th Cir. 2000) (Rule 1006 applies to summary charts based on evidence that "is so voluminous that in-court review by the jury would be inconvenient"). For example, courts have found charts admissible under Rule 1006 as a replacement for otherwise admissible records of 1,300 medical billing transactions (*Janati*, 374 F.3d at 271-73) and for "four bankers boxes' worth" of mortgage transaction documents (*United States v. White*, 737 F.3d 1121, 1134 (7th Cir. 2013)). Charts may also be admitted where the underlying evidence, though admitted, is too voluminous to be conveniently examined by the jury, such as in *United States v. Casamento*, a seventeen-month trial involving "[m]ore than forty-thousand pages of trial transcript . . . thousands of exhibits and the testimony of more than 275 witnesses." 887 F.2d 1141, 1149 (2d

42

Cir. 1989); *see also United States v. Pinto*, 850 F.2d 927, 935 (2d Cir. 1988) (ten-week trial involving 66 wiretaps of calls placed to 35 phone numbers).

Rule 1006 does not, however, authorize the admission of summary charts created for the purpose of generating a narrative supporting the prosecution's theory of the case. The court arguably had the discretion to allow the charts to be used as demonstrative exhibits, pursuant to Rule 611(a). *See United States v. Bradley*, 869 F.2d 121, 123 (2d Cir. 1989) (noting parenthetically that "[c]are should be taken to distinguish between the use of summaries or charts *as evidence* pursuant to Rule 1006, and the use of summaries, charts or other aids *as pedagogical devices* to summarize or organize testimony or documents which have themselves been admitted in evidence."). But demonstrative exhibits are not admitted into evidence, and cannot be viewed by the jury during its deliberations. *See Janati*, 374 F.3d at 273 ("These 'pedagogical' devices are not evidence themselves, but are used merely to aid the jury in its understanding of the evidence that has already been admitted. . . . and in the end they are not admitted as evidence."); *Baugh ex rel. Baugh v. Cuprum S.A. de C.V.*, 730 F.3d 701, 708 (7th Cir. 2013) ("We would not allow a lawyer to accompany the jury into the deliberation room to help the jurors best view and

43

understand the evidence in the light most favorable to her client. The same goes for objects or documents used only as demonstrative exhibits during trial.").

The summary charts characterized materials that were in evidence and could easily have been examined by the jury, with all of the context and nuance contained therein, without relying on the government's summaries. The emails and text messages summarized in the government's charts consisted of only 71 documents related to the Chad Scheme plus translations (totaling 370 pages), and 62 documents related to the Uganda Scheme plus translations (totaling 399 pages), that had been admitted into evidence during a one-week trial and were readily available for the jury's consideration. The court should not have permitted the jury to review the government's edited and curated versions of these materials during its deliberations.

## B. The Evidentiary Errors Were Not Harmless

"In order to uphold a verdict in the face of an evidentiary error, it must be 'highly probable' that the error did not affect the verdict." *United States v. Dukagjini*, 326 F.3d 45, 61 (2d Cir. 2003) (quoting *United States v. Forrester*, 60 F.3d 52, 64 (2d Cir. 1995)). An "erroneous admission of evidence is harmless 'if the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury.'" *United States v. Al-Moayad*, 545 F.3d 139, 164 (2d Cir. 2008) (quoting *United States v. Garcia*, 291 F.3d 127, 142 (2d Cir. 2002)); *see also United States v. Stewart*, 907 F.3d 677, 688 (2d Cir. 2018). When the

44

evidentiary error involves the wrongful admission of testimony or documents, as it does here, "[t]he principal factors" in the harmless error "inquiry are 'the importance of the witness's wrongly admitted testimony' and 'the overall strength of the prosecution's case.'" *Dukagjini*, 326 F.3d at 62 (quoting *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000)); *see also United States v. Natal*, 849 F.3d 530, 537 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 276 (2017). Because the relevant evidence was central to the government's case, its erroneous admission requires reversal.

The hearsay testimony about Déby's statements was the only evidence that Déby had been given cash by the Chinese delegation, and the government emphasized in its jury address that the payment of cash—rather than remuneration in some other form, like a wire or a check—demonstrated the CEFC delegation's wrongful intent. A446-47 (arguing that it is "common sense" that corporations do not donate money in cash but "by wire transfer or formal check"); A453 ("real multi-million dollar donations are sent by wire or check to the national treasury . . . they're not paid in cash, stuffed into gift boxes.").

Boubker's text was similarly critical to the government's arguments to the jury. The defense theory of the case, which was supported by the letter drafted on December 10, following the Chinese delegation's meeting with Déby, was that the Chinese delegation intended to make a gift to the state of Chad, not to Déby. A575. In response, the government highlighted Boubker's text as a critical piece of

45

corroboration for Gadio's testimony, pointing to the text's reference to the payment as an "attempt to buy the president," as indication that the payment was intended for Déby, not the state of Chad. A455-56, A537, A542. It was the only documentary evidence that showed such an intention. That the government relied on the improperly admitted evidence in its addresses to the jury shows that the erroneous admission of the evidence was not harmless. *See Sheng v. M&TBank Corp.*, 848 F.3d 78, 85–86 (2d Cir. 2017) (finding evidentiary error not harmless where party referred to the erroneously admitted evidence in its jury address); *United States v. Okatan*, 728 F.3d 111, 121 (2d Cir. 2013) ("Accordingly, the court's instructions to the jury did not obviate the harm suffered as a result of Boucher's improperly admitted testimony and the emphasis that the government placed on that testimony in its closing.").

The harmful impact of the charts is best seen in connection with the chart that purported to summarize the Uganda Scheme. A837-47. The issue with respect to the Uganda Scheme was not whether money had been paid, but whether it had been paid "corruptly." The critical evidence relevant to Ho's *mens rea* were in the emails that he sent and received. To assess Ho's *mens rea* the jury should have assessed those emails. Instead, the jury assessed the government's gloss on them. The following examples demonstrate important points that the Uganda Chart obscured:

46

*October 10, 2014 email*:  Ho met with Kutesa for the first time on this date.  The government's chart stated simply:  "HO meets with PGA Sam Kutesa in New York."  A837.

The inference, of course, was that the meeting was about what became the "Uganda Scheme," but the cited email set forth the topics discussed at the meeting, and none of them related to the alleged scheme.  *See* A591.

*November 23, 2014 email*:  The government's chart noted simply, "HO provides a report to CEFC Chairman regarding HO's meeting with PGA Sam Kutesa in New York."  A838.

Once again, the chart does not indicate what the meeting was about, but the report itself (A593-600) sets forth details of the meeting, which the jury might have examined.  Had they done so, they would have seen that the meeting primarily concerned UN affairs.  A594-96.

*March 17, 2015 email*:  Sam Kutesa's wife, Edith Kutesa, reached out to Ho by email shortly after Ho attended a party at Kutesa's home (*see* A607-08).  The government's chart notes, "Sam Kutesa's wife emails HO regarding business issues, including the possibility of acquiring a bank in Uganda."  A840.

On reading this entry, the jury may have believed that Mrs. Kutesa contacted Ho in the role of Mr. Kutesa's assistant, and that the subject matter of the email was a specific business opportunity offered for CEFC Energy, on which Mr. Kutesa might (rightly or wrongly) provide assistance.  In fact, the email reveals that Mrs. Kutesa is the Chief Executive Officer of a Ugandan company, MCash, and the

communication primarily concerned possible business between MCash and private entities in Hong Kong. A616-649.

> *April 20, 2016 email*: The government's chart described the last communication between Ho and either of the Kutesas before Ho recommended the payment of money to the Ugandan charity as follows: "Sam Kutesa's wife, copying Sam Kutesa, sends Ho the invitations to President Museveni's inauguration and conveys Sam Kutesa's advice regarding a meeting with President Museveni." A844.

One reading this description would not know what advice Sam Kutesa gave. The email shows that the advice was innocuous: "Regarding other team to bring for investment purpose, Sam suggests that we organise ourselves later when the new cabinet is put in place end May. He suggest that during the audience with the President you express your investment interest in area of your choice so that he can invite you later to participate." A680. The email was emphatic that there was no agreement that anything would be given to Ho or anyone else in exchange for the donation—that is, there was no *quid pro quo*. It stated: "Now there will be no commitment[,] no firm commitment." *Id.*

The interpretation of the actual emails is precisely the exercise that the jury should have engaged in. Given the far easier option of reviewing the government's summary of the emails, easy-to-read and attractively digested, it was almost inevitable that the jury would opt for that, and thus foreclose the very weighing of the evidence that juries are required to do. Unsurprisingly, the jury relied on the government's gloss on the evidence, in a form that communicated the government's

48

view of its case through cherry-picked quotes and characterizations. The charts were among the few documents that the jurors asked to have sent back to them in the jury room. AT552-53. The jury did not ask for or receive any of the communications referred to in the Uganda scheme chart. A554; *see* A637-47.

Through the charts, the government effectively, and improperly, "accompan[ied] the jury into the deliberation room." *Baugh*, 730 F.3d at 708 ("We would not allow a lawyer to accompany the jury into the deliberation room to help the jurors best view and understand the evidence in the light most favorable to her client. The same goes for objects or documents used only as demonstrative exhibits during trial."); *see also United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998) (observing that "a summary containing elements of argumentation could very well be the functional equivalent of a mini-summation by the chart's proponent every time the jurors look at it during their deliberations"). And, because the Uganda chart was the only evidence that the jury reviewed, the erroneous admission of the Uganda chart was far from harmless, as it cannot be said "with fair assurance" that the evidence did not substantially influence the jury.

## POINT IV

## COUNTS 1, 4 AND 5 SHOULD HAVE BEEN STRICKEN BECAUSE THEY ARE LEGALLY DEFECTIVE

The indictment was facially inconsistent on whether Ho was or was not a "domestic concern." The inconsistencies required that Counts 4 and 5 be stricken,

49

which would also have fatally undermined Count 1. Ho moved to dismiss those counts. *See* Dkt.62-64. Because the motion involved the question whether the indictment was facially defective, this Court reviews the district court's denial of the motion *de novo*. *See United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016).

## A. The Indictment Was Repugnant Because It Charged that Ho Was, and Was Not, a "Domestic Concern"

Counts 4 and 5 of the indictment charged Ho with violating § 78dd-3, with respect to the Chad and Uganda schemes, respectively. That section makes it a crime

> for any person ***other than . . . a domestic concern*** . . . while in the territory of the United States, corruptly to make use of the mails or any means or instrumentality of interstate commerce or to do any other act in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, . . . or authorization of the giving of anything of value to . . . any foreign official for purposes of [improperly influencing the foreign official] . . . in order to assist such person in obtaining or retaining business for or with, or directing business to, any person.

15 U.S.C. § 78dd-3(a)(1)(B) (emphasis added).[14] Yet, the indictment alleges three times that Ho was a domestic concern. *See* A85-86 ("the defendant, and others known and unknown, being a domestic concern and an officer, director, employee, and agent of a domestic concern[,] and a stockholder thereof, . . ."), A90 (same), A91 (same). Those allegations are fatal to Counts 4 and 5: The grand jury that found

---

[14] "Domestic concern" is defined in § 78dd-2(h)(1), which was quoted above, *see supra* note 7.

probable cause that Ho was a domestic concern could not also find probable cause that he had violated § 78dd-3, which expressly excludes domestic concerns.

The government argued that the indictment's allegations that Ho was a domestic concern "merely reflects the pleading policy in this district to plead in the conjunctive." SPA9-10. But no pleading policy can excuse a facially defective indictment. Although citation errors in indictments may be overlooked or corrected, *see, e.g.*, *United States v. Kumar*, 617 F.3d 612, 622 (2d Cir. 2010); Fed. R. Crim. P. 7(c)(2) (citation errors generally not a ground for dismissal of an indictment unless misleading), the grand jury's finding that Ho was a domestic concern was not that. It was an assertion of fact that pertained directly to the indictment's allegations that Ho violated § 78dd-2, which makes it criminal for "a domestic concern" to do certain acts. *See* 15 U.S.C. § 78dd-2 (quoted *supra* at n.6).

The indictment is thus "repugnant," because it contains "contradiction between material allegations." *United States v. Cisneros*, 26 F. Supp. 2d 24, 52 (D.C. Cir. 1998) (quoting *United States v. Briggs*, 54 F. Supp. 731, 732 (D.D.C. 1944), and citing *Cohen v. Wilhelm*, 63 F.2d 543, 545 (3d Cir. 1933)). *See also United States v. Bethea*, 483 F.2d 1024, 1029-31 (4th Cir. 1973) (guilty verdicts on charges of failure to keep the draft board notified of current address and failure to report for physical exam and induction were contradictory and required a new trial). The contradiction is between the indictment's several allegations that Ho was a

51

domestic concern, and the counts that allege that he violated § 78dd-3, which does not apply to a domestic concern.

The government ultimately disclaimed the allegation that Ho was a domestic concern. *See* A105. But that does not cure the error in the grand jury. The government cannot change its theory mid-stream and contradict the grand jury's finding that Ho was a domestic concern, which is flatly inconsistent with its indictment of Ho for violations of § 78dd-3.[15]

## B. Sections 78dd-2 and 78dd-3 Are Mutually Exclusive

Even if the indictment did not allege that Ho was a domestic concern, he could not be prosecuted under both §§ 78dd-2 and 78dd-3 because Congress intended the two sections to be mutually exclusive. As noted above, § 78dd-3 was added to the FCPA in 1998, approximately 20 years after § 78dd-2. *See supra* at 25; Foreign Corrupt Practices Act of 1977, Pub. L. No. 95-213, § 104, 91 Stat. 1494 (1977). The reason it was added was to include within the ambit of the FCPA persons who were not already covered by it. Thus, the Senate Committee Report for § 78dd-3 states that

> Section 4 creates a new section in the FCPA [§ 78dd-3] providing for criminal and civil penalties ***over persons not covered under the existing FCPA provisions regarding issuers and domestic concerns***.

---

[15]  Ho sought to inspect the instructions that were given to the grand jury, but the district court denied the request. SPA10-11.

S. Rep. No. 105-277, at *5 (1998) (emphasis added). The Report also explains that it was the express purpose of the 1998 amendments to bring the coverage of the FCPA to the level required by the Organization for Economic Cooperation and Development Convention on Combatting Bribery of Foreign Public Officials in International Business Transactions (the "OECD Convention") by expanding the coverage of the FCPA to include those who previously had been beyond its scope:

> [T]he OECD Convention calls on parties to cover 'any person'; the current FCPA covers only issuers with securities registered under the 1934 Securities Exchange Act and "domestic concerns." The Act, therefore, expands the FCPA's coverage to include all foreign persons who commit an act in furtherance of a foreign bribe while in the United States.

*See id.* at *2-3.

In *United States v. Hoskins*, 902 F.3d 69 (2d Cir. 2018), in the course of conducting an analysis under *Gebardi v. United States*, 287 U.S. 112 (1932), this Court undertook a thorough review of the language, structure, and legislative history of the FCPA to determine exactly to whom each provision of the FCPA applied, mindful that "Congress drew lines in the FCPA out of specific concern about the scope of the extraterritorial application of the statute." *Hoskins,* 902 F.3d at 83. The Court relied on, among other things, the Committee Report, which showed that Congress "carefully" clarified which foreign nationals would "fall within one of the three categories" of the statute. *Id.* at 91. In the course of its analysis, the Court described the scope of §§ 78dd-1, 78dd-2, and 78dd-3. *See id.* at 84-85. Referring

53

to § 78dd-3, the Court indicated that it applied to "foreign persons (including foreign nationals and most foreign companies) *not within any of the aforementioned categories* who violate the FCPA while present in the United States." *Id.* at 85 (emphasis added.) That analysis is precisely correct, and controls here.

The district court (which did not have the benefit of *Hoskins* when it decided Ho's pretrial motions) noted that § 78dd-3 specifically exempts "domestic concern[s]," not their "officers, directors, or agents," and thus ruled that such persons might be prosecuted under both §§ 78dd-2 and 78dd-3. SPA8-10. That holding is contrary to *Hoskins*, and it would lead to the anomalous result that a domestic concern that is an entity (such as a corporation organized in the United States) that engaged in criminal wrongdoing could be prosecuted only under § 78dd-2, whereas its agents who effectuated the wrongdoing on its behalf could be prosecuted under both §§ 78dd-2 and 78dd-3. This violates the principle that entities are criminally liable for the acts of their agents undertaken in the course of their agency. *See, e.g.*, *United States v. Ionia Mgmt., SA*, 555 F.3d 303, 309 (2d Cir. 2009); *United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 660 (2d Cir. 1989), *aff'd*, 926 F.2d 227 (2d Cir. 1991); *United States v. Agosto-Vega*, 617 F. 3d 541, 553-53 (1st Cir. 2010).

Where the scope of a criminal statute is ambiguous, the statute must be narrowly interpreted. *See, e.g.*, *Moskal v. United States*, 498 U.S. 103, 108 (1990)

54

(rule of lenity applies where "a reasonable doubt persists about a statute's intended scope"); *United States v. Valle*, 807 F.3d 508, 523 (2d Cir. 2015) ("where, as here, the Government and the defense both posit plausible interpretations of a criminal statute, the rule of lenity requires us to adopt the defendant's construction"). It is a plausible (at least) interpretation of § 78dd-3 that it does not apply to officers, directors, or agents of domestic concerns. The interpretation is therefore compelled here.

## C. The Legal Defects Underlying Counts 4 and 5 Are Fatal to Count 1

Count 1 charges a conspiracy in violation of 18 U.S.C. § 371. The objects of the conspiracy were to violate §§ 78dd-2 and 78dd-3. *See* A85-88 ¶¶ 2, 3. Because the counts of the indictment that charge Ho with violating § 78dd-3 are legally defective, a conspiracy count that identifies the violation of § 78dd-3 as an object of a conspiracy is defective.

## **Conclusion**

For the foregoing reasons, (1) the judgment of conviction should be vacated, (2) Counts 1, 4, 5, 6, and 8 should be dismissed, and (3) the Clerk of the Court should be directed to enter a judgment of acquittal as to Counts 2 and 3.

Dated:  July 10, 2019

Respectfully submitted,

By:   */s/ Benjamin E. Rosenberg*

DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Tel.: (212) 698-3622
Fax: (212) 698-3599
benjamin.rosenberg@dechert.com
katherine.wyman@dechert.com

KRIEGER KIM & LEWIN LLP
500 Fifth Avenue, 34th Floor
New York, New York 10110
Tel.: (212) 390-9550
Edward.Kim@KKLllp.com
Jonathan.Bolz@KKLllp.com

*Attorneys for Appellant Chi Ping Patrick Ho*

## CERTIFICATE OF COMPLIANCE

Pursuant to the Federal Rules of Appellate Procedure 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation.

1.     This brief complies with the type-volume limitation of Second Circuit Local Rule 32.1, because this brief contains 13,583 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate procedure 32(a)(6), because this brief has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

Dated: July 10, 2019                              /s/ Benjamin E. Rosenberg
                                                  *Counsel for Appellant Chi Ping*
                                                  *Patrick Ho*

## CERTIFICATE OF SERVICE

I certify that, on July 10, 2019, a copy of the foregoing Brief of Defendant-Appellant Chi Ping Patrick Ho was filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit and served on the parties through the Court's electronic filing system. I further certify that all parties required to be served have been served.

Dated: July 10, 2019

/s/ Benjamin E. Rosenberg
*Counsel for Appellant Chi Ping Patrick Ho*

# No. 19-761

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

UNITED STATES OF AMERICA,

*Appellee,*

v.

CHI PING PATRICK HO, AKA PATRICK C.P. HO

*Defendant-Appellant.*

## BRIEF OF DEFENDANT-APPELLANT
## CHI PING PATRICK HO

On Appeal from the United States District Court for the Southern District of
New York, No. 1:17-cr-779, Hon. Loretta A. Preska

### SPECIAL APPENDIX

EDWARD Y. KIM
JONATHAN F. BOLZ
KRIEGER KIM & LEWIN LLP
500 Fifth Avenue, 34th Floor
New York, New York 10110
Tel.: (212) 390-9550

BENJAMIN E. ROSENBERG
KATHERINE M. WYMAN
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3622

*Attorneys for Chi Ping Patrick Ho*

## TABLE OF CONTENTS

**Page**

Judgment Filed March 27, 2019 (ECF No. 226) ............................................... SPA1

Excerpt of Motion to Dismiss Hearing Transcript, July 19, 2018 (pp. 15-19, 31-36) ........................................................................................................ SPA6

Excerpt of Pretrial Conference Transcript, Nov. 14, 2018 (pp. 45-47).......... SPA18

Order re In Limine Motions (ECF No. 188) .................................................... SPA22

Excerpt of Trial Transcript, Nov. 28, 2018 (pp. 293-94) .............................. SPA30

Excerpt of Trial Transcript, Nov. 29, 2018 (pp. 481-82) .............................. SPA33

Excerpt of Trial Transcript, Dec. 3, 2018 (pp. 927-28).................................. SPA36

Memo Endorsement Denying Letter Motion for Judgment of Acquittal (ECF No. 219) ............................................................................. SPA40

15 U.S.C. § 78dd-2........................................................................................ SPA41

15 U.S.C. § 78dd-3........................................................................................ SPA48

18 U.S.C. § 1956 .......................................................................................... SPA53

AO 245B (Rev. 02/18)    Judgment in a Criminal Case   (form modified within District on February 22, 2019)
Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA<br>**v.**<br><br>CHI PING PATRICK HO | ) **JUDGMENT IN A CRIMINAL CASE**<br>)<br>)<br>) Case Number:  1:17CR00779-01 (LAP)<br>)<br>) USM Number:  76101-054<br>)<br>) Edward Kim<br>) Defendant's Attorney |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☑ was found guilty on count(s)    One, Two, Three, Four, Five, Six, and Eight
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18USC371 | Conspiracy to Violate the Foreign Corrupt Practices Act | 1/31/2017 | 1 |
| 15USC78dd-2(a)(1)(A),<br>78dd-2(a)(1)(B), | Violation of the Foreign Corrupt Practices Act | 1/31/2017 | 2-5 |

    The defendant is sentenced as provided in pages 2 through _____5_____ of this judgment.  The sentence is imposed pursuant to
the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)    Seven

☐ Count(s) _____ ☐ is  ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence,
or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution,
the defendant must notify the court and United States attorney of material changes in economic circumstances.

3/25/2019
Date of Imposition of Judgment

_Loretta A. Preska_
Signature of Judge

Loretta A. Preska, Senior U.S.D.J.
Name and Title of Judge

_March 26, 2019_
Date

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3-27-19

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 1A

| | Judgment—Page | 2 | of | 5 |

DEFENDANT:   CHI PING PATRICK HO
CASE NUMBER:   1:17CR00779-01 (LAP)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 78dd-2(a)(3)(A), | | | |
| 78dd-2(a)(3)(B), | | | |
| 78dd-2(g)(2)(A), and | | | |
| 18USC2 | | | |
| 18USC1956(h) | Conspiracy to Commit Money Laundering | 1/31/2017 | 6 |
| 18USC1956(a)(2)(A) & 2 | Money Laundering | 1/31/2017 | 8 |

**SPA2**

AO 245B (Rev. 02/18)   Judgment in Criminal Case
Sheet 2 — Imprisonment

|  | Judgment — Page | 3 | of | 5 |

DEFENDANT:  CHI PING PATRICK HO
CASE NUMBER:  1:17CR00779-01 (LAP)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

36 MONTHS

☑   The court makes the following recommendations to the Bureau of Prisons:

That the defendant be designated to a facility as close as possible to the Metropolitan New York area.

☑   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____ ☐ a.m. ☐ p.m. on _____ .

    ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐   before 2 p.m. on _____ .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**SPA3**

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

|  | Judgment — Page | 4 | of | 5 |
|---|---|---|---|---|

DEFENDANT: CHI PING PATRICK HO
CASE NUMBER: 1:17CR00779-01 (LAP)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **JVTA Assessment*** | **Fine** | **Restitution** |
|---|---|---|---|---|
| **TOTALS** | $ 700.00 | $ | $ 400,000.00 | $ |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss**\*\* | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| **TOTALS** | $            0.00 | $            0.00 |  |

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐  the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐  the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B  (Rev. 02/18)  Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page  5  of  5

DEFENDANT:   CHI PING PATRICK HO
CASE NUMBER:   1:17CR00779-01 (LAP)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $  700.00  due immediately, balance due

    ☐  not later than _____ , or
    ☑  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☑ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties:

    The payment of the fine shall be paid in full within 12 months of the imposition of sentencing.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

I7J5hoA

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                          17 Cr. 779 (LAP)

 5   CHI PING PATRICK HO, a/k/a
     "Patrick C.P. Ho," a/k/a "He
 6   Zhiping,",

 7
                    Defendant.
 8   ------------------------------x

 9
                                           July 19, 2018
10                                         3:00 p.m.

11
     Before:
12
                         HON. LORETTA A. PRESKA,
13
                                           District Judge
14
                              APPEARANCES
15
     GEOFFREY S. BERMAN
16        United States Attorney for the
          Southern District of New York
17   BY:   THOMAS MCKAY
           DANIEL C. RICHENTHAL
18         DOUGLAS S. ZOLKIND
           Assistant United States Attorneys
19             -AND-
     PAUL A. HAYDEN
20   U.S. Department of Justice (DC)

21   DECHERT, LLP
          Attorneys for Defendant
22   BY: ANDREW J. LEVANDER
         BENJAMIN E. ROSENBERG
23       KATHERINE M. WYMAN
              -AND-
24   KRIEGER, KIM & LEWIN, LLP
     BY: EDWARD Y.K. KIM
25       JONATHAN L. BODANSKY
```

**SPA6**

I7J5hoA

1    Court to infer, for anyone reading it to infer, that was what

2    the grand jury found.  Because the grand jury made that finding

3    and because domestic concerns are exempt from dd-3, Dr. Ho

4    should not be charged with Counts Four and Five.  If, in fact,

5    what the government is saying is that, well, apart from his

6    being the domestic concern he somehow engaged in activity that

7    makes him fall within dd-3, then the Court should order that

8    the grand jury minutes be available for inspection to see if

9    the grand jury in fact made that analysis that the government

10   suggests.

11           Thank you.

12           THE COURT:  Anything to add?

13           MR. ZOLKIND:  No, your Honor.

14           THE COURT:  Thank you.

15           Counsel, as we have discussed, the indictment alleges

16   Dr. Ho's participation in two schemes, the Chad scheme and the

17   Uganda scheme.  Each scheme is subject to two counts in the

18   indictment.  Count Two alleges that the Chad scheme violates

19   Section dd-2 and Count Four alleges that the Chad scheme

20   violates Section dd-3.  Similarly, Count Three alleges that the

21   Uganda scheme violates Section dd-2 and Count Five alleges that

22   the Uganda scheme violates Section dd-3.

23           As we have discussed here today, the FCPA's

24   prohibitions are set forth in 78dd-1, dd-2, and dd-3.  dd-2

25   applies to any domestic concern other than an issuer which is

I7J5hoA

1      subject to Section dd-1, and to any officer, director, employee

2      or agent of such domestic concern or any stockholder thereof,

3      acting on behalf of the domestic concern, and the statute

4      permits, among other things, any use or means of interstate

5      commerce in furtherance of certain specified, corrupt acts.  A

6      domestic concern is defined as any individual who is a citizen,

7      national, or resident of the United States, or any entity with

8      its principal place of business in the United States, or

9      organized under any laws of any U.S. state or territory.

10             Section dd-3, as we have discussed, applies to any

11     person other than one, an issuer that is subject to

12     Section dd-1; or two, a domestic concern as defined in

13     Section dd-2, and to any officer, director, employee, or agent

14     of such person, or any stockholder thereof acting on behalf of

15     such person, and it makes it unlawful for such person to engage

16     in specified corrupt acts while in the territory of the United

17     States.  Importantly, the qualifying language applicable to the

18     term "any person" under Section dd-3, does not include

19     officers, directors, or agents of domestic concerns.

20     Similarly, the qualifying language only applies to any person,

21     it does not apply to officers, directors, or agents of any such

22     person.

23             As we have heard, the defendant contends that because

24     the indictment states that he is a domestic concern under dd-2,

25     he cannot also be charged under dd-3, which applies to persons

**SPA8**

I7J5hoA

1    other than domestic concerns.  In so arguing, the defendant

2    refers to paragraphs 2, 5, and 6 of the indictment, and with

3    respect to Counts Four and Five.

4         As we have discussed, the defendant argues that the

5    legislative history of Section dd-3 shows that the provision

6    was intended to broaden the scope of the FCPA to cover persons

7    and entities not already covered.  The government acknowledges

8    that Dr. Ho is not himself a domestic concern, that is, he is

9    not a citizen, national, or resident of the United States.  As

10   counsel told us, he is instead a citizen and national of China

11   and a resident of Hong Kong, which defense counsel

12   acknowledges.

13        The complaint, however, states that from 2014 to 2017,

14   the Energy NGO was a domestic concern and the defendant was an

15   officer, director, employee, and agent of a domestic concern

16   within the meaning of the FCPA.  As an officer, agent, etc.,

17   etc., of the Energy NGO, the defendant is properly charged

18   under subsection dd-2.  Subsection dd-3's text is unambiguous.

19   It excludes only issuers, subject to dd-1, and domestic

20   concerns as defined in dd-2.  It does not exclude officers,

21   directors, employees, etc., of a domestic concern.  So, based

22   on the clear statutory language, the defendant appears to come

23   under both statutes.

24        The government argues in response to defendant's

25   argument about the "finding" that he is a domestic concern, the

1    government argues that the recitation in the indictment that

2    the defendant is a domestic concern and an officer, director,

3    employee, etc. of a domestic concern, merely reflects the

4    pleading policy in this district to plead in the conjunctive.

5    Whatever the policy, though, charging this defendant under

6    subdivisions 2 and 3 is not inconsistent.  As we discussed

7    during our argument, these are factual findings to be made by

8    the jury and the jury will be instructed under dd-2 and dd-3,

9    it will make whatever findings it makes.

10            With respect to counsel's suggestion that we should

11   look at the grand jury minutes, we all know that the proper

12   functioning of our grand jury system depends on the secrecy of

13   the grand jury proceedings.  Accordingly, a person seeking

14   access to the grand jury minutes must demonstrate a

15   particularized need for pertinent portions of the transcript.

16   Here, defendant has done little else other than refer to the

17   indictment's recitation of the statutory language as a

18   suggestion that perhaps the grand jury was confused.  Well,

19   first, as the government has pointed out in its papers, the

20   grand jury doesn't necessarily have to receive instructions;

21   but secondly, under the unambiguous terms of the two statutes,

22   in this instance with this defendant, charging him under dd-2

23   and dd-3 is not necessarily inconsistent.  Accordingly, I find

24   that the defendant has not made the particularized need

25   required to inspect the grand jury minutes.  Accordingly, the

 1    defendants' motion to dismiss Counts One and Four through

 2    Eight, is denied.

 3            Who wants to be heard on money laundering?

 4            MR. ROSENBERG:  Your Honor, I am up for it again.

 5            THE COURT:  You are going to be exhausted,

 6    Mr. Rosenberg.

 7            MR. ROSENBERG:  Well, your Honor, there was much

 8    discussion about the plain language of the statute in the

 9    earlier discussion of the FCPA and I think that that discussion

10    is pertinent here.

11            The defendant is charged in Counts Seven and Eight

12    with violating 1956(a)(2)(A) and as the Court knows that makes

13    it a crime to transport, transmit, or transfer funds from a

14    place in the United States to or through a place outside the

15    United States, or to a place in the United States from or

16    through a place outside the United States with the intention to

17    promote a specified unlawful activity.

18            There is, and I would respectfully submit there

19    absolutely must be a distinction between, a difference between

20    the words "to," "from," and "through."  They are each used in

21    the statute and it is a fundamental principle of statutory

22    construction with which I know the Court is very, very, very

23    familiar that different words are intended to have different

24    meanings.  The wires at issue here were plainly through the

25    United States, therefore they were not from it nor to it.

I7J5hoA

```
 1                So, unless the Court has any further questions.
 2                THE COURT:  Thank you.
 3                Counsel, as we know, defendant argues that Counts Six
 4      through Eight do not adequately allege violation of the money
 5      laundering statute.  As we have discussed, the defendant claims
 6      that his wire transfers from Hong Kong did not go "to" the
 7      United States or "from"  The United States.  The government
 8      notes, however, that the evidence at trial is expected to show
 9      that each of these wires went from Hong Kong to New York, and
10      then from New York to Dubai or Uganda.
11                As we have all acknowledged, an indictment is
12      sufficient if it contains the elements of the offense charged
13      and fairly informs the defendant of the charge against which he
14      must defend and enables him to plead an acquittal or conviction
15      in bar of future prosecutions for the same offense.  As we have
16      noted, Section 1956(a)(2)(A) makes it unlawful to "transport,
17      transmit, or transfer a monetary instrument or funds from a
18      place in the United States to or through a place outside the
19      United States, or to a place in the United States, from or
20      through a place outside the United States with certain intent."
21                Thus, there are two straightforward elements.  A
22      defendant must have, (1), transmitted or transferred a monetary
23      instrument or funds from a place in the United States to or
24      through a place outside the United States; or to a place in the
25      United States from or through a place outside the United
```

**SPA12**

I7J5hoA

1   States, (2) with intent to promote the carrying on of specified

2   unlawful activities.  And my friend Judge Berman found that in

3   *United States v. Zarrab*.

4          Here the indictment explicitly alleges that the

5   defendant "agreed to transmit or cause to be transmitted"

6   (Count Six) and "transmitted and caused to be transmitted"

7   (Count Seven around Eight) funds from China to and through the

8   United States, and from the United States to foreign

9   countries,"  And that those transfers furthered the alleged

10  bribery schemes.  Clearly, the indictment alleges the elements

11  of the charged money laundering offenses and sufficiently

12  informs the defendant of the charges against which he must

13  defend.

14          I would say that that is the end of the story.  In

15  light of defendant's arguments, however, we go on and discuss

16  whether or not the applicable wires were from a place in the

17  United States or to a place in the United States.  The

18  indictment is clearly sufficient because it alleges that the

19  defendant transmitted funds both to the United States and from

20  the United States.

21          Moving away from the technical sufficiency of the

22  indictment, the defendant argues that the government's evidence

23  would be insufficient to demonstrate that the wire transfers at

24  issue went from a place in the United States or to a place in

25  the United States.

**SPA13**

I7J5hoA

1          The government sets out evidence of three wire

2    transfers that it expects to offer at trial on page 19 of its

3    brief.  I will spare the court reporter reading all of the

4    various transfers that are alleged here, but counsel and I have

5    discussed the first one, the March 25, 2015 transfer which went

6    from HSBC Hong Kong to HSBC New York, from HSBC New York to

7    Mashreq Bank New York, from Mashreq Bank New York, to Mashreq

8    Bank Dubai.  Clearly, that was a wire transfer from outside the

9    United States to the United States and a wire transfer from the

10   United States to a place outside of the United States.

11          This is clearly sufficient under Second Circuit

12   precedent.  In *United States v. Daccarett*, 6 F.3d 37, 54 (2d

13   Cir. 1993).  The Court, in the analogous context of a civil

14   forfeiture proceeding, found that correspondent bank wires

15   involved discrete financial transactions "to"  And "from" the

16   United States rejecting the argument made here that such wires

17   merely pass "through the United States."

18          With your permission, counsel, I will instead of

19   reading the blocked quote that the government read, I will mark

20   it for the court reporter and that is from 6 F.3d at 54.

21          *The claimants' conception of the intermediary banks as*

22          *messengers who never hold the goods, but only pass the*

23          *word along, is inaccurate.  On receipt of EFTs from*

24          *the originating banks, the intermediary banks possess*

25          *the funds, in the form of bank credits, for some*

**SPA14**

I7J5hoA

1           *period of time before transferring them on to the*

2           *destination banks.  While claimants would have us*

3           *believe that modern technology moved the funds from*

4           *the originating bank through the intermediary bank to*

5           *their ultimate destination without stopping, that was*

6           *not the case.  With each EFT, at least two separate*

7           *transactions occurred:  First, funds moved from the*

8           *originating bank to the intermediary bank; then the*

9           *intermediary bank was to transfer the funds to the*

10          *destination bank . . . . While the two transactions*

11          *can occur almost instantaneously, sometimes they are*

12          *separated by several days. Each of the amounts at*

13          *issue was seized at the intermediary bank after the*

14          *first transaction had concluded and before the second*

15          *had begun.*

16          As noted, the District Court in Washington, D.C.

17     similarly addressed this issue in *United States v. All Assets*

18     *Held at Bank Julius Baer & Co., LTD,* 571 F.Supp.2d 1 (D.D.C.

19     2008)  The Court there rejected the argument being made here

20     that the transactions, through a correspondent bank, should be

21     surround as a single transfer.  In so doing, the Court in D.C.

22     relied upon the Second Circuit's decision in *Daccarett*.  See

23     also, *United States v. All Assets Held At Bank Julius Baer &*

24     *Co., Ltd.*, 251 F.Supp. 3d 82 (D.D.C. 2017); *United States v.*

25     *Prevezon Holdings, Ltd.*, 251 F.Supp. 3d 684, 693 (S.D.N.Y.

**SPA15**

I7J5hoA

1    2017).

2              As the government has noted, the case relied upon by

3    the defendant, *United States v. Harris*, 79 F.3d 223 (2d Cir.

4    1996) does not particularly support his position.  I would

5    never accuse anyone on the Court of Appeals of perhaps using

6    less than precise language, but it was clear that in that case

7    the Court was attributing the defendant's intent to conceal to

8    both legs of the transaction.  It wasn't really considering the

9    argument that the defendant makes here.

10             I will just note, in passing, that the defendant has

11   also argued that the money laundering prosecution here violates

12   his due process rights based on whether it is the ricochet

13   theory, the speeding bullet theory, but the theory that the

14   three wires momentarily passed through the United States.  At

15   this stage it does seem to be premature because the government

16   is not required to set out the nature of the nexus to the

17   United States in the indictment.  Nevertheless, however, the

18   government has detailed the evidence that it expects at trial

19   to establish that the defendant's offense conduct had multiple

20   and substantial connections to the United States.

21             At this point it suffices to say that the indictment

22   is valid on its face and if one wants to address the violation

23   of due process argument, the expectation of the evidence the

24   government notes is more than sufficient to find that this

25   prosecution is not a violation of the defendant's due process

36

I7J5hoA

1   rights.  Accordingly, defendant's motion to dismiss Counts Six,

2   through Eight, is denied.

3         Okay.  Are we going to switch horses for suppression?

4         MR. KIM:  We are, your Honor.

5         THE COURT:  All right, counsel.

6         MR. KIM:  Hopefully, with different results.

7         THE COURT:  Mr. Kim.

8         MR. KIM:  Good afternoon, your Honor.

9         THE COURT:  Good afternoon, sir.

10        MR. KIM:  It is about a little over four years ago, in

11  another courtroom, a prosecutor stood up and argued that

12  Supreme Court precedent addressing non-digital technology just

13  had to apply to digital technology, and that case was *Riley v.*

14  *California.*  In that case the government argued that the search

15  incident to arrest doctrine applied to modern smartphones.  The

16  Supreme Court rejected that argument and it found that it was a

17  mechanical application of precedent to digital technology and

18  that was 10 years after *Patane.*

19        Just recently in *Carpenter v. United States* the

20  government tried to make a similar argument and they argued

21  that non-digital precedent should be applied to digital

22  technology if the context of cell site location information.

23  And again the Supreme Court rejected that argument and noted

24  that digital technology is qualitatively different, and the

25  government position many that case failed to contend with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**SPA17**

IBE5hoC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                          17 Cr. 779 )LAP)

5   CHI PING PATRICK HO,

6              Defendant.

7   ------------------------------x

8                                         November 14, 2018
                                          10:00 a.m.
9

10  Before:

11                    HON. LORETTA A. PRESKA,

12                                        District Judge

13

14                    APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    BY:  DOUGLAS S. ZOLKIND
17       DANIEL C. RICHENTHAL
         CATHERINE E. GHOSH
18       Assistant United States Attorneys

19  PAUL HAYDEN, US DOJ Fraud Section

20  DECHERT, LLP
         Attorneys for Defendant
21  BY: BENJAMIN E. ROSENBERG
         KATHERINE M. WYMAN
22       -and-
    KRIEGER, KIM & LEWIN, LLP
23  BY: EDWARD Y.K. KIM
         JONATHAN L. BODANSKY
24       JONATHAN BOLZ

25

IBE5hoC                           conference

1    agreement.  That is a basis for cross-examination but it is not

2    a basis for conclusion.

3          THE COURT:  All right.  Anything else on this point?

4          MR. ROSENBERG:  No, your Honor.

5          MR. KIM:  No, your Honor.

6          THE COURT:  Certainly we have all agreed, I think,

7    that Gadio may testify about his observations of the events of

8    December of 2014 including, for example, that neither the

9    defendant nor any of his associates had ever mentioned a

10   donation until after being excoriated by President Déby.  With

11   respect to the statements of President Déby that defendant has

12   objected to, the defendant certainly adopted statements under

13   801(d)(2)(B).  As related by counsel, certainly when the

14   president excoriated them the next morning he said those gift

15   boxes had cash in them.  Even if Gadio's testimony is only that

16   the defendant said I was impressed by your rejection of the

17   boxes, that can only make sense in the context of adopting the

18   president's statement that the boxes had cash in them.  So, I

19   will permit the statements of the president under 801(d)(2)(B).

20   As we have already said, I think, and agreed, Gadio may say

21   that he did not believe that it was a donation.  I will reserve

22   on the last portion and that is whether he may, under 701 or

23   otherwise, state his opinion that what was going on there was a

24   bribe.

25         What do you want to do next, friends?

IBE5hoC                        conference

1          MR. ROSENBERG:  Your Honor, can I --

2          MR. ZOLKIND:  Your Honor, I apologize.  Can I ask in

3     terms of clarifying?

4          THE COURT:  Sir.

5          MR. ZOLKIND:  What the Court is allowing us and what

6     the Court is reserving on?  I understand Gadio can say that he

7     didn't believe the explanation that it was a bribe.  I take it

8     from that, but I want to make sure, that he can explain that as

9     he viewed it, it is something offered personally to the

10    president and the Court is reserving on whether he can use the

11    "B" word, that he understood it was a bribe.

12         THE COURT:  Right.  Correct.

13         MR. ROSENBERG:  Your Honor, may I?

14         THE COURT:  Yes, sir.

15         MR. ROSENBERG:  May I ask for another clarification?

16         THE COURT:  Yes, sir.

17         MR. ROSENBERG:  We divided in our brief the statements

18    that one day President Déby made to Dr. Gadio, the defendant

19    wasn't present, and the statements next day.  Your Honor has

20    ruled on the statements the next day on the theory of adopted

21    admission.

22         Are those the only statements that are admitted?

23         THE COURT:  I'm sorry, Mr. Rosenberg, I just didn't

24    hear the last sentence.

25         MR. ROSENBERG:  Are those the only statements of

IBE5hoC                              conference

1    President Déby's that are admitted?

2              THE COURT:  No.  I think the controversial ones were

3    the cash statements, and because the defendant adopted the

4    proposition that there was cash in the boxes, the president's

5    statements as to that may come in and the rest of it comes in

6    purely as context and to tell the story.

7              MR. ROSENBERG:  And, your Honor, my question is does

8    that include statements of the prior day?

9              THE COURT:  Yes, sir.

10             MR. ROSENBERG:  That they were not made to Dr. Gadio?

11             THE COURT:  Yes, sir; because they're in the same

12   bucket because they were the statements of the president which

13   Gadio will testify to.  And, the statement that there was cash

14   in the box was eventually adopted by the defendant.

15             What else, friends?

16             MR. ROSENBERG:  I understand the Court's ruling.  Very

17   well.

18             THE COURT:  What do you want to do next, friend?

19             MR. ZOLKIND:  Your Honor, there are obviously a number

20   of other motions.  I think two of the significant ones -- well,

21   there is maybe three additional significant ones.

22             THE COURT:  What if I go through the ones I have and

23   then you can tell me what you want?

24             MR. ZOLKIND:  Absolutely.

25             THE COURT:  All right.

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA,           :
                                    :
                Plaintiff,          :          17 Cr. 779 (LAP)
                                    :
        -against-                   :
                                    :          ORDER
                                    :
CHI PING PATRICK HO,                :
                                    :
                Defendant.          :
                                    :
------------------------------------x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #
DATE FILED: 11-21-18

LORETTA A. PRESKA, Senior United States District Judge:

On November 14, 2018, the Court held a final pretrial conference (the "Conference").

For the reasons stated on the record in the minutes of the Conference, Defendant Chi Ping Patrick Ho's ("Ho") Motion in Limine to Preclude the Testimony of Gardner Walkup, dated Oct. 2, 2018 [dkt. no. 123] is denied.

For the reasons stated on the record in the minutes of the Conference, Ho's Motion in Limine to Preclude Evidence or Argument Concerning Statements Made by President Idriss Déby, dated Oct. 2, 2018 [dkt. no. 126] is denied.

For the reasons stated on the record in the minutes of the Conference, Ho's Motion in Limine to Preclude Dr. Cheikh Gadio from Characterizing the Payment to President Idriss Déby as a

1

**SPA22**

Bribe or Otherwise Opining on Defendant's State of Mind or
Intent, dated Oct. 2, 2018 [dkt. no. 128] is denied in part.  At
the Conference, the Court reserved on whether Dr. Cheikh Gadio
may testify that he understood Ho's $2 million cash payment to
President Idriss Déby to be a "bribe."  The Court now finds that
Gadio is not prohibited from so testifying.  Accordingly, dkt.
no. 128 is denied in its entirety.

Federal Rule of Evidence 701 provides, in relevant part,
that "testimony in the form of an opinion" is permitted if it
"is limited to one that is: (a) rationally based on the
witness's perception; [and] (b) helpful to clearly understanding
the witness's testimony or to determining a fact in issue." FED.
R. EVID. 701(a)-(b).  The Court of Appeals has noted that "the
first prong requires that a witness meet 'the familiar
requirement of first-hand knowledge or observation.'" United
States v. Urlacher, 979 F.2d 935, 939 (2d Cir. 1992) (citation
omitted).  "The second prong requires that the testimony be
helpful to the jury's clear understanding of the witness's
testimony." Id.

Federal Rule of Evidence 403 provides that "[t]he court may
exclude relevant evidence if its probative value is
substantially outweighed by a danger of one or more of the
following: unfair prejudice, confusing the issues, misleading

2

the jury, undue delay, wasting time, or needlessly presenting
cumulative evidence."  FED. R. EVID. 403.

Ho argues that Gadio's testimony as to his understanding
that the $2 million cash was, in his view, a "bribe" constitutes
lay opinion on an ultimate issue, and as such, it must be
precluded.  Defendant's Memorandum of Law in Support of His
Motion in Limine to Preclude Dr. Cheikh Gadio From
Characterizing the Payment to President Idriss Déby as a Bribe
or Otherwise Opining on Defendant's State of Mind or Intent,
dated Oct. 2, 2018 [dkt. no. 130], 6.  However, as the
Government correctly points out, lay opinion is "not
objectionable just because it embraces an ultimate issue."
Government's Letter, dated Nov. 18, 2018 [dkt. no. 180] (the
"Letter"), 1 (quoting FED. R. EVID. 704(a)); see also United
States v. Awadallah, 401 F. Supp. 2d 308, 313 (S.D.N.Y.
2005), aff'd, 436 F.3d 125 (2d Cir. 2006) ("[T]he fact that a
lay witness's opinion testimony might go to an ultimate issue in
this case does not, by itself, mean that it must be
precluded.").

Indeed, the Court is persuaded by the Government's
arguments in the Letter.  The Government represented that it
expects to admit at trial prior communications between Ho and
Gadio in which Gadio did the following:  "(i) referred to CEFC

3

providing 'secret or very confidential financial assistance
. . . to [President Déby] for his political campaigns in his
country'; and (ii) advised CEFC to 'reward [Déby] with a nice
financial package as an entry ticket in the Chadian oil market
. . . .'" Letter at 2.  The Court agrees with the Government
that precluding Gadio from testifying as to his full
understanding of the $2 million cash would be "particularly
problematic in this case" because Gadio would not be able to
explain "what he was suggesting (political support and an 'entry
ticket,' respectively) and what he was not suggesting (in his
view, a bribe), and to explain why the $2 million cash was not
consistent with his advice." Id.  In addition, the Court agrees
with the Government that "[i]t would be difficult or impossible
for Gadio to respond meaningfully" to cross-examination related
to these prior communications "in natural and comprehensible
language without using the word 'bribe.'" Id.

The Government also asserts that "it is not sufficient for
Gadio merely to testify that he did not believe the cash to be a
charitable donation" because "[s]uch testimony would leave open
the question of what he did believe the cash to be." Id.  The
Government explains that "while Gadio could conceivably attempt
to explain that he neither viewed the cash as a charitable
donation, nor political support, nor an 'entry ticket,' nor any
other form of legitimate payment, but as something else

4

entirely, it would be difficult for him to convey his understanding to the jury without using the word 'bribe.'"   Id. The Court agrees.  Precluding Gadio from using the word "bribe" would risk confusing the jury.  Id.  Finally, the Court finds that the probative value of Gadio's use of the word "bribe" is not "substantially outweighed by a danger of . . . unfair prejudice" to Ho.  FED. R. EVID. 403.  Accordingly, Gadio is not prohibited from testifying as to his understanding that the $2 million cash was, in his view, a "bribe" and dkt. no. 128 is denied in its entirety.  To the extent that Ho requests an instruction to the effect that the jury rely on the Court's instructions on the law as to the legal elements of bribery, the Court will consider it.

For the reasons stated on the record in the minutes of the Conference, the Government's Motions in Limine, dated Oct. 2, 2018 [dkt. no. 129] are granted in part.  The following evidence is admissible:  evidence that Ho would only contribute money to John Ashe if Ashe first agreed, in return, to undertake actions beneficial to CEFC's interests; and evidence of Ho's brokering Iranian transactions and arms transactions.  The following evidence is precluded:  evidence or argument concerning the "merits" of the projects Ho sought to advance through bribery or the alleged good causes toward which the officials he bribed could have used the bribe payments; and Ho's proffered testimony

5

of his expert, Professor William C. Kirby.  For the reasons
stated on the record in the minutes of the Conference, the
Government's Motions in Limine, dated Oct. 2, 2018 [dkt. no.
129] are also denied as moot in part for the following evidence
because the defense has stated that it has no intention of
presenting such evidence or argument:  evidence or argument that
the Government brought this case against Ho as part of a broader
campaign against China or that the timing of this prosecution,
in some way, suggests that it is part of the administration's
broader political agenda; evidence or argument concerning the
filing of a motion in this case pursuant to the Classified
Information Procedures Act or the provision of notice concerning
the Foreign Intelligence Surveillance Act; evidence or argument
concerning Ho's family background, health condition, age,
pretrial detention, or any other personal factor unconnected to
guilt and discussion of punishment; evidence or argument
concerning Ho's or CEFC's prior commission of "good acts,"
including philanthropic giving and other good deeds, or non-
commission of other bad acts; and evidence that CEFC NGO's
special consultive status with the U.N. or that that status
precludes it from having engaged in a bribery.  Defense counsel
is instructed to alert the Court prior to proffering the
following evidence so that it can be discussed:  evidence as to
Ho's view of the purpose of his work and its relation to China

and Chinese foreign policy; evidence as to Ho's background and professional activities; evidence as to the nature and mission of the CEFC NGO "in order to demonstrate Defendant's intent;" and evidence of the CEFC NGO'special consultive status.

As indicated on the record in the minutes of the Conference, the Court was advised at the Conference that reciprocal discovery pursuant to Federal Rule of Criminal Procedure 16(b), and any materials received pursuant to a Federal Rule of Criminal Procedure 17(c) subpoena, except to the extent that the Court has authorized ex parte production of such materials, have been produced.  Accordingly, the Government's Letter Motion, dated Oct. 19, 2018 [dkt. no. 147] is denied as moot.

For the reasons stated on the record in the minutes of the Conference, the Government's Second Motion in Limine, dated Nov. 6, 2018 [dkt. no. 163] is granted.

For the reasons stated on the record in the minutes of the Conference, Ho's Motion in Limine to Preclude the Testimony of Dr. Oriana Skylar Mastro, dated Nov. 8, 2018 [dkt. no. 165] is denied as moot.

For the reasons stated on the record in the minutes of the Conference, Ho's Motion *in Limine* to Preclude Testimony Regarding Certain Out-of-Court Declarations, dated Nov. 13, 2018 [dkt. no. 170] is denied.

SO ORDERED.

Dated:     New York, New York
           November 21, 2018

                                     _____
                                     LORETTA A. PRESKA
                                     Senior United States District Judge

8

**SPA29**

Ibs1ho1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        17 Cr. 779 (LAP)

5    CHI PING PATRICK HO,

6              Defendant.               Jury Trial

7    ------------------------------x
                                        New York, N.Y.
8                                       November 28, 2018
                                        9:36 a.m.
9

10   Before:

11                 LORETTA A. PRESKA
                                     District Judge
12

13                    APPEARANCES

14   GEOFFREY S. BERMAN
          United States Attorney for the
15        Southern District of New York
     BY:  DANIEL RICHENTHAL
16        DOUGLAS ZOLKIND
          CATHERINE GHOSH
17        PAUL HAYDEN
          Assistant United States Attorneys
18

19   BENJAMIN ROSENBERG
     EDWARD KIM
     KATHERINE WYMAN
20   JONATHAN BODANSKY
     JONATHAN BOLZ
21        Attorneys for Defendant

22   ALSO PRESENT:  Ryan Carey, F.B.I.
                    Aashna Rao, Paralegal
23                  Peter Calabrese, Paralegal

24

25

Ibs1ho1

1    put us on the side." For the purposes the government is

2    proffering, even if it were permissible, it should be excluded.

3           MR. ZOLKIND: Your Honor, if I can make one last

4    point, I think what would be misleading to the jury is if the

5    defense is allowed to cross-examine Gadio along the lines of,

6    you never called this a bribe until you started meeting with

7    the government, and I think that's very clearly the line of

8    cross-examination they want to do, and this message shows

9    clearly that Gadio viewed it as a bribe, or, as they put it, an

10   attempt to buy the president, two weeks after the event took

11   place. And so I think it squarely rebuts that line of

12   cross-examination.

13          THE COURT: Anything else?

14          MR. KIM: Your Honor, there are ways under the rules

15   for the government to do that, which would be calling the son,

16   or calling someone else to whom the defendant made the prior

17   consistent statement and having that declarant witness

18   available to be cross-examined about it. This is not the way

19   to do it.

20          THE COURT: Okay. First of all, the statement, it

21   seems to me, has to come in because of completeness,

22   particularly in light of Mr. Gadio's earlier text message in

23   the middle of this page.

24          Secondly, it does operate as a prior consistent

25   statement in light of the defense's obvious intention to

ibs1ho1                         C.T. Gadio - Direct

1   suggest that Mr. Gadio's testimony with respect to any

2   attempted bribe is a recent fabrication.  Accordingly, I'll

3   permit the third statement to come in.

4           And for the record, of course, the defense has not

5   challenged the first two statements.

6           What else, friends?

7           MR. ZOLKIND:  Nothing else from the government.

8           MR. KIM:  Nothing from us, your Honor.

9           THE COURT:  All right.  Why don't you run out if you

10  have to, and we'll check on the jury.  Thank you.

11          (Recess)

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

IBT7HO1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                              17 Cr. 779 (LAP

5   CHI PING PATRICK HO,

6              Defendant.

7   ------------------------------x
                                        New York, N.Y.
8                                       November 29, 2018
                                        9:30 a.m.
9

10  Before:

11                  LORETTA A. PRESKA
                                     District Judge
12

13                    APPEARANCES

14  GEOFFREY S. BERMAN
         United States Attorney for the
15       Southern District of New York
    BY:  DANIEL RICHENTHAL
16       DOUGLAS ZOLKIND
         CATHERINE GHOSH
17       PAUL HAYDEN
         Assistant United States Attorneys
18

19  BENJAMIN ROSENBERG
    EDWARD KIM
    KATHERINE WYMAN
20  JONATHAN BODANSKY
    JONATHAN BOLZ
21       Attorneys for Defendant

22  ALSO PRESENT:  Ryan Carey, F.B.I.
                   Aashna Rao, Paralegal
23                 Peter Calabrese, Paralegal

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

**SPA33**

IBT7HO1

1    that.  They would have to locate -- and, by the way, it can do

2    this if it wishes, so there is no unfair prejudice whatsoever.

3    These materials are totally admissible, and the defense

4    concedes.  But if it wished to do so, what it would have to do

5    is the following:  It would have to find exhibits -- all of

6    which are noted on there -- in multiple sources, in multiple

7    places.  Some of them are several pages long, some of them are

8    translated from Chinese or French.  It would then have to find

9    the part that relates to this scheme -- because as your Honor

10   knows there are plenty of parts that do not -- it then would

11   have to line it up temporally, that is, chronologically with

12   other exhibits, and so on and so forth.  This is an

13   extraordinarily painstaking process.  We know that because we

14   did it.  It is plainly admissible under 1006.

15              THE COURT:  Anything else, Mr. Rosenberg?

16              MR. ROSENBERG:  No, your Honor.

17              THE COURT:  OK.  Number one, the chart is clearly

18   admissible under 1006.  I will note that the government states

19   in its letter that it produced these charts to the defense on

20   November 19.  Today is November 29, and last night overnight

21   was the first we heard of any of this.

22              I will also note that the defense letter states a

23   couple of times there are certain inaccuracies in the chart.

24   To date, so far as I know, the inaccuracies the defense claims

25   have not been pointed out.  To the extent that the

IBT7HO1

1   characterizations are in any way inaccurate, apparently this

2   morning is the first time we have heard of that.

3           There is no reason we had to have this fire drill.

4   The defense shall confer with the government.  If there are any

5   complaints, you do it N-O-W, now; it is too late for this.

6   But, in any event, the chart is clearly admissible as to a

7   summary chart.

8           Usually the court gives an instruction to the jury

9   when receiving a chart under this rule that states that the

10  actual evidence is the underlying documents, which they will

11  have access to; the chart is merely something to assist them in

12  their deliberations.  If counsel wishes some different

13  instruction, let me know.  Anything else?

14          MR. RICHENTHAL:  Since we're all here and the jury's

15  not here, can I just put a couple things on the record now?

16          THE COURT:  Yes, please.

17          MR. RICHENTHAL:  First, in leaving court last night I

18  think a juror may have forgotten something, so after he had

19  left he came back, and he said to the government team you can

20  take the elevator first; we didn't say anything in response.

21  But in case he thinks we didn't say anything in response

22  because we're not nice people, could your Honor just maybe

23  remind the jurors that there is a reason we won't even say

24  thank you to them.

25          Second, last night the defense identified for us one

863

IC37HO1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          17 Cr. 779 (LAP

5   CHI PING PATRICK HO,

6            Defendant.

7   ------------------------------x
                                        New York, N.Y.
8                                       December 3, 2018
                                        9:30 a.m.
9

10  Before:

11                  LORETTA A. PRESKA
                                  District Judge
12

13                  APPEARANCES

14  GEOFFREY S. BERMAN
         United States Attorney for the
15       Southern District of New York
    BY:  DANIEL RICHENTHAL
16       DOUGLAS ZOLKIND
         CATHERINE GHOSH
17       PAUL HAYDEN
         Assistant United States Attorneys
18

19  BENJAMIN ROSENBERG
    EDWARD KIM
    KATHERINE WYMAN
20  JONATHAN BODANSKY
    JONATHAN BOLZ
21       Attorneys for Defendant

22  ALSO PRESENT:  Ryan Carey, F.B.I.
                   Aashna Rao, Paralegal
23                 Peter Calabrese, Paralegal

24

25

**SPA36**

Ic31ho2

1    advocated for the view that a defendant, as an agent, employee,

2    officer, etc. of a domestic concern, needs to be acting on

3    behalf of the domestic concern.  That's not the language in the

4    statute.  In fact, the statute is very, very clear.  The words

5    "on behalf of" occur at the end of the statute and modified the

6    word "stockholder" and only modified the word "stockholder."

7    *Hoskins* does not.  To the contrary, and indeed the structure of

8    the statute would make little sense if "on behalf of" was

9    deemed to modify the rest of it.

10            The government understands that the defendant also

11   raised a second *Hoskins* objection, which is that the jury

12   should be instructed with respect to category of persons

13   covered by the statute.  That objection we understand has been

14   mooted by the agreement to which the Court referred a couple

15   minutes ago, so we understand the only remaining objection is

16   what I'll call the "on behalf of" objection, and we believe

17   it's without merit for the reasons I've stated and also

18   described in our letter of a couple weeks ago.

19            THE COURT:  Do you want to respond to that?  Anything

20   more on that, Mr. Rosenberg?

21            MR. ROSENBERG:  No, your Honor.

22            THE COURT:  Thank you.

23            I agree with the government.  The statute is

24   completely plain that "acting on behalf of" modifies only

25   "stockholder" and does not modify officer, director, employee,

Ic31ho2

1 | or agent.  Accordingly, the objection is overruled.

2 |       MR. RICHENTHAL:  And the defendant also advanced an

3 | argument in his papers and again a moment ago that only one of

4 | the two subsections of the FCPA here applies on a money

5 | laundering statute.  That argument is also without merit.  The

6 | money laundering statute refers directly to the Foreign Corrupt

7 | Practices Act.  It doesn't distinguish between the two

8 | subsections in particular, and there's no basis in the statute,

9 | or, for that matter, in logic, to believe that Congress would

10 | have distinguished either.

11 |       THE COURT:  Anything more on that, Mr. Rosenberg?

12 |       MR. ROSENBERG:  Only, your Honor, to the point I made

13 | earlier.  Just so it's clear on the record, our position is

14 | that when the money laundering statute refers to Foreign

15 | Corrupt Practices Act, it included only 78dd-2.  It did not

16 | include 78dd-3.  Our position is the addition of 78dd-3 in 1998

17 | does not change the meaning of the money laundering statute.

18 |       THE COURT:  I disagree.  As counsel pointed out, the

19 | statute refers to the FCPA generally, and if the prohibited

20 | acts related only to statutes in effect at the time the statute

21 | was passed, then there would be zillions of statutes, different

22 | new drugs and the variety of other things which would not be

23 | included.  That is not the language of the statute.  The

24 | statute is clear that whatever the specified acts are at the

25 | time and place of the indictment are the ones that control.

Ic31ho2

1    Accordingly, the objection is overruled.

2              Is there anything else?

3              MR. RICHENTHAL:  The government only notes that our

4    nonobjection to the deletion of the standalone conscious

5    avoidance instruction was predicated, in our understanding,

6    that the defense does not intend in its summation tomorrow to

7    make arguments that are inconsistent with that provision.  If

8    the defense were to make arguments inconsistent with that, we

9    respectfully reserve the right to ask your Honor to put it back

10   in the instruction.

11             THE COURT:  Yes, sir.

12             Anything else, friends?

13             MR. RICHENTHAL:  I have a couple things off the record

14   but nothing on the charge, your Honor.

15             THE COURT:  Thank you.  Thank you for acting like

16   grownups.

17             (Discussion off the record)

18             MR. RICHENTHAL:  I'm sorry.  I forgot one thing.

19             In the defendant's letter of yesterday with respect to

20   *Hoskins*, he also objected to your Honor's aiding and abetting

21   instruction on grounds similar to the objection with respect to

22   conspiracy.  After conferring, it's our understanding that the

23   defendant believes that your Honor's aiding and abetting

24   instruction is accurate as written and does not have the

25   problems which he alluded to in his letter of yesterday and





Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036-6797
+1  212  698  3500  Main
+1  212  698  3599  Fax
www.dechert.com

**BENJAMIN E. ROSENBERG**

benjamin.rosenberg@dechert.com
+1 212 698 3622  Direct
+1 212 698 0495  Fax

December 18, 2018

**VIA ECF**

Honorable Loretta A. Preska
United States Courthouse
500 Pearl Street, Room 2220
New York, NY 10007-1312

     **Re:**   ***United States v. Chi Ping Patrick Ho*, 17 Cr. 779 (LAP)**

Dear Judge Preska:

In order to preserve all arguments as to the sufficiency of the evidence to convict Dr. Ho, we hereby move pursuant to Rule 29(c) for a judgment of acquittal on all counts of which Dr. Ho was convicted.

Respectfully,

*/s/ Benjamin E. Rosenberg*
   Benjamin E. Rosenberg

cc:    All counsel of record

*Denied*

SO ORDERED

LORETTA A. PRESKA
UNITED STATES DISTRICT JUDGE

12/19/18

> United States Code Annotated
>   Title 15. Commerce and Trade
>     Chapter 2B. Securities Exchanges (Refs & Annos)

15 U.S.C.A. § 78dd-2

§ 78dd-2. Prohibited foreign trade practices by domestic concerns

Effective: November 10, 1998

Currentness

**(a) Prohibition**

It shall be unlawful for any domestic concern, other than an issuer which is subject to section 78dd-1 of this title, or for any officer, director, employee, or agent of such domestic concern or any stockholder thereof acting on behalf of such domestic concern, to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to--

**(1)** any foreign official for purposes of--

**(A)**(i) influencing any act or decision of such foreign official in his official capacity, (ii) inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or (iii) securing any improper advantage; or

**(B)** inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality,

in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person;

**(2)** any foreign political party or official thereof or any candidate for foreign political office for purposes of--

**(A)**(i) influencing any act or decision of such party, official, or candidate in its or his official capacity, (ii) inducing such party, official, or candidate to do or omit to do an act in violation of the lawful duty of such party, official, or candidate, or (iii) securing any improper advantage; or

**(B)** inducing such party, official, or candidate to use its or his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality,

in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person; or

**(3)** any person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to any foreign official, to any foreign political party or official thereof, or to any candidate for foreign political office, for purposes of--

**(A)**(i) influencing any act or decision of such foreign official, political party, party official, or candidate in his or its official capacity, (ii) inducing such foreign official, political party, party official, or candidate to do or omit to do any act in violation of the lawful duty of such foreign official, political party, party official, or candidate, or (iii) securing any improper advantage; or

**(B)** inducing such foreign official, political party, party official, or candidate to use his or its influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality,

in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person.

**(b) Exception for routine governmental action**

Subsections (a) and (i) shall not apply to any facilitating or expediting payment to a foreign official, political party, or party official the purpose of which is to expedite or to secure the performance of a routine governmental action by a foreign official, political party, or party official.

**(c) Affirmative defenses**

It shall be an affirmative defense to actions under subsection (a) or (i) that--

**(1)** the payment, gift, offer, or promise of anything of value that was made, was lawful under the written laws and regulations of the foreign official's, political party's, party official's, or candidate's country; or

**(2)** the payment, gift, offer, or promise of anything of value that was made, was a reasonable and bona fide expenditure, such as travel and lodging expenses, incurred by or on behalf of a foreign official, party, party official, or candidate and was directly related to--

**(A)** the promotion, demonstration, or explanation of products or services; or

**(B)** the execution or performance of a contract with a foreign government or agency thereof.

**(d) Injunctive relief**

**(1)** When it appears to the Attorney General that any domestic concern to which this section applies, or officer, director, employee, agent, or stockholder thereof, is engaged, or about to engage, in any act or practice constituting a violation

of subsection (a) or (i) of this section, the Attorney General may, in his discretion, bring a civil action in an appropriate district court of the United States to enjoin such act or practice, and upon a proper showing, a permanent injunction or a temporary restraining order shall be granted without bond.

**(2)** For the purpose of any civil investigation which, in the opinion of the Attorney General, is necessary and proper to enforce this section, the Attorney General or his designee are empowered to administer oaths and affirmations, subpoena witnesses, take evidence, and require the production of any books, papers, or other documents which the Attorney General deems relevant or material to such investigation. The attendance of witnesses and the production of documentary evidence may be required from any place in the United States, or any territory, possession, or commonwealth of the United States, at any designated place of hearing.

**(3)** In case of contumacy by, or refusal to obey a subpoena issued to, any person, the Attorney General may invoke the aid of any court of the United States within the jurisdiction of which such investigation or proceeding is carried on, or where such person resides or carries on business, in requiring the attendance and testimony of witnesses and the production of books, papers, or other documents. Any such court may issue an order requiring such person to appear before the Attorney General or his designee, there to produce records, if so ordered, or to give testimony touching the matter under investigation. Any failure to obey such order of the court may be punished by such court as a contempt thereof. All process in any such case may be served in the judicial district in which such person resides or may be found. The Attorney General may make such rules relating to civil investigations as may be necessary or appropriate to implement the provisions of this subsection.

**(e) Guidelines by Attorney General**

Not later than 6 months after August 23, 1988, the Attorney General, after consultation with the Securities and Exchange Commission, the Secretary of Commerce, the United States Trade Representative, the Secretary of State, and the Secretary of the Treasury, and after obtaining the views of all interested persons through public notice and comment procedures, shall determine to what extent compliance with this section would be enhanced and the business community would be assisted by further clarification of the preceding provisions of this section and may, based on such determination and to the extent necessary and appropriate, issue--

**(1)** guidelines describing specific types of conduct, associated with common types of export sales arrangements and business contracts, which for purposes of the Department of Justice's present enforcement policy, the Attorney General determines would be in conformance with the preceding provisions of this section; and

**(2)** general precautionary procedures which domestic concerns may use on a voluntary basis to conform their conduct to the Department of Justice's present enforcement policy regarding the preceding provisions of this section.

The Attorney General shall issue the guidelines and procedures referred to in the preceding sentence in accordance with the provisions of subchapter II of chapter 5 of Title 5 and those guidelines and procedures shall be subject to the provisions of chapter 7 of that title.

**(f) Opinions of Attorney General**

**(1)** The Attorney General, after consultation with appropriate departments and agencies of the United States and after obtaining the views of all interested persons through public notice and comment procedures, shall establish a procedure to provide responses to specific inquiries by domestic concerns concerning conformance of their conduct with the Department of Justice's present enforcement policy regarding the preceding provisions of this section. The Attorney General shall, within 30 days after receiving such a request, issue an opinion in response to that request. The opinion shall state whether or not certain specified prospective conduct would, for purposes of the Department of Justice's present enforcement policy, violate the preceding provisions of this section. Additional requests for opinions may be filed with the Attorney General regarding other specified prospective conduct that is beyond the scope of conduct specified in previous requests. In any action brought under the applicable provisions of this section, there shall be a rebuttable presumption that conduct, which is specified in a request by a domestic concern and for which the Attorney General has issued an opinion that such conduct is in conformity with the Department of Justice's present enforcement policy, is in compliance with the preceding provisions of this section. Such a presumption may be rebutted by a preponderance of the evidence. In considering the presumption for purposes of this paragraph, a court shall weigh all relevant factors, including but not limited to whether the information submitted to the Attorney General was accurate and complete and whether it was within the scope of the conduct specified in any request received by the Attorney General. The Attorney General shall establish the procedure required by this paragraph in accordance with the provisions of subchapter II of chapter 5 of Title 5 and that procedure shall be subject to the provisions of chapter 7 of that title.

**(2)** Any document or other material which is provided to, received by, or prepared in the Department of Justice or any other department or agency of the United States in connection with a request by a domestic concern under the procedure established under paragraph (1), shall be exempt from disclosure under section 552 of Title 5 and shall not, except with the consent of the domestic concern, be made publicly available, regardless of whether the Attorney General responds to such a request or the domestic concern withdraws such request before receiving a response.

**(3)** Any domestic concern who has made a request to the Attorney General under paragraph (1) may withdraw such request prior to the time the Attorney General issues an opinion in response to such request. Any request so withdrawn shall have no force or effect.

**(4)** The Attorney General shall, to the maximum extent practicable, provide timely guidance concerning the Department of Justice's present enforcement policy with respect to the preceding provisions of this section to potential exporters and small businesses that are unable to obtain specialized counsel on issues pertaining to such provisions. Such guidance shall be limited to responses to requests under paragraph (1) concerning conformity of specified prospective conduct with the Department of Justice's present enforcement policy regarding the preceding provisions of this section and general explanations of compliance responsibilities and of potential liabilities under the preceding provisions of this section.

**(g) Penalties**

**(1)(A)** Any domestic concern that is not a natural person and that violates subsection (a) or (i) of this section shall be fined not more than $2,000,000.

**(B)** Any domestic concern that is not a natural person and that violates subsection (a) or (i) of this section shall be subject to a civil penalty of not more than $10,000 imposed in an action brought by the Attorney General.

**(2)(A)** Any natural person that is an officer, director, employee, or agent of a domestic concern, or stockholder acting on behalf of such domestic concern, who willfully violates subsection (a) or (i) of this section shall be fined not more than $100,000 or imprisoned not more than 5 years, or both.

**(B)** Any natural person that is an officer, director, employee, or agent of a domestic concern, or stockholder acting on behalf of such domestic concern, who violates subsection (a) or (i) of this section shall be subject to a civil penalty of not more than $10,000 imposed in an action brought by the Attorney General.

**(3)** Whenever a fine is imposed under paragraph (2) upon any officer, director, employee, agent, or stockholder of a domestic concern, such fine may not be paid, directly or indirectly, by such domestic concern.

**(h) Definitions**

For purposes of this section:

**(1)** The term "domestic concern" means--

**(A)** any individual who is a citizen, national, or resident of the United States; and

**(B)** any corporation, partnership, association, joint-stock company, business trust, unincorporated organization, or sole proprietorship which has its principal place of business in the United States, or which is organized under the laws of a State of the United States or a territory, possession, or commonwealth of the United States.

**(2)(A)** The term "foreign official" means any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality, or for or on behalf of any such public international organization.

**(B)** For purposes of subparagraph (A), the term "public international organization" means--

**(i)** an organization that is designated by Executive order pursuant to section 288 of Title 22; or

**(ii)** any other international organization that is designated by the President by Executive order for the purposes of this section, effective as of the date of publication of such order in the Federal Register.

**(3)(A)** A person's state of mind is "knowing" with respect to conduct, a circumstance, or a result if--

**(i)** such person is aware that such person is engaging in such conduct, that such circumstance exists, or that such result is substantially certain to occur; or

SPA45

**(ii)** such person has a firm belief that such circumstance exists or that such result is substantially certain to occur.

**(B)** When knowledge of the existence of a particular circumstance is required for an offense, such knowledge is established if a person is aware of a high probability of the existence of such circumstance, unless the person actually believes that such circumstance does not exist.

**(4)(A)** The term "routine governmental action" means only an action which is ordinarily and commonly performed by a foreign official in--

**(i)** obtaining permits, licenses, or other official documents to qualify a person to do business in a foreign country;

**(ii)** processing governmental papers, such as visas and work orders;

**(iii)** providing police protection, mail pick-up and delivery, or scheduling inspections associated with contract performance or inspections related to transit of goods across country;

**(iv)** providing phone service, power and water supply, loading and unloading cargo, or protecting perishable products or commodities from deterioration; or

**(v)** actions of a similar nature.

**(B)** The term "routine governmental action" does not include any decision by a foreign official whether, or on what terms, to award new business to or to continue business with a particular party, or any action taken by a foreign official involved in the decision-making process to encourage a decision to award new business to or continue business with a particular party.

**(5)** The term "interstate commerce" means trade, commerce, transportation, or communication among the several States, or between any foreign country and any State or between any State and any place or ship outside thereof, and such term includes the intrastate use of--

**(A)** a telephone or other interstate means of communication, or

**(B)** any other interstate instrumentality.

**(i) Alternative jurisdiction**

**(1)** It shall also be unlawful for any United States person to corruptly do any act outside the United States in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to any of the persons or entities set forth in paragraphs (1), (2), and

SPA46

(3) of subsection (a), for the purposes set forth therein, irrespective of whether such United States person makes use of the mails or any means or instrumentality of interstate commerce in furtherance of such offer, gift, payment, promise, or authorization.

**(2)** As used in this subsection, the term "United States person" means a national of the United States (as defined in section 1101 of Title 8) or any corporation, partnership, association, joint-stock company, business trust, unincorporated organization, or sole proprietorship organized under the laws of the United States or any State, territory, possession, or commonwealth of the United States, or any political subdivision thereof.

## CREDIT(S)

(Pub.L. 95-213, Title I, § 104, Dec. 19, 1977, 91 Stat. 1496; Pub.L. 100-418, Title V, § 5003(c), Aug. 23, 1988, 102 Stat. 1419; Pub.L. 103-322, Title XXXIII, § 330005, Sept. 13, 1994, 108 Stat. 2142; Pub.L. 105-366, § 3, Nov. 10, 1998, 112 Stat. 3304.)

Notes of Decisions (43)

15 U.S.C.A. § 78dd-2, 15 USCA § 78dd-2
Current through P.L. 116-21.

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 15. Commerce and Trade
        Chapter 2B. Securities Exchanges (Refs & Annos)

15 U.S.C.A. § 78dd-3

§ 78dd-3. Prohibited foreign trade practices by persons other than issuers or domestic concerns

Effective: November 10, 1998
Currentness

**(a) Prohibition**

It shall be unlawful for any person other than an issuer that is subject to section 78dd-1 of this title or a domestic concern (as defined in section 78dd-2 of this title), or for any officer, director, employee, or agent of such person or any stockholder thereof acting on behalf of such person, while in the territory of the United States, corruptly to make use of the mails or any means or instrumentality of interstate commerce or to do any other act in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to--

**(1)** any foreign official for purposes of--

**(A)**(i) influencing any act or decision of such foreign official in his official capacity, (ii) inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or (iii) securing any improper advantage; or

**(B)** inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality,

in order to assist such person in obtaining or retaining business for or with, or directing business to, any person;

**(2)** any foreign political party or official thereof or any candidate for foreign political office for purposes of--

**(A)**(i) influencing any act or decision of such party, official, or candidate in its or his official capacity, (ii) inducing such party, official, or candidate to do or omit to do an act in violation of the lawful duty of such party, official, or candidate, or (iii) securing any improper advantage; or

**(B)** inducing such party, official, or candidate to use its or his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality,

in order to assist such person in obtaining or retaining business for or with, or directing business to, any person; or

SPA48

**(3)** any person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to any foreign official, to any foreign political party or official thereof, or to any candidate for foreign political office, for purposes of--

**(A)**(i) influencing any act or decision of such foreign official, political party, party official, or candidate in his or its official capacity, (ii) inducing such foreign official, political party, party official, or candidate to do or omit to do any act in violation of the lawful duty of such foreign official, political party, party official, or candidate, or (iii) securing any improper advantage; or

**(B)** inducing such foreign official, political party, party official, or candidate to use his or its influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality,

in order to assist such person in obtaining or retaining business for or with, or directing business to, any person.

**(b) Exception for routine governmental action**

Subsection (a) of this section shall not apply to any facilitating or expediting payment to a foreign official, political party, or party official the purpose of which is to expedite or to secure the performance of a routine governmental action by a foreign official, political party, or party official.

**(c) Affirmative defenses**

It shall be an affirmative defense to actions under subsection (a) of this section that--

**(1)** the payment, gift, offer, or promise of anything of value that was made, was lawful under the written laws and regulations of the foreign official's, political party's, party official's, or candidate's country; or

**(2)** the payment, gift, offer, or promise of anything of value that was made, was a reasonable and bona fide expenditure, such as travel and lodging expenses, incurred by or on behalf of a foreign official, party, party official, or candidate and was directly related to--

**(A)** the promotion, demonstration, or explanation of products or services; or

**(B)** the execution or performance of a contract with a foreign government or agency thereof.

**(d) Injunctive relief**

**(1)** When it appears to the Attorney General that any person to which this section applies, or officer, director, employee, agent, or stockholder thereof, is engaged, or about to engage, in any act or practice constituting a violation of subsection (a) of this section, the Attorney General may, in his discretion, bring a civil action in an appropriate

district court of the United States to enjoin such act or practice, and upon a proper showing, a permanent injunction or a temporary restraining order shall be granted without bond.

**(2)** For the purpose of any civil investigation which, in the opinion of the Attorney General, is necessary and proper to enforce this section, the Attorney General or his designee are empowered to administer oaths and affirmations, subpoena witnesses, take evidence, and require the production of any books, papers, or other documents which the Attorney General deems relevant or material to such investigation. The attendance of witnesses and the production of documentary evidence may be required from any place in the United States, or any territory, possession, or commonwealth of the United States, at any designated place of hearing.

**(3)** In case of contumacy by, or refusal to obey a subpoena issued to, any person, the Attorney General may invoke the aid of any court of the United States within the jurisdiction of which such investigation or proceeding is carried on, or where such person resides or carries on business, in requiring the attendance and testimony of witnesses and the production of books, papers, or other documents. Any such court may issue an order requiring such person to appear before the Attorney General or his designee, there to produce records, if so ordered, or to give testimony touching the matter under investigation. Any failure to obey such order of the court may be punished by such court as a contempt thereof.

**(4)** All process in any such case may be served in the judicial district in which such person resides or may be found. The Attorney General may make such rules relating to civil investigations as may be necessary or appropriate to implement the provisions of this subsection.

## (e) Penalties

**(1)(A)** Any juridical person that violates subsection (a) of this section shall be fined not more than $2,000,000.

**(B)** Any juridical person that violates subsection (a) of this section shall be subject to a civil penalty of not more than $10,000 imposed in an action brought by the Attorney General.

**(2)(A)** Any natural person who willfully violates subsection (a) of this section shall be fined not more than $100,000 or imprisoned not more than 5 years, or both.

**(B)** Any natural person who violates subsection (a) of this section shall be subject to a civil penalty of not more than $10,000 imposed in an action brought by the Attorney General.

**(3)** Whenever a fine is imposed under paragraph (2) upon any officer, director, employee, agent, or stockholder of a person, such fine may not be paid, directly or indirectly, by such person.

## (f) Definitions

For purposes of this section:

SPA50

**(1)** The term "person", when referring to an offender, means any natural person other than a national of the United States (as defined in section 1101 of Title 8 [1] or any corporation, partnership, association, joint-stock company, business trust, unincorporated organization, or sole proprietorship organized under the law of a foreign nation or a political subdivision thereof.

**(2)(A)** The term "foreign official" means any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality, or for or on behalf of any such public international organization.

**(B)** For purposes of subparagraph (A), the term "public international organization" means--

**(i)** an organization that is designated by Executive order pursuant to section 288 of Title 22; or

**(ii)** any other international organization that is designated by the President by Executive order for the purposes of this section, effective as of the date of publication of such order in the Federal Register.

**(3)(A)** A person's state of mind is knowing, with respect to conduct, a circumstance or a result if--

**(i)** such person is aware that such person is engaging in such conduct, that such circumstance exists, or that such result is substantially certain to occur; or

**(ii)** such person has a firm belief that such circumstance exists or that such result is substantially certain to occur.

**(B)** When knowledge of the existence of a particular circumstance is required for an offense, such knowledge is established if a person is aware of a high probability of the existence of such circumstance, unless the person actually believes that such circumstance does not exist.

**(4)(A)** The term "routine governmental action" means only an action which is ordinarily and commonly performed by a foreign official in--

**(i)** obtaining permits, licenses, or other official documents to qualify a person to do business in a foreign country;

**(ii)** processing governmental papers, such as visas and work orders;

**(iii)** providing police protection, mail pick-up and delivery, or scheduling inspections associated with contract performance or inspections related to transit of goods across country;

SPA51

**(iv)** providing phone service, power and water supply, loading and unloading cargo, or protecting perishable products or commodities from deterioration; or

**(v)** actions of a similar nature.

**(B)** The term "routine governmental action" does not include any decision by a foreign official whether, or on what terms, to award new business to or to continue business with a particular party, or any action taken by a foreign official involved in the decision-making process to encourage a decision to award new business to or continue business with a particular party.

**(5)** The term "interstate commerce" means trade, commerce, transportation, or communication among the several States, or between any foreign country and any State or between any State and any place or ship outside thereof, and such term includes the intrastate use of--

**(A)** a telephone or other interstate means of communication, or

**(B)** any other interstate instrumentality.

**CREDIT(S)**

(Pub.L. 95-213, Title I, § 104A, as added Pub.L. 105-366, § 4, Nov. 10, 1998, 112 Stat. 3306.)

Notes of Decisions (5)

Footnotes

| | |
|---|---|
| 1 | So in original. A closing parenthesis probably should appear. |

15 U.S.C.A. § 78dd-3, 15 USCA § 78dd-3
Current through P.L. 116-21.

---

End of Document                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

🟨 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
        Chapter 95. Racketeering (Refs & Annos)

18 U.S.C.A. § 1956

§ 1956. Laundering of monetary instruments

Effective: October 7, 2016
Currentness

**(a)(1)** Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--

    **(A)(i)** with the intent to promote the carrying on of specified unlawful activity; or

    **(ii)** with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

    **(B)** knowing that the transaction is designed in whole or in part--

        **(i)** to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

        **(ii)** to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

**(2)** Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States--

    **(A)** with the intent to promote the carrying on of specified unlawful activity; or

SPA53

**(B)** knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part--

**(i)** to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

**(ii)** to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both. For the purpose of the offense described in subparagraph (B), the defendant's knowledge may be established by proof that a law enforcement officer represented the matter specified in subparagraph (B) as true, and the defendant's subsequent statements or actions indicate that the defendant believed such representations to be true.

**(3)** Whoever, with the intent--

**(A)** to promote the carrying on of specified unlawful activity;

**(B)** to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or

**(C)** to avoid a transaction reporting requirement under State or Federal law,

conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both. For purposes of this paragraph and paragraph (2), the term "represented" means any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section.

**(b) Penalties.--**

**(1) In general.**--Whoever conducts or attempts to conduct a transaction described in subsection (a)(1) or (a)(3), or section 1957, or a transportation, transmission, or transfer described in subsection (a)(2), is liable to the United States for a civil penalty of not more than the greater of--

**(A)** the value of the property, funds, or monetary instruments involved in the transaction; or

**(B)** $10,000.

**(2) Jurisdiction over foreign persons.**--For purposes of adjudicating an action filed or enforcing a penalty ordered under this section, the district courts shall have jurisdiction over any foreign person, including any financial institution authorized under the laws of a foreign country, against whom the action is brought, if service of process upon the foreign person is made under the Federal Rules of Civil Procedure or the laws of the country in which the foreign person is found, and--

**(A)** the foreign person commits an offense under subsection (a) involving a financial transaction that occurs in whole or in part in the United States;

**(B)** the foreign person converts, to his or her own use, property in which the United States has an ownership interest by virtue of the entry of an order of forfeiture by a court of the United States; or

**(C)** the foreign person is a financial institution that maintains a bank account at a financial institution in the United States.

**(3) Court authority over assets.**--A court may issue a pretrial restraining order or take any other action necessary to ensure that any bank account or other property held by the defendant in the United States is available to satisfy a judgment under this section.

**(4) Federal receiver.**--

**(A) In general.**--A court may appoint a Federal Receiver, in accordance with subparagraph (B) of this paragraph, to collect, marshal, and take custody, control, and possession of all assets of the defendant, wherever located, to satisfy a civil judgment under this subsection, a forfeiture judgment under section 981 or 982, or a criminal sentence under section 1957 or subsection (a) of this section, including an order of restitution to any victim of a specified unlawful activity.

**(B) Appointment and authority.**--A Federal Receiver described in subparagraph (A)--

**(i)** may be appointed upon application of a Federal prosecutor or a Federal or State regulator, by the court having jurisdiction over the defendant in the case;

**(ii)** shall be an officer of the court, and the powers of the Federal Receiver shall include the powers set out in section 754 of title 28, United States Code; and

**(iii)** shall have standing equivalent to that of a Federal prosecutor for the purpose of submitting requests to obtain information regarding the assets of the defendant--

**(I)** from the Financial Crimes Enforcement Network of the Department of the Treasury; or

SPA55

**(II)** from a foreign country pursuant to a mutual legal assistance treaty, multilateral agreement, or other arrangement for international law enforcement assistance, provided that such requests are in accordance with the policies and procedures of the Attorney General.

**(c)** As used in this section--

**(1)** the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7);

**(2)** the term "conducts" includes initiating, concluding, or participating in initiating, or concluding a transaction;

**(3)** the term "transaction" includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected;

**(4)** the term "financial transaction" means (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree;

**(5)** the term "monetary instruments" means (i) coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, and money orders, or (ii) investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery;

**(6)** the term "financial institution" includes--

**(A)** any financial institution, as defined in section 5312(a)(2) of title 31, United States Code, or the regulations promulgated thereunder; and

**(B)** any foreign bank, as defined in section 1 [1] of the International Banking Act of 1978 (12 U.S.C. 3101);

**(7)** the term "specified unlawful activity" means--

**(A)** any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under subchapter II of chapter 53 of title 31;

**(B)** with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving--

**(i)** the manufacture, importation, sale, or distribution of a controlled substance (as such term is defined for the purposes of the Controlled Substances Act);

**(ii)** murder, kidnapping, robbery, extortion, destruction of property by means of explosive or fire, or a crime of violence (as defined in section 16);

**(iii)** fraud, or any scheme or attempt to defraud, by or against a foreign bank (as defined in paragraph 7 of section 1(b) of the International Banking Act of 1978)); [2]

**(iv)** bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official;

**(v)** smuggling or export control violations involving--

**(I)** an item controlled on the United States Munitions List established under section 38 of the Arms Export Control Act (22 U.S.C. 2778); or

**(II)** an item controlled under regulations under the Export Administration Regulations (15 C.F.R. Parts 730-774);

**(vi)** an offense with respect to which the United States would be obligated by a multilateral treaty, either to extradite the alleged offender or to submit the case for prosecution, if the offender were found within the territory of the United States; or

**(vii)** trafficking in persons, selling or buying of children, sexual exploitation of children, or transporting, recruiting or harboring a person, including a child, for commercial sex acts;

**(C)** any act or acts constituting a continuing criminal enterprise, as that term is defined in section 408 of the Controlled Substances Act (21 U.S.C. 848);

**(D)** an offense under section 32 (relating to the destruction of aircraft), section 37 (relating to violence at international airports), section 115 (relating to influencing, impeding, or retaliating against a Federal official by threatening or injuring a family member), section 152 (relating to concealment of assets; false oaths and claims; bribery), section 175c (relating to the variola virus), section 215 (relating to commissions or gifts for procuring loans), section 351 (relating to congressional or Cabinet officer assassination), any of sections 500 through 503 (relating to certain counterfeiting offenses), section 513 (relating to securities of States and private entities), section

541 (relating to goods falsely classified), section 542 (relating to entry of goods by means of false statements), section 545 (relating to smuggling goods into the United States), section 549 (relating to removing goods from Customs custody), section 554 (relating to smuggling goods from the United States), section 555 (relating to border tunnels), section 641 (relating to public money, property, or records), section 656 (relating to theft, embezzlement, or misapplication by bank officer or employee), section 657 (relating to lending, credit, and insurance institutions), section 658 (relating to property mortgaged or pledged to farm credit agencies), section 666 (relating to theft or bribery concerning programs receiving Federal funds), section 793, 794, or 798 (relating to espionage), section 831 (relating to prohibited transactions involving nuclear materials), section 844(f) or (i) (relating to destruction by explosives or fire of Government property or property affecting interstate or foreign commerce), section 875 (relating to interstate communications), section 922(l) (relating to the unlawful importation of firearms), section 924(n) (relating to firearms trafficking), section 956 (relating to conspiracy to kill, kidnap, maim, or injure certain property in a foreign country), section 1005 (relating to fraudulent bank entries), 1006 [3] (relating to fraudulent Federal credit institution entries), 1007 [3] (relating to Federal Deposit Insurance transactions), 1014 [3] (relating to fraudulent loan or credit applications), section 1030 (relating to computer fraud and abuse), 1032 [3] (relating to concealment of assets from conservator, receiver, or liquidating agent of financial institution), section 1111 (relating to murder), section 1114 (relating to murder of United States law enforcement officials), section 1116 (relating to murder of foreign officials, official guests, or internationally protected persons), section 1201 (relating to kidnaping), section 1203 (relating to hostage taking), section 1361 (relating to willful injury of Government property), section 1363 (relating to destruction of property within the special maritime and territorial jurisdiction), section 1708 (theft from the mail), section 1751 (relating to Presidential assassination), section 2113 or 2114 (relating to bank and postal robbery and theft), section 2252A (relating to child pornography) where the child pornography contains a visual depiction of an actual minor engaging in sexually explicit conduct, section 2260 (production of certain child pornography for importation into the United States), section 2280 (relating to violence against maritime navigation), section 2281 (relating to violence against maritime fixed platforms), section 2319 (relating to copyright infringement), section 2320 (relating to trafficking in counterfeit goods and services), section 2332 (relating to terrorist acts abroad against United States nationals), section 2332a (relating to use of weapons of mass destruction), section 2332b (relating to international terrorist acts transcending national boundaries), section 2332g (relating to missile systems designed to destroy aircraft), section 2332h (relating to radiological dispersal devices), section 2339A or 2339B (relating to providing material support to terrorists), section 2339C (relating to financing of terrorism), or section 2339D (relating to receiving military-type training from a foreign terrorist organization) of this title, section 46502 of title 49, United States Code, a felony violation of the Chemical Diversion and Trafficking Act of 1988 (relating to precursor and essential chemicals), section 590 of the Tariff Act of 1930 (19 U.S.C. 1590) (relating to aviation smuggling), section 422 of the Controlled Substances Act (relating to transportation of drug paraphernalia), section 38(c) (relating to criminal violations) of the Arms Export Control Act, section 11 (relating to violations) of the Export Administration Act of 1979, section 206 (relating to penalties) of the International Emergency Economic Powers Act, section 16 (relating to offenses and punishment) of the Trading with the Enemy Act, any felony violation of section 15 of the Food and Nutrition Act of 2008 [7 U.S.C.A. § 2024] (relating to supplemental nutrition assistance program benefits fraud) involving a quantity of benefits having a value of not less than $5,000, any violation of section 543(a)(1) of the Housing Act of 1949 [42 U.S.C.A. § 1490s(a)(1)] (relating to equity skimming), any felony violation of the Foreign Agents Registration Act of 1938, any felony violation of the Foreign Corrupt Practices Act, section 92 of the Atomic Energy Act of 1954 (42 U.S.C. 2122) (relating to prohibitions governing atomic weapons), or section 104(a) of the North Korea Sanctions Enforcement Act of 2016 (relating to prohibited activities with respect to North Korea);

**ENVIRONMENTAL CRIMES**

**(E)** a felony violation of the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.), the Ocean Dumping Act (33 U.S.C. 1401 et seq.), the Act to Prevent Pollution from Ships (33 U.S.C. 1901 et seq.), the Safe Drinking Water Act (42 U.S.C. 300f et seq.), or the Resources Conservation and Recovery Act (42 U.S.C. 6901 et seq.);

**(F)** any act or activity constituting an offense involving a Federal health care offense; or

**(G)** any act that is a criminal violation of subparagraph (A), (B), (C), (D), (E), or (F) of paragraph (1) of section 9(a) of the Endangered Species Act of 1973 (16 U.S.C. 1538(a)(1)), section 2203 of the African Elephant Conservation Act (16 U.S.C. 4223), or section 7(a) of the Rhinoceros and Tiger Conservation Act of 1994 (16 U.S.C. 5305a(a)), if the endangered or threatened species of fish or wildlife, products, items, or substances involved in the violation and relevant conduct, as applicable, have a total value of more than $10,000;

**(8)** the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States; and

**(9)** the term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity.

**(d)** Nothing in this section shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this section.

**(e)** Violations of this section may be investigated by such components of the Department of Justice as the Attorney General may direct, and by such components of the Department of the Treasury as the Secretary of the Treasury may direct, as appropriate, and, with respect to offenses over which the Department of Homeland Security has jurisdiction, by such components of the Department of Homeland Security as the Secretary of Homeland Security may direct, and, with respect to offenses over which the United States Postal Service has jurisdiction, by the Postal Service. Such authority of the Secretary of the Treasury, the Secretary of Homeland Security, and the Postal Service shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury, the Secretary of Homeland Security, the Postal Service, and the Attorney General. Violations of this section involving offenses described in paragraph (c)(7)(E) may be investigated by such components of the Department of Justice as the Attorney General may direct, and the National Enforcement Investigations Center of the Environmental Protection Agency.

**(f)** There is extraterritorial jurisdiction over the conduct prohibited by this section if--

**(1)** the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and

**(2)** the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

**(g) Notice of conviction of financial institutions.**--If any financial institution or any officer, director, or employee of any financial institution has been found guilty of an offense under this section, section 1957 or 1960 of this title, or section 5322 or 5324 of title 31, the Attorney General shall provide written notice of such fact to the appropriate regulatory agency for the financial institution.

**(h)** Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

**(i) Venue.--(1)** Except as provided in paragraph (2), a prosecution for an offense under this section or section 1957 may be brought in--

**(A)** any district in which the financial or monetary transaction is conducted; or

**(B)** any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted.

**(2)** A prosecution for an attempt or conspiracy offense under this section or section 1957 may be brought in the district where venue would lie for the completed offense under paragraph (1), or in any other district where an act in furtherance of the attempt or conspiracy took place.

**(3)** For purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction. Any person who conducts (as that term is defined in subsection (c)(2)) any portion of the transaction may be charged in any district in which the transaction takes place.

## CREDIT(S)

(Added Pub.L. 99-570, Title I, § 1352(a), Oct. 27, 1986, 100 Stat. 3207-18; amended Pub.L. 100-690, Title VI, §§ 6183, 6465, 6466, 6469(a)(1), 6471(a), (b), Title VII, § 7031, Nov. 18, 1988, 102 Stat. 4354, 4375, 4377, 4378, 4398; Pub.L. 101-647, Title I, §§ 105 to 108, Title XII, § 1205(j), Title XIV, §§ 1402, 1404, Title XXV, § 2506, Title XXXV, § 3557, Nov. 29, 1990, 104 Stat. 4791, 4792, 4831, 4835, 4862, 4927; Pub.L. 102-550, Title XV, §§ 1504(c), 1524, 1526(a), 1527(a), 1530, 1531, 1534, 1536, Oct. 28, 1992, 106 Stat. 4055, 4064 to 4067; Pub.L. 103-322, Title XXXII, § 320104(b), Title XXXIII, §§ 330008(2), 330011(l), 330012, 330019, 330021(1), Sept. 13, 1994, 108 Stat. 2111, 2142, 2145, 2146, 2149, 2150; Pub.L. 103-325, Title IV, §§ 411(c)(2)(E), 413(c)(1), (d), Sept. 23, 1994, 108 Stat. 2253-2255; Pub.L. 104-132, Title VII, § 726, Apr. 24, 1996, 110 Stat. 1301; Pub.L. 104-191, Title II, § 246, Aug. 21, 1996, 110 Stat. 2018; Pub.L. 104-294, Title VI, §§ 601(f)(6), 604(b)(38), Oct. 11, 1996, 110 Stat. 3499, 3509; Pub.L. 106-569, Title VII, § 709(a), Dec. 27, 2000, 114 Stat. 3018; Pub.L. 107-56, Title III, §§ 315, 317, 318, 376, Title VIII, § 805(b), Title X, § 1004, Oct. 26, 2001, 115 Stat. 308, 310, 311, 342, 378, 392; Pub.L. 107-273, Div. B, Title IV, §§ 4002(a)(11), (b)(5), (c)(2), 4005(d)(1), (e), Nov. 2, 2002, 116 Stat. 1807, 1809, 1812, 1813; Pub.L. 108-458, Title VI, § 6909, Dec. 17, 2004, 118 Stat. 3774; Pub.L. 109-164, Title I, § 103(b), Jan. 10, 2006, 119 Stat. 3563; Pub.L. 109-177, Title III, § 311(c), Title IV, § 403(b), (c)(1), 405, 406(a)(2), 409, Mar. 9, 2006, 120 Stat. 242-244, 246; Pub.L. 110-234, Title IV, §§ 4002(b)(1)(B), (D), (2)(M), 4115(c)(1)(A)(i), (B)(ii), May 22, 2008, 122 Stat. 1096, 1097, 1109; Pub.L. 110-246, § 4(a), Title IV, §§ 4002(b)(1)(B), (D), (2)(M), 4115(c)(1)(A) (i), (B)(ii), June 18, 2008, 122 Stat. 1664, 1857, 1858, 1870; Pub.L. 110-358, Title II, § 202, Oct. 8, 2008, 122 Stat. 4003;

Pub.L. 111-21, § 2(f)(1), May 20, 2009, 123 Stat. 1618; Pub.L. 112-127, § 6, June 5, 2012, 126 Stat. 371; Pub.L. 114-122, Title I, § 105(c), Feb. 18, 2016, 130 Stat. 101; Pub.L. 114-231, Title V, § 502, Oct. 7, 2016, 130 Stat. 956.)

Notes of Decisions (706)

Footnotes

1        So in original. Probably should read "section 1(b)".
2        So in original. The second closing parenthesis probably should not appear.
3        So in original. Probably should be preceded by "section".

18 U.S.C.A. § 1956, 18 USCA § 1956
Current through P.L. 116-21.

---

End of Document                                         © 2019 Thomson Reuters. No claim to original U.S. Government Works.