# 19-761

*To Be Argued By*:
DOUGLAS S. ZOLKIND

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 19-761

————◄••►————

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

CHI PING PATRICK HO, also known as Patrick C.P. Ho,

*Defendant-Appellant.*

——————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

GEOFFREY S. BERMAN,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

DOUGLAS S. ZOLKIND,
DANIEL C. RICHENTHAL,
CATHERINE E. GHOSH,
ANNA M. SKOTKO,
 *Assistant United States Attorneys,
  Of Counsel.*

PAUL A. HAYDEN,
 *Fraud Section, Criminal Division,
 U.S. Department of Justice,
 Trial Attorney.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.  The Government's Case . . . . . . . . . . . . . . .  2

        1.  CEFC China And Its NGO . . . . . . . . . .  3

        2.  The Chad Scheme . . . . . . . . . . . . . . . . .  4

        3.  The Uganda Scheme . . . . . . . . . . . . . .  12

    B.  The Defense Case . . . . . . . . . . . . . . . . . . . .  17

    C.  The Verdict And Sentencing . . . . . . . . . . .  17

ARGUMENT:

POINT I—Ho's Convictions Were Supported By
    Sufficient Evidence . . . . . . . . . . . . . . . . . . . . . . .  18

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  18

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  20

POINT II—Ho's Conviction For Money Laundering
    Was Both Legally And Factually Sufficient . .  25

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  26

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  27

        1.  Ho's Conviction For Money
           Laundering Was Legally Sufficient . .  27

ii

PAGE

  2. Ho's Conviction For Money
    Laundering Was Factually
    Sufficient . . . . . . . . . . . . . . . . . . . . . . . 33

POINT III—Ho's Evidentiary Challenges Are
  Meritless. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

 A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . 38

 B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 39

  1. The Statements Of President Déby
    Were Properly Admitted . . . . . . . . . . . 39

  2. The Statement Of Gadio's Son Was
    Properly Admitted . . . . . . . . . . . . . . . . 42

  3. The Summary Charts Were Properly
    Admitted. . . . . . . . . . . . . . . . . . . . . . . . . 45

POINT IV—The Indictment Was Valid . . . . . . . . . . 47

 A. Ho Was Properly Charged Under
   Different Sections Of The FCPA . . . . . . . . 47

 B. Sections 78dd-2 And 78dd-3 Of The FCPA
   Are Not Mutually Exclusive. . . . . . . . . . . . 51

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

iii

PAGE

## TABLE OF AUTHORITIES

*Cases*:

*Branzburg v. Hayes,*
    408 U.S. 665 (1972) . . . . . . . . . . . . . . . . . . . . . . . . 49

*Caminetti v. United States,*
    242 U.S. 470 (1917) . . . . . . . . . . . . . . . . . . . . . . . . 27

*Chickasaw Nation v. United States,*
    534 U.S. 84 (2001) . . . . . . . . . . . . . . . . . . . . . . . . 29

*Connecticut Nat'l Bank v. Germain,*
    503 U.S. 249 (1992) . . . . . . . . . . . . . . . . 27, 28, 52

*Dickerson v. Napolitano,*
    604 F.3d 732 (2d Cir. 2010) . . . . . . . . . . . . . . . . 33

*Green v. City of New York,*
    465 F.3d 65 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 28

*Griffin v. Oceanic Contractors, Inc.,*
    458 U.S. 564 (1982) . . . . . . . . . . . . . . . . . . . . . . . . 30

*Griffin v. United States,*
    502 U.S. 46 (1991) . . . . . . . . . . . . . . . . . . . . . . . . 27

*Hassett v. Welch,*
    303 U.S. 303 (1938) . . . . . . . . . . . . . . . . . . . . . . . . 32

*Headley v. Tilghman,*
    53 F.3d 472 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 42

*Hubbard v. United States,*
    514 U.S. 695 (1995) . . . . . . . . . . . . . . . . . . . . . . . . 53

iv

PAGE

*Jackson v. Virginia,*
    443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . 19, 26

*Jam v. Int'l Fin. Corp.,*
    139 S. Ct. 759 (2019) . . . . . . . . . . . . . . . 28, 29, 30

*Matal v. Tam,*
    137 S. Ct. 1744 (2017) . . . . . . . . . . . . . . . . . . . . . 52

*Millares Guiraldes de Tineo v. United States,*
    137 F.3d 715 (2d Cir. 1998) . . . . . . . . . . . . . . . . 41

*Natural Res. Def. Council, Inc. v. Muszynski,*
    268 F.3d 91 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 28

*Papachristou v. City of Jacksonville,*
    405 U.S. 156 (1972) . . . . . . . . . . . . . . . . . . . . . . . 32

*Pilot Life Ins. Co. v. Dedeaux,*
    481 U.S. 41 (1987) . . . . . . . . . . . . . . . . . . . . . . . . 29

*Snell v. Chicago,*
    133 Ill. 413 (1890) . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Albertini,*
    472 U.S. 675 (1985) . . . . . . . . . . . . . . . . . . . . 27, 52

*United States v. All Assets Held at Bank*
    *Julius Baer & Co. Ltd.,*
    251 F. Supp. 3d 82 (D.D.C. 2017) . . . . . . . . . . . 37

*United States v. All Assets Held at Bank*
    *Julius Baer & Co., Ltd.,*
    571 F. Supp. 2d 1 (D.D.C. 2008) . . . . . . . . . . 36, 37

*United States v. Aponte,*
    31 F.3d 86 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . 43

v

PAGE

*United States v. Arboleda,*
   20 F.3d 58 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . 24

*United States v. Astolas,*
   487 F.2d 275 (2d Cir. 1973) . . . . . . . . . . . . . . . . 50

*United States v. Balde,*
   927 F.3d 71 (2d Cir. 2019) . . . . . . . . . . . . . . . 32, 33

*United States v. Bellomo,*
   176 F.3d 580 (2d Cir. 1999) . . . . . . . . . . . . . . . . 39

*United States v. Blackwood,*
   366 F. App'x 207 (2d. Cir. 2010). . . . . . . . . . . . . 46

*United States v. Certified Environmental
   Servs., Inc.,*
   753 F.3d 72 (2d Cir. 2014) . . . . . . . . . . . . . . . . . 42

*United States v. Coplan,*
   703 F.3d 46 (2d Cir. 2012) . . . . . . . . . . . . . . *passim*

*United States v. Coppola,*
   671 F.3d 220 (2d Cir. 2012) . . . . . . . . . . . . . . . . 41

*United States v. Cotton,*
   535 U.S. 625 (2002). . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Daccarett,*
   6 F.3d 37 (2d Cir. 1993) . . . . . . . . . . . . . . . . 34, 37

*United States v. Dauray,*
   215 F.3d 257 (2d Cir. 2000) . . . . . . . . . . . . . . . . 30

*United States v. Desnoyers,*
   637 F.3d 105 (2d Cir. 2011) . . . . . . . . . . . . . . . . 26

vi

PAGE

*United States v. Dhinsa,*
    243 F.3d 635 (2d Cir. 2001) . . . . . . . . . . . . . . 38, 44

*United States v. DiCristina,*
    726 F.3d 92 (2d Cir. 2013) . . . . . . . . . . . . . . 28, 52

*United States v. Dinero Exp., Inc.,*
    313 F.3d 803 (2d Cir. 2002) . . . . . . . . . . . . . . . . 36

*United States v. Epskamp,*
    832 F.3d 154 (2d Cir. 2016) . . . . . . . . . . . . . . . . 27

*United States v. Flecha,*
    539 F.2d 874 (2d Cir. 1976) . . . . . . . . . . . . . . . . 43

*United States v. Friedman,*
    854 F.2d 535 (2d Cir. 1988) . . . . . . . . . . . . . . . . 51

*United States v. Guzman,*
    754 F.2d 482 (2d Cir. 1985) . . . . . . . . . . . . . . . . 41

*United States v. Harris,*
    79 F.3d 223 (2d Cir. 1996) . . . . . . . . . . . . . . . . 35

*United States v. Hassan,*
    578 F.3d 108 (2d Cir. 2008) . . . . . . . . . . . . . . 18, 19

*United States v. Hawit,*
    2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) . . . . . 36

*United States v. Heras,*
    609 F.3d 101 (2d Cir. 2010) . . . . . . . . . . . . . . . . 18

*United States v. Hoskins,*
    902 F.3d 69 (2d Cir. 2018) . . . . . . . . . . . . . . 53, 54

*United States v. LeBlanc,*
    24 F.3d 340 (1st Cir. 1994) . . . . . . . . . . . . . . 30, 31

vii

PAGE

*United States v. McDermott,*
  245 F.3d 133 (2d Cir. 2001) . . . . . . . . . . . . . . 19, 35

*United States v. McDonough,*
  56 F.3d 381 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 50

*United States v. Mechanik,*
  475 U.S. 66 (1986). . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Mejia,*
  545 F.3d 179 (2d Cir. 2008) . . . . . . . . . . . . . . . . 50

*United States v. Moloney,*
  287 F.3d 236 (2d Cir. 2002) . . . . . . . . . . . . . . . . 36

*United States v. Ness,*
  466 F.3d 79 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 55

*United States v. Pascarella,*
  84 F.3d 61 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . 55

*United States v. Paulino,*
  445 F.3d 211 (2d Cir. 2006) . . . . . . . . . . . . . . . . 38

*United States v. Pedroza,*
  750 F.2d 187 (2d Cir. 1984) . . . . . . . . . . . . . . . . 40

*United States v. Rahman,*
  189 F.3d 88 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 19

*United States v. Robinson,*
  294 F. App'x 630 (2d Cir. 2008) . . . . . . . . . . . . . 41

*United States v. Ron Pair Enters., Inc.,*
  489 U.S. 235 (1989). . . . . . . . . . . . . . . . . . . . . 27, 28

*United States v. Rubin,*
  609 F.2d 51 (2d Cir. 1979) . . . . . . . . . . . . . . . . . 43

viii

PAGE

*United States v. Samet,*
    466 F.3d 251 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 38

*United States v. Santos,*
    541 F.3d 63 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 19

*United States v. Sorrentino,*
    72 F.3d 294 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 41

*United States v. Stavroulakis,*
    952 F.2d 686 (2d Cir. 1992) . . . . . . . . . . . . . . . . 29

*United States v. Triumph Capital Grp., Inc.,*
    544 F.3d 149 (2d Cir. 2008) . . . . . . . . . . . . . . . . 19

*United States v. United States Gypsum Co.,*
    438 U.S. 422 (1978). . . . . . . . . . . . . . . . . . . . 32, 53

*United States v. Vargas-Cordon,*
    733 F.3d 366 (2d Cir. 2013) . . . . . . . . . . . . . . . . 38

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003) . . . . . . . . . . .  45, 47, 49

*Statutes, Rules & Other Authorities:*

15 U.S.C. § 78dd-1 . . . . . . . . . . . . . . . . . . . . . . . 48

15 U.S.C. § 78dd-2 . . . . . . . . . . . . . . . . . . . . . *passim*

15 U.S.C. § 78dd-3 . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . 50

18 U.S.C. § 1956(a)(2) . . . . . . . . . . . . . . . . . . . . . 2, 25

18 U.S.C. § 1956(c)(7). . . . . . . . . . . . . . . . . .  27, 30, 33

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 19-761

––––––––––

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

CHI PING PATRICK HO, also known as Patrick C.P. Ho,

*Defendant-Appellant.*

––––––––––

## BRIEF FOR THE UNITED STATES OF AMERICA

––––––––––

### Preliminary Statement

Chi Ping Patrick Ho appeals from a judgment of conviction entered on March 25, 2019 in the United States District Court for the Southern District of New York, following an eight-day trial before the Honorable Loretta A. Preska, United States District Judge, and a jury.

Indictment 17 Cr. 779 (LAP) (the "Indictment") was filed on December 18, 2017, in eight counts. Count One charged Ho with conspiring to violate the Foreign Corrupt Practices Act ("FCPA"), in violation of 18 U.S.C. § 371. Counts Two and Three charged Ho with violating the FCPA under 15 U.S.C. § 78dd-2, and Counts

2

Four and Five charged Ho with violating the FCPA under 15 U.S.C. § 78dd-3. Count Six charged Ho with conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h). Counts Seven and Eight charged Ho with money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A).

Trial commenced on November 26, 2018, and ended on December 5, 2018, when Ho was convicted on Counts One through Six and Count Eight, and acquitted on Count Seven.

On March 25, 2019, Judge Preska sentenced Ho to 36 months' imprisonment on each count of conviction, to be served concurrently, and fined him $400,000.

Ho is serving his sentence.

## Statement of Facts

### A. The Government's Case

The evidence at trial overwhelmingly proved that Ho, acting as an officer or director of a U.S.-based organization, engaged in two schemes to pay senior officials of Chad and Uganda in exchange for business advantages for CEFC China Energy Company Limited ("CEFC China"), a Shanghai-based multibillion-dollar conglomerate. At the time of these bribery schemes, Ho was the Secretary-General of a non-governmental organization ("NGO") based in Hong Kong and Virginia that held "Special Consultative Status" with the United Nations ("UN") and was funded by CEFC China.

3

The Government's evidence included the testimony of six witnesses and extensive emails, financial records, photographs, travel records, and other documentary evidence.

## 1. CEFC China And Its NGO

CEFC China was a multibillion dollar "privately owned and fast growing energy conglomerate from China," with interests in "[o]il, gas, alternative energies," and other sectors. (Tr. 66-67; *see also* Tr. 791-92).[1] CEFC China funded an NGO known as China Energy Fund Committee. (Tr. 66, 199). The NGO was incorporated both in Hong Kong, as CEFC Limited, and in Virginia, as China Energy Fund Committee (USA) Inc., a non-profit and purportedly charitable organization ("CEFC NGO HK" and "CEFC NGO USA," respectively, and together, "CEFC NGO"). (Tr. 204-07, 824-25). CEFC NGO maintained offices in both countries. (Tr. 203-05). In the United States, CEFC NGO USA maintained an office in Virginia, and used a suite, also used by CEFC China, in Trump World Tower, near the UN. (Tr. 62-63, 203, 208-13). Prior to the events in this case, CEFC NGO had applied for and

---

[1]   "Tr." refers to the trial transcript, complete copies of which were provided by the Government on DVDs; "Br." refers to Ho's brief on appeal; "A." refers to the appendix submitted with that brief; "SPA" refers to the special appendix; "Add." refers to the addendum to the Government's brief; and "Dkt." refers to an entry on the District Court's docket.

4

obtained "consultative status" at the UN, which entitled it, along with many other NGOs, to participate in various UN events. (Tr. 56-57).

Ho was the officer and director of both the Hong Kong arm and the Virginia arm of CEFC NGO. (Tr. 202-03, 206-09, 824-26). Ho ran the NGO's day-to-day operations, including in the United States. (*E.g.*, Tr. 203). Ho was also a signatory on CEFC NGO's bank account at HSBC Hong Kong, which funded CEFC NGO USA. (Tr. 896-98). As described below, Ho and others affiliated with the NGO often referred to CEFC NGO and CEFC China interchangeably, as simply "CEFC."[2]

In public speeches, Ho touted the alleged good work of CEFC NGO, but in private, he focused on furthering the business interests of CEFC China. (Tr. 61, 69-74, 78-80, 82-124, 153-55).

### 2. The Chad Scheme

The Chad Scheme began in or about September 2014 when Ho flew to New York to attend the annual UN General Assembly. (Tr. 142, 144, 295-96, 693). At that time, CEFC China was working to expand to Chad and sought to meet with Idriss Déby, the President of Chad. (Tr. 144-46, 149, 693-94). The government of Chad had imposed a $1.2 billion fine on another Chinese oil company, and Ho wanted to obtain

———————

[2] This brief does the same, using "CEFC China" or "CEFC NGO" to refer specifically to the for-profit energy company or the NGO, respectively, but generally using "CEFC."

5

access to President Déby in the hope of resolving this
dispute, as it was impeding CEFC China's own ability
to pursue business in Chad. (Tr. 324-26).

At Ho's request, Vuk Jeremic, a former President
of the UN General Assembly, who was working as a
consultant to CEFC China, connected Ho to an indi-
vidual close to Déby, Cheikh Gadio, by touting Ho's
NGO-related work involving the UN. (Tr. 153-54, 298,
311-12, 696-97). Gadio had served as Minister of For-
eign Affairs of Senegal, and was then running a con-
sulting firm. (Tr. 257-58, 297).

Ho and Gadio met in the suite that both CEFC
China and CEFC NGO USA used at Trump World
Tower in Manhattan. (Tr. 303-04). Ho told Gadio that
Ho was working on behalf of "CEFC," a "powerful com-
pany in China," headquartered in Shanghai, which
was engaged in oil operations and other business.
(Tr. 305-09). Ho explained that CEFC China was in-
terested in expanding to Chad and wanted Gadio to
assist it in obtaining access to Déby. (Tr. 207-11). Ho
did not mention any interest in doing charitable work
in Chad. (Tr. 311). Ho later reported to the individual
who served as Chairman of both CEFC China and
CEFC NGO that Ho "gave [Gadio] a detailed account
. . . and informed him of our preliminary plans and
ideas, hoping for his help to receive special attention
and support from President Déby." (Tr. 203, 697).

In late October 2014, shortly after meeting with Ho
in Manhattan, Gadio flew to Chad and met with Déby.
(Tr. 328-30). Afterwards, he reported to Ho that the
meeting had gone well, and that Déby was interested
in pursuing business opportunities with CEFC China

6

—including in the sectors that Ho had outlined (oil, infrastructure, banking, and military arms and equipment)—and was open to resolving the dispute with the other Chinese oil company. (Tr. 329-39). Gadio also requested that CEFC enter into a formal contract with his consulting firm. (Tr. 345-46). Ho responded, "[p]lease be well assured that we remember and appreciate help from good friends," and that "[w]e would honor and extend to you our appreciation for your effort, and when this deal is done, even more appreciation will follow." (Tr. 347-48).

A couple of days later, Ho informed Gadio that the dispute with the other Chinese oil company had been resolved, and that "we treasure an opportunity to meet and befriend the president in confidence." (Tr. 350-52).

The first meeting between a CEFC delegation and Déby took place in November 2014 in Chad. (Tr. 375, 698-99). The delegation consisted of Ho—who presented himself as the head of the delegation—and executives of CEFC China. (Tr. 376-78, 390). Gadio attended as an intermediary. (Tr. 385, 390-91). During the meeting, Ho informed Déby that "CEFC was very interested in doing business in Chad," in oil and infrastructure and other business sectors, and that CEFC had "chose[n] Chad as their gateway to . . . enter the African market." (Tr. 392). Déby presented CEFC with the opportunity to acquire a Chadian oilfield known as "Block H." (Tr. 382-83, 393-94). Déby explained why "he believed that it was really an excellent opportunity for any company interested in oil business," and noted that oil companies from other countries had expressed interest in it. (Tr. 393-94). Ho and other members of

7

the delegation expressed great interest in this opportunity. (Tr. 394-95). Déby then outlined the next steps the delegation team should take, namely, sending a technical team to study the oilfield and performing due diligence necessary to begin negotiations over the price. (Tr. 395-96). At no point did Ho or any other member of the delegation reference any charitable donation. (Tr. 396-97).

Following his trip to Chad, Ho reported on the Block H opportunity to the CEFC Chairman. (Tr. 699-701). Ho noted:

> President Déby emphasized that Brazil is highly interested in [Block H], giving an all-out effort to get the right to develop the oilfield. [Déby] stated laughingly that the Brazilian aspect had already 'bribed' to convince his . . . subordinates who . . . are in charge, and he has been given a lot of pressure. However, [Déby] is personally willing to give this oilfield project to China CEFC, to work in it jointly.

(Tr. 701).

About a week after the first meeting in Chad, Ho requested that Gadio arrange a second meeting with Déby "before the end of this month." (Tr. 398-401). Gadio advised Ho not to seek such a second meeting, as there was nothing further to discuss with Déby at that time. (Tr. 401). Rather, Gadio advised that the next step should be to send a technical team to begin studying Block H. (Tr. 402-05). But Ho persisted in his request for an immediate second meeting. (Tr. 412). Ho

8

told Gadio that "[t]he most pertinent issue at this time is to arrange for a meeting with the president in Chad as soon as feasible." (Tr. 422). Although Gadio disagreed, Ho's "position was quite firm," and Gadio complied. (Tr. 423).

The second meeting occurred in early December 2014. (Tr. 423-24). The participants included Ho and CEFC China executives, Déby, his chief of staff, Gadio, and Gadio's business partner (and adult son). (Tr. 432). As with the first meeting, the "major topic" at this meeting was the Block H oilfield. (Tr. 433-35). Ho continued to play the leading role in the meeting. (Tr. 428). At the end of the meeting, the CEFC delegation presented Déby with multiple, wrapped gift boxes. (Tr. 438-39). Déby thanked the delegation and the meeting concluded without the boxes being opened. (Tr. 439-40).

After Gadio returned to his hotel room, he received a call demanding that he return to the presidential compound. (Tr. 440-41). Gadio immediately returned and met with Déby and his chief of staff. (Tr. 441). Déby appeared "furious," and demanded to know whether Gadio was aware that CEFC's gift boxes contained cash. (Tr. 442). Gadio replied, "Absolutely not. I'm just learning it now." (*Id.*). Déby stated that this was "extremely, extremely grave, and totally unacceptable," and asked why "people believe that all African leaders are corrupt?" (*Id.*). Gadio was "shocked" to learn that Ho and his colleagues had provided Déby with cash, because Gadio believed that that could not "be anything else but a bribery attempt." (Tr. 444). In-

9

deed, the payment was made after Déby had announced his willingness to sell Block H, but before negotiations over the price had even begun. (Tr. 660-61).

The next morning, Déby summoned the delegation. (Tr. 446-47). Gadio did not give Ho any indication of the purpose of the meeting. (Tr. 447). Déby told Ho and his colleagues that $2 million cash had been found inside the gift boxes, that he was "very shocked and angry," that his "first reaction . . . was to expel [them] from Chad," that he does not "know why people believe all African leaders are corrupt," and that he wanted "a clear explanation." (Tr. 448). Ho immediately responded, "Mr. President, I'm very impressed by your reaction and your attitude," which Ho said confirmed that he "was right to propose Chad as the entry point for CEFC for doing business in Africa." (Tr. 449). Ho made this statement "spontaneous[ly]," without first conferring with any of his colleagues. (*Id.*).

After Ho made this statement, he and the CEFC China executives conferred privately for approximately two minutes. (Tr. 449-50). Afterwards, one of the CEFC China executives stated that he did not "know what we were trying . . . to achieve," but "[w]e did it so poorly," "that was not really our intention," and the $2 million was really "intended to be a donation to your country, to your causes, or something." (Tr. 451). Gadio did not believe this after-the-fact explanation, since he had "never seen a donation to a country . . . being done in gift boxes in cash," and neither Ho nor anyone from CEFC had previously mentioned any interest in making a donation to Chad. (Tr. 451-52). Déby responded that "donations are not

10

made this way," and refused to accept it. (Tr. 452). Ul-
timately, however, the delegation prevailed on Déby to
keep the cash in Chad and they promised to provide a
"formal letter of donation." (Tr. 453).

The next day, Ho sent an email to a colleague in
which Ho (i) provided comments on a draft Memoran-
dum of Understanding between CEFC China and
Chad, which stated that the Chadian government
would support CEFC China's interests in Chadian oil
opportunities, and (ii) drafted a letter to Déby, stating
that CEFC "wish[es] to make a donation of USD 2 mil-
lion to the people of Chad at your personal disposal to
support your social and other programs as you see fit."
(Tr. 705-07).

Ho (through his assistant) then sent Gadio a signed
version of this so-called "donation letter." (Tr. 466-67).
Gadio believed that the letter, especially as translated
into French (the principal language of Chad), "was not
well written," so he reformulated it. (Tr. 469, 498-505).
CEFC China signed the final letter and Gadio con-
veyed it to Déby's chief of staff. (Tr. 502-04). Despite
the letter, it remained Gadio's understanding that the
$2 million had been intended by Ho for Déby, person-
ally. (Tr. 498-99). Among other things, in Gadio's view,
CEFC had not followed any of the accepted procedures
that would typically accompany a legitimate donation,
such as (i) notifying Chad that a donation would be
forthcoming, (ii) negotiating a formal donation agree-
ment, (iii) organizing a ceremony to publicize the char-
itable act, and (iv) transferring the funds via a wire to
the country's treasury department or central bank.
(Tr. 511-17). Also unlike with a legitimate donation,

CEFC made no effort to publicize the payment, and after the "donation letter" was sent, Ho never asked Gadio about the status of the "donation" or ever mentioned the topic again. (Tr. 513, 517-18, 551-52).[3]

Also during the December 2014 trip, Gadio again requested a contract from Ho. (Tr. 456, 458). Gadio was upset because he had not received any compensation for the work he was doing, and because Ho had failed to make good on a prior pledge to donate $100,000 to a forum with which Gadio was involved. (Tr. 461-64). After returning from Chad, Gadio's son sent him a text message asking if Gadio had gotten "[a]ny feedback from our friends in China?"—referring to Gadio's request for a contract. (A. 736; Tr. 471). Gadio responded, "No our Chinese friends are strange! Let us give them another week. Otherwise we will go to Chad early January and destroy their reputation and strategies in Chad!" (A. 736; Tr. 471-72). His son replied, "I sincerely think they will reply favorably . . . their attempt to buy the president to put us to the side did not work. Big companies don't like middle men it's

---

[3] As part of his job, Ho issued press releases highlighting CEFC NGO's alleged good works. (Tr. 218, 224, 821-24). Yet, neither CEFC China nor CEFC NGO issued a press release regarding a donation to Chad. (Tr. 228-30, 716-22). The CEFC NGO employee who was chiefly responsible for drafting press releases testified that, based on his experience working for Ho, if CEFC NGO had facilitated such a donation, he would have expected to be asked to publicize it. (Tr. 230).

12

normal but they don't have a choice with us[.]" (A. 736 (ellipsis in original); Tr. 472).

About a month later, Ho provided Gadio with a "letter of appointment," which proposed to pay Gadio a "consulting fee" consisting of (i) a $100,000 "donation" to support Gadio's NGO work, (ii) $100,000 as compensation for the work performed to date, and (iii) $200,000 as compensation for further work. (Tr. 518-24). Gadio felt that Ho's offer was unfair and responded, in part, that "[i]t is difficult to comprehend a 2 million dollar gift to the President and only one hundred thousand dollar to the facilitator who made all of this possible." (Add. 3; Tr. 530-31). Even after the "donation letter," Gadio still viewed—and believed that Ho still viewed—the $2 million cash as a payment for Déby's personal benefit, which was why Gadio used that payment as a comparison for the amount Ho was proposing to compensate him. (Tr. 531-32).

Ultimately, Ho caused CEFC NGO to pay Gadio $400,000. (Tr. 537-42, 875-80). Despite extensive further efforts by Ho—with Gadio's assistance—to negotiate a deal for Chadian oil rights, by mid-2015, no deal was reached because the parties could not agree on a price. (Tr. 551-58). Ho thereafter ceased being involved in the discussions with Chad and was replaced by other CEFC officials. (Tr. 558-61, 658).

### 3.  The Uganda Scheme

While Ho was in New York for the 2014 UN General Assembly, Ho sought an introduction to Sam Kutesa, the Minister of Foreign Affairs of Uganda, who had recently begun his one-year term as President of

13

the UN General Assembly (the "PGA"). (Tr. 141, 159-60, 163, 723-25). The PGA is "the top position in the hierarchy of the United Nations"; he or she is "elected by the member states" for a one-year term to "chair the sessions of the General Assembly" and to "speak[ ] on behalf of the UN." (Tr. 50-51).

Ho reached out to Kutesa's PGA office by describing himself as "Deputy Chairman and Secretary General of ChinaEnergy Fund Committee, a Chinese think tank registered in Hong Kong and also in the USA as a public charity" that was "also granted special consultative status from UN's Economic and Social Council." (Add. 11; Tr. 725-26). Ho thereafter met with Kutesa and cultivated a relationship with him in an effort to form a "strategic partnership" between Uganda and CEFC China for business ventures, once Kutesa completed his term as the PGA and returned to Uganda. (Tr. 163-66, 726, 728-34, 736-41). As Ho reported to the CEFC Chairman, Kutesa's brother-in-law was the President of Uganda, and Kutesa was "more than happy to assist us" in developing Uganda's oil fields, acquiring shares of Ugandan banks, and pursuing infrastructure projects. (Tr. 740-41).

In or about February 2016—after Kutesa had returned to Uganda and resumed his role as Foreign Minister, and his brother-in-law, Yoweri Museveni, had been reelected as the President of Uganda—Kutesa (through his wife) solicited a payment from Ho, purportedly for a charitable foundation. (Tr. 746-48). Ho replied that "[w]e want to . . . renew our friendship as well as our mutual agreement and commitments,"

14

and requested an invitation to Museveni's inaugura-
tion. (Tr. 748-49). Kutesa's wife asked Ho to "confirm
the contribution to [Kutesa's] foundation," and simul-
taneously advised him of a bank acquisition oppor-
tunity in Uganda. (Tr. 749-50). Ho agreed to provide
the requested payment, and stated (in the same
email): "We will also bring an entourage of CEOs to
Uganda to directly dovetail with your heads of busi-
ness. Just give me a list of all the major projects, from
infrastructure, energy, agriculture, to finance and
banking, and we will bring the relevant heads to your
country to kickstart each project." (Tr. 755-56). At no
point did Ho request any information about the mis-
sion or work of Kutesa's "foundation" (Tr. 757).

After Ho had agreed to provide the requested pay-
ment, but before wiring the money, Ho emailed Kutsea
and his wife stating:

> The size of the entourage is . . . depend-
> ent on the number of projects the Presi-
> dent and Sam [Kutesa] want to engage
> China with. It can be anything from en-
> ergy, agriculture, infrastructures, tour-
> ism, banking and finance, to stock mar-
> ket. . . . [O]ur company is now holding in-
> terests in all of these fields and sec-
> tors. . . . What can come out of this occa-
> sion can only be limited by what can be
> imagined.

(Tr. 759-60). Kutesa's wife replied, "I promise to send
you a tentative list of projects you may be interested
in no later than the end of this week." (Tr. 761).

15

Around this time, Ho wrote a report to the CEFC Chairman, designating it "Highly Confidential" and "Super Urgent." (Tr. 765). In the report, Ho stated that they had been invited to President Museveni's inauguration and that the Ugandan side would be "arrang[ing] for meetings and specific project negotiations between the newly selected ministers in the relevant field (such as energy, finance and transportation, etc.) and our counterparts." (Tr. 766). Ho also advised the Chairman to provide $500,000 in cash to President Museveni as a purported "campaign" contribution. (Tr. 766-67).

On May 5, 2016, shortly before Ho traveled to Uganda, he caused CEFC NGO to wire $500,000 to the account in the name of the purported "foundation" designated by the Kutesas. (Tr. 768-72). This money was transmitted (i) from a CEFC NGO account at HSBC in Hong Kong to HSBC USA, (ii) then to Deutsche Bank Trust Company Americas in New York, New York, and (iii) then to Stanbic Bank in Kampala, Uganda. (Tr. 811-14, 880-81; A. 745-48). As with the so-called "donation" to Chad, Ho made no effort to publicize this purported "donation" to a Ugandan foundation. (Tr. 218-31). CEFC's multiple websites also made no reference to any such contribution, despite the fact that they included press releases touting various other charitable activities. (Tr. 815-21).

As Ho prepared to travel to Uganda, he wrote to Kutesa and his wife that, "we are preparing to bring with us some very 'nice' gifts to your president and to Minister Kutesa to celebrate the occasion," and "shall

16

require special assistance with your customs procedure." (Tr. 786-87 (internal quotation marks in original)).

Ho and other members of a CEFC delegation, including officers of CEFC China, flew to Uganda, attended President Museveni's inauguration, and met privately with, among others, Museveni, Kutesa, a Ugandan central bank official, and the minister of the Department of Energy and Mineral Resources. (Tr. 789-90, 794-95). Shortly after the trip, Ho emailed his assistant regarding the "main points of Uganda possibilities," and described various business opportunities in the energy, infrastructure, finance, agriculture, and tourism sectors. (Tr. 793-94). Ho also wrote a "Highly Confidential" and "Super Urgent" report to the CEFC Chairman, noting, among other things, that during the meeting with the President, they discussed "the discovery of the oil fields . . . near the border areas of Western Uganda and Congo . . . . No matter which aspect we are interested in, participation is possible. Even if bidding process for a project is completed, it can be reversed and restarted again." (Tr. 795-99).

Approximately two weeks after returning from Uganda, Ho emailed Kutesa and his wife, stating that CEFC China had decided on its "first step" and "first priority" in Uganda—namely, that CEFC China wanted to "acquir[e] controlling shares of Barclays Bank Africa in Uganda," and requested their "assistance in going about doing so." (Tr. 802). He further noted that CEFC China was "very enthusiastic about the prospect of joint ventures in Uganda," "[i]n particular, in working with you [the Kutesas] and the

17

Kutesa family." (*Id.*). Ho said that CEFC China wanted to "partner" with the Kutesas in such "business ventures." (*Id.*).

Kutesa's wife responded to Ho's email, but noted that "Sam [Kutesa] is very busy now" with certain diplomatic responsibilities. (Tr. 803). Ho immediately responded that "CEFC would like to partner with the Kutesa enterprise and would like to invest through you and with your family businesses (and the president's) who can be the local operators." (Tr. 803-04). Ho asked her to "relay th[is] to Sam [Kutesa] and to the president" and to "look into the opportunity with . . . Barclays." (*Id.*).

Approximately five months later, Kutesa's wife informed Ho of a "confidential and urgent" opportunity to acquire a Ugandan bank. (Tr. 805-06). She advised Ho to contact the Ugandan central bank official whom he had met during his trip to Uganda. (Tr. 805-06). Ho then contacted this Ugandan official, and ultimately referred the matter to another CEFC China executive to handle. (Tr. 806-08).

## B.  The Defense Case

Ho offered a single document and a corresponding translation into evidence, and otherwise relied on cross-examination of the Government's witnesses as his defense case. (Tr. 913).

## C.  The Verdict And Sentencing

On December 5, 2018, the jury returned a verdict of guilty on Counts One through Six and Count Eight, and not guilty on Count Seven. (Tr. 1153-56).

18

On March 25, 2019, Judge Preska sentenced Ho to 36 months' imprisonment on each count of conviction, to be served concurrently, and imposed a fine of $400,000.

Ho is currently serving his sentence.

## ARGUMENT

### POINT I

### Ho's Convictions Were Supported By Sufficient Evidence

Ho challenges the sufficiency of the evidence that he violated the FCPA in only one respect: He contends that, as to Counts Two and Three, the Government failed to demonstrate that, in connection with his offering and payment of bribes, he acted to assist a "domestic concern," namely, a U.S. entity. (Br. 19-23). That contention is meritless. The evidence amply demonstrated that Ho acted to assist CEFC NGO, including its U.S. arm, CEFC NGO USA—which Ho headed and directed—in obtaining business for, and directing business to, CEFC China, the multibillion-dollar conglomerate that funded CEFC NGO.

### A.   Applicable Law

"[A] defendant challenging the sufficiency of the evidence that led to his conviction at trial 'bears a heavy burden,' as the standard of review is 'exceedingly deferential.'" *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (quoting *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010); *United States v. Hassan*, 578

19

F.3d 108, 126 (2d Cir. 2008)). This Court "view[s] the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Id.* (internal quotation marks omitted). The Court has emphasized that "the task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). Accordingly, "[a]lthough sufficiency review is *de novo*, [the Court] will uphold the judgments of conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Coplan*, 703 F.3d at 62 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)).

The Court "must consider the evidence as a whole, and not as individual pieces, and remember that the jury is entitled to base its decision on reasonable inferences from circumstantial evidence." *United States v. Rahman*, 189 F.3d 88, 122-23 (2d Cir. 1999); *see also United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (A "verdict may be based entirely on circumstantial evidence." (internal quotation marks omitted)). "[C]ourts must defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony when reviewing the sufficiency of the evidence." *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 158-59 (2d Cir. 2008) (internal quotation marks and citations omitted).

20

## B.  Discussion

Ho claims that there was insufficient evidence that CEFC NGO USA was related to the bribes that he offered and paid. Rather, Ho asserts that "all of his actions relevant to this case were undertaken for two foreign entities, CEFC [China] and CEFC NGO, which were based in Shanghai and Hong Kong, respectively," and therefore he is entitled to acquittal as a matter of law on Counts Two and Three.[4] (Br. 20-21). Ho is wrong.

Counts Two and Three charged Ho under 15 U.S.C. § 78dd-2, which, as is relevant here, prohibits an officer, director, employee, or agent of a "domestic concern" from offering or paying bribes "to . . . any foreign official for purposes of [one or more specific purposes, including 'securing any improper advantage'] . . . in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person." 15 U.S.C. § 78dd-2(a)(1); *see also id.* § 78dd-2(a)(3). A "domestic concern" is defined as (i) a

---

[4]  Ho does not dispute, among other things, that the evidence sufficiently demonstrated that (1) he was an officer, director, employee, or agent of a "domestic concern," *i.e.*, CEFC NGO's U.S. arm, CEFC NGO USA; and (2) he used various means of interstate commerce, such as emails, (i) corruptly, (ii) in furtherance of an offer or payment of "anything of value," (iii) to a foreign official, (iv) for one or more specified purposes, such as securing an improper advantage, (v) in order to obtain business for, or direct business to, CEFC China. *See* 15 U.S.C. § 78dd-2.

21

U.S. citizen, national, or resident, or (ii) entity organized under the laws of a U.S. state or federal territory or with its principal place of business in the United States. *Id.* § 78dd-2(h)(1).

As an initial matter, Ho's challenge conflates two distinct elements, which were separately described to the jury (*see* Tr. 1082-84, 1089-90), in instructions the accuracy of which Ho does not contest. To prove him guilty of each of Counts Two and Three, the Government had to demonstrate that Ho acted to (i) "assist such domestic concern" (*i.e.*, the domestic concern of which he was an officer, director, employee, and/or agent) (ii) in "obtaining or retaining business for or with, or directing business to, any person" (*i.e.*, the person or entity that would benefit from the bribe offer or payment). 15 U.S.C. § 78dd-2(a)(1). There is no requirement that the domestic concern (here, CEFC NGO USA) and the person or entity that would benefit from the bribe offer or payment (here, CEFC China) must be the same. The pertinent question is not, as Ho suggests, whether his bribes were "undertaken *for*" a domestic concern (Br. 20 (emphasis added)), or whether the domestic concern *itself* had an "interest in Chad or Uganda" (Br. 22), but simply whether there was sufficient evidence that Ho acted to assist the domestic concern to obtain business for, or direct business to, another entity. The answer to that question is yes.

The evidence presented at trial conclusively demonstrated that: (i) Ho was Secretary-General of and led CEFC NGO (Tr. 61, 70, 202-03); (ii) CEFC NGO was incorporated in the United States as CEFC

22

NGO USA and both maintained a significant presence and acted in the United States—a fact touted by Ho (*see, e.g.*, Tr. 207-13, 725-26; Add. 11, 12) and in CEFC NGO's materials, which described it as a single organization, operating in multiple countries, with "Special Consultative Status" at the UN (*see, e.g.*, A. 731-33; Add. 13 (CEFC NGO website in Chinese), 20 (English translation)); (iii) CEFC NGO USA used offices in both Virginia and New York (the latter of which was also used by CEFC China) (Tr. 62-64, 207-13); (iv) Ho was both a director and an officer of CEFC NGO USA, and directed its work, including through meetings in New York (A. 749-60; Add. 26; Tr. 207-09, 214, 824-25); and (v) Ho used that position, including through meetings in New York, to execute both the Chad Scheme and the Uganda Scheme.

As to the Chad Scheme, Ho tasked Jeremic (a former PGA) to connect Ho with Gadio (a former foreign minister), which Jeremic did by touting Ho's NGO and UN-related work. (Tr. 153-54, 298, 311, 364, 696-97). Ho then met with Gadio at the suite used by CEFC NGO USA at Trump World Tower, at which point Ho apprised Gadio of his true goal, *i.e.*, to establish a connection to Déby to pursue business opportunities for CEFC China. (Tr. 207-11, 303-09, 697). Ho then used Gadio to arrange meetings with Déby, at which he offered Déby the cash bribe, which he later characterized as a "donation."

As to the Uganda Scheme, Ho brokered a connection to Kutesa, while Kutesa was serving as the PGA, by describing himself as the Secretary-General of "a Chinese think tank registered in Hong Kong and also

23

in the USA as a public charity" that was "also granted special consultative status from UN's Economic and Social Council." (Add. 11; Tr. 725-26). Over the course of the year that Kutesa served as the PGA, Ho met repeatedly with him in New York, ostensibly for NGO-related meetings, but actually to lay the groundwork for Kutesa to steer business projects to CEFC China once he returned to Uganda. (*See* A. 591-92, 593-600, 601-05, 606-15; Add. 12, 27, 28, 29). Ho also used his NGO position to disguise his $500,000 bribe payment as a purported "donation," including by wiring it from CEFC NGO's bank account. (A. 745-48).

In short, Ho's suggestion that there was a discrete and unbroken line between (1) CEFC NGO, on behalf of which Ho both sought "to facilitate a sale of oil resources [in Chad] to CEFC [China]" and "worked . . . to arrange meetings between Uganda officials and representatives of . . . CEFC [China]" (Br. 21), and (2) the NGO's U.S. affiliate, CEFC NGO USA, "for which Ho was director," but purportedly did nothing of relevance (Br. 22), is not just unsupported by the evidence, but also conflicts with Ho's own contemporaneous words. Neither CEFC NGO nor Ho recognized or acted in accord with the distinction that Ho now draws.

Nor, contrary to Ho's argument on appeal, did the Government's "theory of the case" at trial somehow "*foreclose*[ ] a conviction" (Br. 23 (emphasis in original)). The Government explicitly argued to the jury that Ho "took actions in his capacity as an officer or director of what is called the domestic concern—which is a fancy word for an entity that is based here in the United States," that is, CEFC NGO USA, "the U.S.

24

branch of the CEFC NGO," and referenced "extensive evidence in this case about how the defendant used his status as the head of a nonprofit NGO registered as a charity here in the United States to carry out these schemes." (Tr. 984-85). The Government described how, among other things, Ho "gained access to Gadio and Kutesa through meetings at the UN here in New York, in Manhattan" and how "[h]is NGO position also gave him cover to call these payments bribes." (Tr. 985).

To be sure, as Ho notes (Br. 22-23), the Government principally focused its arguments on whether Ho's payments were bribes intended to benefit CEFC China—but that was the core disputed issue at trial, not whether Ho acted on behalf of CEFC NGO and its U.S. affiliate. In fact, Ho's counsel did not use the phrase "domestic concern" in summation, instead telling the jury that the "real issue" for it to decide was "whether these were payments to build goodwill or whether they were bribes to obtain business" (Tr. 993), the same issue on which the Government principally focused. In any event, the pertinent question is whether sufficient evidence supported Ho's convictions, not the degree to which the Government's summation discussed those elements. *See, e.g.*, *United States v. Arboleda*, 20 F.3d 58, 61 (2d Cir. 1994) ("A summation is not evidence. It is simply an attorney's argument to the jury on the circumstances of the case.").

Here, the evidence amply established that Ho used CEFC NGO's U.S. affiliate—which was indisputably a "domestic concern" and of which Ho was indisputably

a director, officer, and/or agent—to facilitate his access to and cultivation of world leaders and UN officials, whom Ho then engaged to further CEFC China's goals. Put differently, in the language of the FCPA, a rational jury easily could have found that Ho "assist[ed]" CEFC NGO USA in "obtaining . . . business for" and/or "directing business to" CEFC China.

## POINT II

## Ho's Conviction For Money Laundering Was Both Legally And Factually Sufficient

Ho next challenges the legal and factual sufficiency of his conviction under Count Eight, which charged him with money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A).[5] Specifically, Count Eight charged him with transmitting funds to and from the United States with the intent to promote the carrying on of

————————

[5]   Section 1956(a)(2)(A) provides that:

Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States [for one or more purposes, including] with the intent to promote the carrying on of specified unlawful activity [shall be guilty of a crime].

18 U.S.C. § 1956(a)(2)(A).

26

three specified unlawful activities ("SUAs"): (1) the violation of the FCPA charged in Count Three, under 15 U.S.C. § 78dd-2; (2) the violation of the FCPA charged in Count Five, under 15 U.S.C. § 78dd-3; and (3) bribery of a Ugandan official, under Ugandan law. (A. 98-99).

Ho first contends that his conviction under Count Eight was legally insufficient because the second of the three listed SUAs—namely, the FCPA violation charged in Count Five—should not have been presented to the jury because the version of the FCPA in existence at the time the pertinent portion of the money laundering statute was enacted did not include Section 78dd-3. (Br. 25-26).

Ho also contends that his conviction under Count Eight was factually insufficient because, he claims, the Government failed to prove that the transfer of funds charged in Count Eight went either "to" or "from" the United States. (Br. 24, 29-36).

## A. Applicable Law

"Claims of factual and legal defects both challenge the sufficiency of the Government's case, but they do so in distinct ways." *United States v. Desnoyers*, 637 F.3d 105, 109 (2d Cir. 2011). "A factual challenge tests the sufficiency of the evidence," *id.*, and requires a court to "uphold the judgment[ ] of conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" *Coplan*, 703 F.3d at 62 (quoting *Jackson*, 443 U.S. at 319 (emphasis in original)). A legal challenge, by con-

27

trast, questions whether a conviction rests on "a mistake about the law, as opposed to a mistake concerning the weight or the factual import of the evidence." *Griffin v. United States*, 502 U.S. 46, 59 (1991).

## B. Discussion

### 1. Ho's Conviction For Money Laundering Was Legally Sufficient

Ho's objection to the legal sufficiency of his conviction under Count Eight raises a question of statutory interpretation of the money laundering statute, which this Court reviews *de novo*. *See, e.g.*, *United States v. Epskamp*, 832 F.3d 154, 160 (2d Cir. 2016). Statutory interpretation "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *United States v. Albertini*, 472 U.S. 675, 680 (1985) (internal quotation marks omitted). Where "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)); *see also Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.").

The money laundering statute is clear on its face. It covers, without limitation, "any felony violation of the Foreign Corrupt Practices Act." 18 U.S.C.

28

§ 1956(c)(7)(D). Accordingly, this Court should "enforce it according to its terms." *Ron Pair Enters.*, 489 U.S. at 241 (internal quotation marks omitted).

Ho nevertheless argues that this Court should read an unexpressed limitation into the statute, by invoking the "reference canon" (Br. 25), which, he claims, requires reading the money laundering statute as "in effect cut[ting] and past[ing] the referenced statute as it existed when the referring statute was enacted, without any subsequent amendments," *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019). This argument should be rejected for multiple reasons. Resort to the reference canon is both unnecessary, because the statute is clear, and improper, because it would lead to absurd results and unintelligible criminal laws.

First, because the money laundering statute is clear on its face, the Court need not and should not resort to a canon. Canons provide a method of "supplementing and narrowing the possible meaning of ambiguous text." *Natural Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 98 (2d Cir. 2000). They "do not come into play if the language of the statute is plain." *United States v. DiCristina*, 726 F.3d 92, 99 n.8 (2d Cir. 2013) (citing *Connecticut Nat'l Bank*, 503 U.S. at 253); *see also Green v. City of New York*, 465 F.3d 65, 78 (2d Cir. 2006) ("Only if an attempt to discern the plain meaning fails because the statute is ambiguous, do we resort to canons of construction."). *Jam*, upon which Ho relies (Br. 25), is in accord. There, the Supreme Court stated that "[w]e ordinarily assume, absent a clearly expressed legislative intention to the contrary, that the legislative purpose is expressed by

29

the ordinary meaning of the words used," and examined the statutory text before noting that the "natural reading" of that text was "confirmed" by the reference canon. *Jam*, 139 S. Ct. at 769 (internal quotation marks omitted).

In any event, canons are "guides," not "mandatory rules," and are useful only to the extent they "help judges determine the Legislature's intent." *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001). The money laundering statute "takes dead aim at the attempt to launder dirty money." *United States v. Stavroulakis*, 952 F.2d 686, 691 (2d Cir. 1992). "Why and how that money got dirty is defined in other statutes." *Id*. The money laundering statute is thus structured very differently from one that merely "in effect cuts and pastes" a different "referenced statute," *Jam*, 139 S. Ct. at 769. "[I]n expounding a statute," a court "must . . . look to the provisions of the whole law, and to its object and policy." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51 (1987) (internal quotation marks omitted; alteration incorporated). The structure and purpose of the money laundering statute make clear that the list of SUAs in Section 1956(c)(7) is meant to be "link[ed]" to the actual criminal statutes set forth therein "so that the one develops in tandem with the other." *Jam*, 139 S. Ct. at 769. This Court should decline Ho's invitation to interpret the money laundering statute in a manner that ignores its structure and purpose, and freezes it in time.

Moreover, application of the canon invoked by Ho here would lead to absurd results. "[I]nterpretations of a statute which would produce absurd results are to be

30

avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982); *see also, e.g.*, *United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000); *cf. Jam*, 139 S. Ct. at 771-72 (discussing whether an interpretation in accord with statutory text would create "undesirable results"). Ho's suggestion (Br. 26-27) that his interpretation, if adopted, would merely limit the application of one subsection of the money laundering statute in cases involving one provision of the FCPA is demonstrably incorrect. The money laundering statute is replete with the same kind of cross-references. *See, e.g.*, 18 U.S.C. § 1956(c)(7) (specified unlawful activity includes "any act or activity constituting an offense listed in section 1961(1) of this title . . . ."). Adopting Ho's interpretation would mean that virtually every offense in the statute would be strictly limited to the definition of an offense at the time it was first enacted, no matter how many years ago—despite the statute's long-understood purpose broadly to criminalize financial transactions that promote or launder the proceeds of serious criminal activity. *See, e.g.*, *United States v. LeBlanc*, 24 F.3d 340, 346 (1st Cir. 1994). This would lead to absurd results.

For example, if a new drug were scheduled as a controlled substance (as happens with some frequency), transmitting money to or from the United States to promote selling that drug would no longer appear to be a crime. *See* 18 U.S.C. § 1956(c)(7)(A); *id.* § 1961(1)(A). Similarly, transmitting money to promote the selling of arms (or laundering the proceeds of such sales) would appear to be a crime only if the specific arms

31

were identified and placed on the United States Muni-
tions List at the time the pertinent section was en-
acted. *See id.* § 1956(c)(7)(B)(v)(I). This would be a
boon to traffickers of modern weapons, chemical
agents, and related systems. *See, e.g.*, Amendment to
the International Traffic in Arms Regulations: Revi-
sion of U.S. Munitions List Categories XIV and XVIII,
FR 49531-01, 2016 WL 4011597 (July 28, 2016). It is
inconceivable that Congress so intended.[6]

Nor, as the District Court explained (SPA 38),
would such significant and problematic ramifications
be limited to the money laundering statute. *See, e.g.*,
18 U.S.C. § 924(c) (prohibiting use of a firearm in con-
nection with a "drug trafficking crime," defined as "any
felony punishable under the Controlled Substances
Act (21 U.S.C. 801 et seq.), the Controlled Substances
Import and Export Act (21 U.S.C. 951 et seq.), or chap-
ter 705 of title 46"); *id.* § 1961(1)(B) (defining "racket-
eering activity" as including "any act which is indicta-
ble under any of the following provisions," and then
listing such provisions).

Ho argues that if Congress had meant for later-en-
acted parts of the FCPA to be included, it would have
written "as it may be amended." (Br. 26). But the only
examples Ho cites of this type of language are from
more than seventy years ago, and involved different

─────────

6 Indeed, under Ho's interpretation, Congress
could eliminate an offense from the criminal code, but
unless Congress also removed it as an SUA, a defend-
ant could still be prosecuted for "laundering" the pro-
ceeds of such conduct.

32

statutes. (*See* Br. 26 n.8). Alternatively, Ho suggests, Congress would have amended the money laundering statute expressly "to include § 78dd-3." (Br. 27). But Ho does not identify an example of a time when Congress has amended the statute to add a new, express cross-reference to a section that is subsumed within a preexisting, broader cross-reference. If, as Ho suggests, Congress "manifested an intention" for the statute only to cover certain FCPA offenses (Br. 26), one reasonably would expect it to manifest a different intention, at least once, elsewhere in the same statute. It has not done so. The reason is apparent: There is no need to do so.

The absence of an example in support of Ho's presumption as to congressional intent is particularly difficult to reconcile with the canon upon which Ho relies, which has existed since at least 1938, if not 1890. *See Hassett v. Welch*, 303 U.S. 303, 314 (1938); *Snell v. Chicago*, 133 Ill. 413, 437-39 (1890). It is settled law that Congress is "presumed to have legislated against the background of our traditional legal concepts." *United States v. United States Gypsum Co.*, 438 U.S. 422, 437 (1978). Yet if Ho is correct, Congress has knowingly permitted the money laundering statute to ossify with respect to all kinds of conduct. There is no reason to presume that Congress has acted so irrationally.

Finally, criminal laws must be interpreted such that they are understandable by laypeople of ordinary intelligence. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972); *see also, e.g., United States v. Balde*, 927 F.3d 71, 76 (2d Cir. 2019) ("Criminal laws

33

are ordinarily written to be understood by the non-specialist individuals who are subject to the law, law enforcement officers, prosecutors, and jurors . . . ."); *Dickerson v. Napolitano*, 604 F.3d 732, 741 (2d Cir. 2010). If Ho's position were accepted, it would no longer suffice for one to read that laundering the proceeds of a "specified unlawful activity" is a crime, and then to review the list of SUAs. *See* 18 U.S.C. § 1956(c)(7). With respect to most SUAs, if not all, one would instead need to determine (a) when each SUA was added to the money laundering statute, and then (b) how the referenced SUA statute read at that time. This is no easy feat for someone without access to a costly legal database, particularly when the sections at issue may have been enacted decades ago. And one would have to repeat the same time-consuming task outside of the money laundering context as well. *See, e.g.*, *id.* § 924(c), *id.* § 1961(1). This Court should avoid an interpretation of the law that renders it unintelligible on its face "by the non-specialist individuals who are subject to the law." *Balde*, 927 F.3d at 76.

In sum, Ho's proposed interpretation is unsupported by statutory language, conflicts with statutory structure, requires one to presume that Congress has acted irrationally, creates absurd results, and risks rendering the statute facially unintelligible by lay people. His interpretation should be rejected.

## 2. Ho's Conviction For Money Laundering Was Factually Sufficient

Before trial, Ho moved to dismiss Count Eight on the ground that the $500,000 he was alleged to have

34

transmitted from Hong Kong to New York and then from New York to Uganda neither went "to" the United States nor "from" the United States, but merely passed through the United States. (Dkt. 63 at 12-19). The District Court denied this motion, finding that the Indictment tracked the statute, and, in any event, the Government's proffered evidence was sufficient (SPA 12-17). At trial, the Government presented evidence that Ho caused $500,000 to be transmitted (i) from a CEFC NGO account in Hong Kong to HSBC USA, then (ii) from HSBC USA to Deutsche Bank Trust Company Americas in New York, New York, and then (iii) from Deutsche Bank Trust Company Americas in New York, New York to Stanbic Bank in Kampala, Uganda. (Tr. 811, 812-14, 880-81; A. 745-48).

On appeal, Ho does not challenge the District Court's denial of his motion to dismiss the Indictment, but claims that the Government's evidence at trial was insufficient, because funds "[p]assing 'through' a correspondent bank in the United States is not the same as [funds] coming 'from' or going 'to' the United States." (Br. 30 (internal quotation marks in original)). Ho did not request that the jury receive such an instruction and did not make this argument in summation. In any event, Ho's claim is squarely contradicted by the evidence, which demonstrated that the funds at issue went to a bank in the United States, and then from that bank to another bank in the United States, and then from that bank to a third bank abroad. *Cf. United States v. Daccarett*, 6 F.3d 37, 54 (2d Cir. 1993) (rejecting, in the civil forfeiture context, a "conception of the intermediary banks as messengers who never

35

hold the goods, but only pass the word along," explaining that "at least two separate transactions occurred: first, funds moved from the originating bank to the intermediary bank; then the intermediary bank was to transfer the funds to the destination bank, a correspondent bank [abroad]").

Contrary to Ho's suggestion (Br. 29), Section 1956(i)(3) of the money laundering statute does not say otherwise. It simply provides that venue is proper in any district in which a transaction takes place, in whole or in part. Nothing in this provision categorically excludes from prosecution any movement of funds that commences and ends outside of the United States, regardless of what happens in the United States.

Ho's alternative argument, that the rule of lenity requires reversal (Br. 33), also is plainly meritless. The rule of lenity is a rule of statutory construction, not the standard of review of a sufficiency challenge. A defendant is not entitled to reversal on the ground that the evidence is "ambigu[ous]" (Br. 33). Just the opposite—"the task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court." *McDermott*, 245 F.3d at 137. Here, the jury was properly instructed on the law and found no such ambiguity. Rather, it found Ho guilty.

Finally, Ho's reliance on *United States v. Harris*, 79 F.3d 223 (2d Cir. 1996) (Br. 33-34), is misplaced. The defendant in *Harris* was convicted of transmitting funds in violation of Section 1956(a)(2)(A), but, unlike in this case, the charged purpose was to conceal the funds. *See Harris*, 79 F.3d at 228, 230. On appeal, the

defendant argued that the evidence was insufficient because it showed only that he intended to conceal funds when he transferred them from New York to Connecticut, not when he transferred them on to Switzerland. *Id.* at 231. This Court disagreed, explaining that the jury was instructed that it must find that the defendant transferred funds abroad with the requisite intent. *See id.* The Court found that "the scheme was implemented in two stages, [and] each stage was an integral part of a single plan to transfer funds 'from a place in the United States to or through a place outside the United States.' " *Id.* As the District Court put it, in rejecting Ho's challenge: "[I]t was clear in [*Harris*] the Court was attributing the defendant's intent to conceal to both legs of the transaction. It wasn't really considering the argument that [Ho] makes here." (SPA 16).[7]

Ho's challenge has also been addressed, and rejected, elsewhere. In *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 571 F. Supp. 2d 1, 13

---

[7] The other cases cited by Ho (Br. 34) fail to support his claim for similar reasons. None construed the words "to" or "from" or held that a jury could not convict on analogous facts. *See United States v. Dinero Exp., Inc.*, 313 F.3d 803, 807 (2d Cir. 2002) (affirming conviction of defendant who used phony money remittances to move proceeds); *United States v. Moloney*, 287 F.3d 236, 241 (2d Cir. 2002) (rejecting challenge to indictment), *abrogated on other grounds*, *United States v. Cotton*, 535 U.S. 625 (2002); *United States v. Hawit*, No. 15 Cr. 252, 2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) (same).

37

(D.D.C. 2008), the court rejected a claim in civil case that "a transaction that began in Poland, went from Poland to a [U.S.] financial institution, and from that [U.S.] financial institution to Switzerland, should be viewed as a single transaction" and thus does not fall within Section 1956(a)(2). There, the court correctly noted that a contrary ruling would "suppose that Congress did not intend to criminalize the use of United States financial institutions as clearinghouses for criminal money laundering and conversion into United States currency." *Id.* at 13 (citing, *inter alia*, *Daccarett*, 6 F.3d at 54); *see also United States v. All Assets Held at Bank Julius Baer & Co. Ltd.*, 251 F. Supp. 3d 82, 94 (D.D.C. 2017).

This Court need not determine the outer "ambit" of the money laundering statute to resolve this appeal ((Br. 30 (capitalization omitted)), as Ho appears to ask it to do through hypotheticals untethered to the evidence in this particular case (Br. 30-31). Nor need the Court determine whether a defendant might permissibly seek jury instructions different from those given in this case if the defendant were charged with moving money to or from the United States "through a place outside the United States" (Br. 31). As noted above, Ho did not seek a jury instruction in accord with the theory that he now presses, and he does not contest the accuracy of the instructions that were given. The Court need only decide whether any rational jury, presented with evidence that funds that went from a bank in Hong Kong to the bank's affiliate in the United States, then from that U.S. bank to a different bank in the United States, and then from that U.S. bank to a different bank outside of the United States, could find

38

that funds went "to" or "from" the United States. Particularly after "crediting every inference that could have been drawn in the government's favor," *Coplan*, 703 F.3d at 62 (internal quotation marks omitted), a rational jury surely could so find.

## POINT III

### Ho's Evidentiary Challenges Are Meritless

Ho next asserts that the District Court abused its discretion by admitting certain statements and summary charts at trial. Ho is wrong.

### A. Applicable Law

This Court "will reverse only where a ruling to admit or exclude evidence is manifestly erroneous and as such constitutes an abuse of discretion." *United States v. Samet*, 466 F.3d 251, 254 (2d Cir. 2006) (internal quotation marks omitted). This Court will not find an abuse of discretion in an evidentiary ruling unless it is "persuaded that the trial judge ruled in an arbitrary and irrational fashion." *United States v. Dhinsa*, 243 F.3d 635, 649 (2d Cir. 2001) (internal quotation marks omitted).

Even where there is such an abuse of discretion, the Court not grant a new trial unless the improper ruling is "so clearly prejudicial to the outcome of the trial that we are convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *United States v. Vargas-Cordon*, 733 F.3d 366, 384 (2d Cir. 2013) (internal quotation marks omitted); *see also, e.g.*, *United States v. Paulino*, 445 F.3d 211,

39

219 (2d Cir. 2006) (For an error to be deemed harmless, the Court is "not required to conclude that the error could not have had any effect whatever" on the jury's verdict. (internal quotation marks omitted; alterations incorporated)).

## B. Discussion

### 1. The Statements Of President Déby Were Properly Admitted

Déby's statements expressing outrage upon finding $2 million cash in the gift boxes left by the CEFC delegation were properly admitted at trial. As described above, at the second meeting between CEFC and Chadian officials on December 8, 2014, the CEFC delegation presented Déby with gift boxes, and later that day Déby expressed anger and concern to Gadio about finding cash in those boxes. The next day, Déby, using substantially the same language, confronted the delegation about the cash, to which both Ho and a colleague responded.

With respect to Déby's statements to Gadio on December 8, the District Court found that these statements were admissible "as context and to tell the story." (SPA 21). This was not an abuse of discretion.

As an initial matter, many of Déby's statements were in the form of questions or directives (*see* Tr. 442), and therefore were not factual assertions under Federal Rule of Evidence 801. *See, e.g.*, *Coplan*, 703 F.3d at 84; *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999). In any event, they were neither offered nor admitted for the truth of any factual matter

40

asserted, but rather to put into context and explain what happened next, including Déby's lack of animosity toward Gadio the next day and calling the CEFC delegation back to confront it. An out-of-court-statement may be offered for "background" purposes—*i.e.*, "not as proof of the truth of the matters asserted but rather to show the circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed." *United States v. Pedroza*, 750 F.2d 187, 200 (2d Cir. 1984). The District Court did not abuse its discretion in admitting Déby's statements on December 8 to Gadio.

Regardless, any conceivable error in admitting Déby's statements on December 8 was harmless, because the statements were repeated—using substantially the same words—to Ho the following day. Déby's statements to Ho on December 9 were necessary to understanding Ho's immediate response to Déby, namely that Ho was "very impressed by your reaction and your attitude." (Tr. 449). Ho contends that the District Court should nevertheless have precluded Déby's statements to him. This contention fails for multiple reasons.

First, as the District Court found (SPA 19, 21), Ho's immediate response "can only make sense in the context of adopting the president's statement that the boxes had cash in them." (SPA 19). Déby's December 9 statements were thus admissible as a statement that

41

Ho "manifested that [he] adopted or believed to be true," Fed. R. Evid. 801(d)(2)(B).[8]

Second, even if Ho had not adopted Déby's assertion that the boxes contained cash, Déby's statements to Ho would still be admissible to render Ho's response intelligible. *See, e.g.*, *United States v. Sorrentino*, 72 F.3d 294, 298 (2d Cir. 1995); *United States v. Guzman*, 754 F.2d 482, 487 (2d Cir. 1985). The jury cannot have fairly understood the meaning of Ho's response without such context. So too with the statement from Ho's colleague that the cash was really "intended to be a donation to your country, to your causes, or something." (Tr. 451).

Third, even if Déby's statements on this subject were not admissible on either of these bases, they were admissible as probative of Ho's state of mind.[9] *See*

––––––––––

8    Because admission of a statement under Rule 802(b)(2)(B) involves a preliminary question of fact to be resolved by a preponderance of the evidence (as Ho acknowledges (Br. 39)), to the extent that Ho challenges the District Court's ruling, he must demonstrate that its finding that he adopted Déby's statement was clearly erroneous. *Cf. United States v. Coppola*, 671 F.3d 220, 246 (2d Cir. 2012) (a preliminary question of fact under Rule 801(d)(2)(E) is reviewed only for clear error). Ho cannot so demonstrate.

9    "[A]n evidentiary ruling can be upheld on appeal if there is any basis in the record that supports it, whether articulated below or not." *United States v. Robinson*, 294 F. App'x 630, 632 (2d Cir. 2008) (*citing Millares Guiraldes de Tineo v. United States*, 137 F.3d

*United States v. Certified Environmental Servs., Inc.*, 753 F.3d 72, 89 (2d Cir. 2014). ("An out-of-court statement offered for some other purpose [than to prove the truth of a fact asserted], such as . . . to demonstrate the statement's effect on the listener, or to show the circumstances under which subsequent events occurred, is not hearsay." (citations omitted)). The jury was entitled to weigh the probative value of the fact that, after Ho learned that Déby was offended by the cash payment, Ho hastily drafted an after-the-fact "donation letter" and did not publicize the purported donation, all of which casts serious doubt on Ho's professed belief in the legitimacy of the "donation."

Finally, any error in admitting Déby's statements was harmless. The fact and suspicious nature of Ho's $2 million so-called "donation" to Déby was readily apparent from other evidence, including Ho's *post hoc* "donation letter" (Tr. 705-07), his failure to publicize it (Tr. 228-31, 716-22), and his correspondence with Gadio (Tr. 530-32).

## 2. The Statement Of Gadio's Son Was Properly Admitted

As described above, after returning from the December trip to Chad, Gadio's adult son (Boubker Gadio) texted him, "Any feedback from our friends in China?," referring to Gadio's request for a contract.

––––––––––

715, 719 (2d Cir. 1998)). *See, e.g.*, *Headley v. Tilghman*, 53 F.3d 472, 476 (2d Cir. 1995) (rejecting hearsay challenge on different basis from that provided by district court).

43

(A. 736; Tr. 471). Gadio responded, "No our Chinese friends are strange! Let us give them another week. Otherwise we will go to Chad early January and destroy their reputation and strategies in Chad!" (A. 736; Tr. 471-72). His son replied, "I sincerely think they will reply favorably . . . their attempt to buy the president to put us to the side did not work. Big companies don't like middle men it's normal but they don't have a choice with us[.]" (A. 736 (ellipsis in original); Tr. 472).

The District Court admitted the last part of this text exchange as a prior consistent statement of Gadio, pursuant to Federal Rule of Evidence 801(d)(1)(B)(i). (SPA 31-32; *see also* Tr. 286-92 (oral argument preceding ruling)). Ho asserts that this cannot be so, because the "text contains [Gadio's son's] words, not Gadio's." (Br. 41). But this Court has found that a statement of a third party may be admissible as a prior consistent statement where the witness adopted the statement, *see United States v. Rubin*, 609 F.2d 51, 62 (2d Cir. 1979), and the law has long been that one may adopt the statement of another in multiple ways, including through silence, *see, e.g.*, *United States v. Aponte*, 31 F.3d 86, 87 (2d Cir. 1994); *United States v. Flecha*, 539 F.2d 874, 876-77 (2d Cir. 1976). Applying these basic principles, Ho's challenge fails.

Ho had contended in his opening statement that Gadio had recently fabricated his story about the attempt to bribe Déby. (*See* Tr. 27 (Gadio "figured out just what to say" to the Government "to get him off the hook"); SPA 31-32 (District Court noting "the defense's obvious intention to suggest that Mr. Gadio's testimony with respect to any attempted bribe is a recent

44

fabrication")). As the Government subsequently argued to the jury (*see* Tr. 957-58, 1041, 1046), Gadio's silence in response to his son's text reflected his agreement with his son's statement that CEFC had sought to "buy the president," a view that Gadio testified he understood and contemporaneously shared (Tr. 473). The District Court did not act "in an arbitrary and irrational fashion," *Dhinsa*, 243 F.3d at 649 (internal quotation marks omitted), in admitting the statement on this basis following Ho's attack on Gadio's credibility (an attack that Ho continued in summation (*see, e.g.*, Tr. 1002-03)).[10]

In any event, the statement was harmless, as indicated by the lack of cross-examination about it. Contrary to Ho's assertion that it was the "only documentary evidence that showed" that Ho had "an intention" to bribe Déby (Br. 46), there was abundant documentary evidence of Ho's corrupt intention, including, among other things, Gadio telling Ho in a letter that "[i]t is difficult to comprehend a 2 million dollar gift to the President and only one hundred thousand dollar to the facilitator [Gadio] who made all of this possible" (a characterization that Ho did not correct or even comment on) (Add. 3; Tr. 530-33); Ho's reports to the CEFC Chairman (Tr. 697, 699-701); Ho's hastily written and after-the-fact "donation letter" (Tr. 705-07); and Ho's failure to publicize the "donation" or ever

_____

[10] The District Court's reference to "completeness" (Br. 41), was simply noting the need for context and that it would be misleading to admit only a portion of the text exchange, as Ho had sought (*see* SPA 31).

45

mention it again (Tr. 228-31, 513, 517-18, 551-53, 716-22).

### 3. The Summary Charts Were Properly Admitted

Finally, Ho challenges the admission of two summary charts that placed certain emails and other communications in chronological order, and excerpted or summarized those communications. (Br. 41-44). According to Ho, these charts should only have been admitted as demonstrative exhibits, not as evidence, and thus should not have been provided to the jury. (Br. 43). This argument, too, is meritless.[11]

After reviewing the summary charts, the District Court, which was familiar with the underlying exhibits, found that each chart was "clearly admissible" under Federal Rule of Evidence 1006. (SPA 34). Rule 1006 provides in pertinent part: "The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. This Court has "regularly affirmed" the use of summary charts "to draw the jurors' attention to particular evidence culled from a voluminous set of records." *United States v. Yousef*, 327 F.3d 56, 158 (2d Cir. 2003).

Ho argues that the evidence to which the charts refer was not sufficiently voluminous as a matter of law because they "only" reference approximately 770 pages

---

[11] This is also the only evidentiary claim raised by Ho that pertains to the Uganda Scheme.

46

of communications. (Br. 44). That is incorrect. This Court has affirmed the admission of charts summarizing less evidence. *Cf. United States v. Blackwood*, 366 F. App'x 207, 212 (2d. Cir. 2010) (affirming admission of charts concerning "over 100 telephone calls"). Moreover, the charts here were not merely excerpts of communications, but timelines of dozens of such communications, many of which were not in English. As the Government explained (SPA 34), to recreate the charts, the jury would have to identify each exhibit, identify its translation, find the relevant parts, and then line the exhibit up chronologically—numerous times. That kind of laborious organizational task is precisely what Rule 1006 is designed to avoid.

In any event, the admission of the charts was harmless. Ho acknowledges that he both did not object to "use of the summary charts as demonstratives" and "conceded that the charts accurately quoted the underlying emails and text messages" (Br. 15), and does not argue to the contrary on appeal. And the Government did not merely present the charts to the jury, but also went over the pertinent communications, which were in evidence, at length, publishing and reading from them. (*See* Tr. 691-811). Ho did the same with those communications or portions thereof that he wished to highlight. (*See, e.g.*, Tr. 846-51, 853-55). The jury was also told that the charts "are not themselves independent evidence," and that they should "give no greater consideration to [them] than you would give to the evidence upon which they're based," and that it was up to the jury "to decide whether [they] correctly present the information contained in the exhibits on which

47

they're based." (Tr. 1127-28). The jury plainly under-
stood this instruction, as it asked for certain pieces of
that evidence (Tr. 1147, 1151). *See Yousef*, 327 F.3d at
158 ("any possible prejudice" from allegedly erroneous
admission "was cured" by similar instruction). There
is no likelihood that the outcome of the trial would
have been different had the jury been presented with
the same charts, and the same underlying evidence, in
the same way, but with the charts only admitted as
demonstrative exhibits.

## POINT IV

### The Indictment Was Valid

Finally, Ho contends that certain counts in the In-
dictment are facially defective. (Br. 49-55). First, Ho
asserts that to the extent Counts Two and Three ap-
pear to conflict with Counts Four and Five as to
whether Ho was, personally, a "domestic concern,"
Counts Four and Five cannot stand. (Br. 50-51). Sec-
ond, Ho asserts that because he was charged in Counts
Two and Three with violations of one section of the
FCPA, he could not be charged in Counts Four and
Five with violations of another section, and the latter
counts cannot stand. (Br. 52-55). These claims fail for
multiple reasons.

### A. Ho Was Properly Charged Under Different Sections Of The FCPA

Counts Two and Three, which concerned the Chad
Scheme and the Uganda Scheme, respectively,
charged Ho under 15 U.S.C. § 78dd-2. Section 78dd-2
of the FCPA applies to "any domestic concern, other

48

than an issuer which is subject to section 78dd-1,"[12] and to "any officer, director, employee, or agent of such domestic concern or any stockholder thereof acting on behalf of such domestic concern," and prohibits the use of any means of interstate commerce in furtherance of specified corrupt acts. *Id.* § 78dd-2(a). As noted above, a "domestic concern" is a U.S. person or entity. *Id.* § 78dd-2(h)(1). The Indictment here tracked the statute, in the conjunctive, alleging that Ho, "being a domestic concern and an officer, director, employee, and agent of a domestic concern and a stockholder thereof acting on behalf of such domestic concern, [offered and paid bribes]." (A. 90-93).

Counts Four and Five, which also concerned the Chad Scheme and the Uganda Scheme, respectively, charged Ho under 15 U.S.C. § 78dd-3. Section 78dd-3 applies to "any person other than an issuer that is subject to section 78dd-1 of this title or a domestic concern (as defined in section 78dd-2 of this title)," and to "any officer, director, employee, or agent of such person or any stockholder thereof acting on behalf of such person," and it makes it unlawful to engage in specified corrupt acts "while in the territory of the United States." *Id.* § 78dd-3(a). Unlike Sections 78dd-1 and

————

[12] Section 78dd-1 applies to "issuers" listed on a U.S. exchange and to "any officer, director, employee, or agent of such issuer or any stockholder thereof acting on behalf of such issuer," and prohibits the use of any means of interstate commerce in furtherance of specified corrupt acts. 15 U.S.C. § 78dd-1(a).

49

78dd-2, Section 78dd-3 does not require the use of interstate commerce. *See id.* Again, the Indictment here tracked the statute, alleging that Ho, "while in the territory of the United States, [offered and paid bribes]." (A. 93-95).

In short, under the FCPA's plain terms, although one cannot be convicted both of violating the FCPA as a "domestic concern" under Section 78dd-2 and as a "person" under Section 78dd-3, one can be convicted both of violating the FCPA as, *inter alia*, an "officer, director, employee, or agent" of a "domestic concern" under Section 78dd-2 and as a "person" under Section 78dd-3. Nor does Ho dispute that he is both (i) an "officer, director, employee, or agent of [a] domestic concern," 15 U.S.C. § 78dd-2, and (ii) "a[] person other than an issuer . . . or a domestic concern," *id.* § 78dd-3, and thus covered by the plain language of both sections.

Ho asserts that this is irrelevant, because in each of Counts Two and Three as charged in this case, "[t]he grand jury . . . found probable cause that Ho was [personally] a domestic concern" (Br. 50-51), and therefore each of Counts Five and Six should have been dismissed, because each charged a violation of Section 78dd-3, which "expressly excludes domestic concerns" (Br. 51). This argument fails for two independent reasons.

First, the grand jury did not "find" that Ho was, personally, a domestic concern. A grand jury is tasked with determining whether there is probable cause to believe that a crime was committed. *See, e.g.*, *Branzburg v. Hayes*, 408 U.S. 665, 686-87 (1972). The

grand jury is not tasked with drafting a charging in-
strument. Thus, it did not "find" that Ho was, himself,
a domestic concern, any more than an indictment
charging wire fraud, tracking the statute, necessarily
means that the grand jury has "found" that a defend-
ant used "television communication" and "pictures," 18
U.S.C. § 1343. Indeed, it is a common practice for in-
dictments to track a statute in the conjunctive and this
Court has approved of the practice for decades. *See,
e.g.*, *United States v. Mejia*, 545 F.3d 179, 207 (2d Cir.
2008); *United States v. McDonough*, 56 F.3d 381, 390
(2d Cir. 1995); *United States v. Astolas*, 487 F.2d 275,
280 (2d Cir. 1973).

Second, Ho acknowledges that he knew, long before
trial, that the Government did not allege that he was,
himself, a domestic concern. (Br. 51). Indeed, before
Ho was indicted, he was arrested on a complaint, con-
taining the same charges, which alleged that he was
"an officer, director, employee, and agent of a domestic
concern, within the meaning of the [FCPA]." (A. 43; *see
also* SPA 9 (District Court noting the same)). Nor is
there any doubt that the petit jury understood that Ho
was alleged to be a director, officer, employee, and/or
agent of a domestic concern, but not a domestic con-
cern himself. In fact, the parties entered into a stipu-
lation stating that Ho "was not a citizen, national, or
resident of the United States," *i.e.*, was not a domestic
concern. (Tr. 829-30; *see also* Tr. 1081-83 (District
Court instructing the jury that "Counts Two and Three
charge the defendant based on his status as an alleged
officer, director, employee, or agent of a domestic con-
cern"), 1083-84 (additional instructions making clear

51

that Ho was not alleged to be, himself, a domestic concern)).

Even assuming, *arguendo*, that extraneous language indicates that there was some sort of error in the grand jury proceeding (although it indicates no such thing), that error was rendered harmless by the petit jury's verdict. *See United States v. Mechanik*, 475 U.S. 66, 67 (1986) ("[T]he petit jury's verdict of guilty beyond a reasonable doubt demonstrates *a fortiori* that there was probable cause to charge the defendants with the offenses for which they were convicted" and therefore "the convictions must stand" despite a violation of grand jury rules.); *United States v. Friedman*, 854 F.2d 535, 584 (2d Cir. 1988) (affirming conviction despite alleged violation of grand jury rules based on *Mechanik* and because "appellants simply cannot show resultant prejudice").

## B. Sections 78dd-2 And 78dd-3 Of The FCPA Are Not Mutually Exclusive

In Ho's final argument, he asserts that Sections 78dd-2 and Sections 78dd-3 are "mutually exclusive," and that because the Government charged him in Counts Two and Three, Counts Four and Five should therefore be dismissed. (Br. 52-54). This challenge should be swiftly rejected.

Nothing in the language of the FCPA so much as suggests that Congress intended for the Government to have to choose to charge a given defendant under only one section, when he may have violated more than one section, removing an otherwise-applicable statute, with a different element, from the jury's consideration.

52

Nor, as noted above, does Ho dispute that he is both (i) an "officer, director, employee, or agent of [a] domestic concern," 15 U.S.C. § 78dd-2, and (ii) "a[ ] person other than an issuer . . . or a domestic concern," *id.* § 78dd-3, and thus covered by the plain language of both sections.

Instead, Ho invokes legislative history. (Br. 52-53). But because "the statutory language" of the FCPA "is unambiguous and the statutory scheme is coherent and consistent," this Court should not "resort to legislative history." *Matal v. Tam*, 137 S. Ct. 1744, 1756 (2017); *see also Germain*, 503 U.S. at 254 ("When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." (internal quotation marks omitted)).[13]

In any event, legislative history does not favor Ho's position, such that it should overcome the statute's plain language. *See United States v. Albertini*, 472 U.S. 675, 680 (1985) ("[O]nly the most extraordinary showing of contrary intentions in the legislative history will justify a departure from [a statute's] language." (internal quotation marks omitted)). Ho notes that a Senate report reflected that Section 78dd-3 was designed to extend criminal penalties " 'over persons not covered under the existing FCPA provisions.' " (Br. 52 (quoting S. Rep. No. 105-277, at *5 (1998)) (emphasis omitted)). The expansion of the category of persons subject to

---

[13] Ho's invocation of the rule of lenity (Br. 54-55) fails for the same reason. It has no application where a statute is unambiguous. *See, e.g.*, *DiCristina*, 726 F.3d at 97.

53

prosecution does not mean that Congress intended to preclude prosecution under sections already in force. It is not unusual for certain conduct to violate more than one statute. *See, e.g.*, *Hubbard v. United States*, 514 U.S. 695, 714, n.14 (1995) ("Congress may, and often does, enact separate criminal statutes that may, in practice, cover some of the same conduct."). Ho does not explain on what basis this Court should presume that Congress had a different—but entirely unexpressed—understanding here. As noted above, Congress is "presumed to have legislated against the background of our traditional legal concepts." *United States Gypsum Co.*, 438 U.S. at 437. Moreover, as Ho acknowledges (Br. 53), the new section was enacted to comply with an international convention calling on signatory countries to ensure that "any person" committing certain corrupt acts be liable. That weighs strongly against assuming that Congress intended the broadly worded statute it enacted to have an unusual and unwritten exclusion.

This Court has not found that the FCPA has such an exclusion, and Ho misconstrues *United States v. Hoskins*, 902 F.3d 69 (2d Cir. 2018), in arguing to the contrary (Br. 53-54). Unlike Ho, the defendant in *Hoskins* was "a foreign national who never set foot in the United States," and thus did not fall within Section 78dd-3, and the defendant contended that he also was "neither an employee nor an agent of a domestic concern," and thus claimed that he did not fall within Section 78dd-2. *Hoskins*, 902 F.3d at 76. The issue on appeal in *Hoskins* was whether such a person could be charged with conspiring to violate the FCPA or aiding and abetting an FCPA violation by another, which this

54

Court answered in the negative. *Id.* at 97. In the course of summarizing the statute, this Court stated that the FCPA applies to "foreign persons (including foreign nationals and most foreign companies) not within any of the aforementioned categories [referring to Sections 78dd-1 and 78dd-2] who violate the FCPA while present in the United States." *Id.* at 85. This summary sentence concerned something not at issue in the case, and only a few pages later, this Court noted that in the Act upon which Ho relies, Congress sought to ensure that foreign persons would be subject to FCPA liability if they "fit within three categories: (1) those who acted on American soil, (2) those who were officers, directors, employees, or shareholders of U.S. companies, and (3) those who were agents of U.S. companies," *id.* at 91—without suggesting that an individual could only fit into one category, as a matter of law, as Ho asserts. In short, *Hoskins* does not control the outcome here.

Moreover, although Ho's claim fails in any event, the interpretation he favors would lead to absurd results, further militating against reading into the statute an unusual and unwritten exclusion. For example, under Ho's interpretation, if two foreign citizens ("D1" and "D2") traveled to the United States and, while here, paid a $2 million cash bribe to a UN official, and D1 did so on behalf of a U.S. company, while D2 did so on behalf of a foreign company, D1 could not be charged with violating the FCPA because, as an agent of a domestic concern, he could only be charged under Section 78dd-2, and that statute requires the use of interstate commerce in furtherance of the bribe. Yet D2 could be charged under Section 78dd-3 because he is

55

not an agent of a domestic concern and he took an action within the territory of the United States in furtherance of the bribe. There is no reason to assume that Congress intended such an outcome—particularly given both what animated its enactment and the plain language of the enactment.

Finally, Ho contends that if one or more of his claims regarding Section 78dd-3 is meritorious, his conviction under Count One, conspiracy to violate the FCPA, should be vacated. (Br. 55). Ho is wrong. The jury expressly found that Ho agreed to violate both Section 78dd-2 and Section 78dd-3—which were charged as separate objects (Tr. 1159-60). Ho accordingly is not entitled to vacatur of his conviction under Count One regardless of whether any of his challenges to Section 78dd-3 has merit (and none does). *See United States v. Ness*, 466 F.3d 79, 82 (2d Cir. 2006), *vacated on other grounds*, 553 U.S. 1091 (2008); *United States v. Pascarella*, 84 F.3d 61, 71 (2d Cir. 1996).

56

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated:     New York, New York
           October 9, 2019

           Respectfully submitted,

           GEOFFREY S. BERMAN,
           *United States Attorney for the*
           *Southern District of New York,*
           *Attorney for the United States*
               *of America.*

DOUGLAS S. ZOLKIND,
DANIEL C. RICHENTHAL,
CATHERINE E. GOSH,
ANNA M. SKOTKO,
    *Assistant United States Attorneys,*
        *Of Counsel.*

           ROBERT ZINK,
           *Chief, Fraud Section,*
           *Criminal Division,*
           *U.S. Department of Justice.*

PAUL A. HAYDEN,
    *Trial Attorney.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,887 words in this brief.

GEOFFREY S. BERMAN,
*United States Attorney for the*
*Southern District of New York*

By: ANNA M. SKOTKO,
*Assistant United States Attorney*

**ADDENDUM**

Add. 1

| | |
|---|---|
| From: | Cheikh Gadio <cheikhgadio56@gmail.com> |
| To: | cywong@chinaenergyfund.org <cywong@chinaenergyfund.org> |
| CC: | head head <head@chinaenergyfund.org>;路祥安 <colo@chinaenergyfund.org>;Boubagadio <boubagadio@aol.com> |
| Sent: | 2/5/2015 3:51:04 AM |
| Subject: | Re: Letter of appointment 2015 |
| Attachments: | CEFC LETTER.pdf; Sarata International & CEFC Consultancy Agreement.doc |

PLEASE FIND ATTACHED OUR REPLY TO YOUR LETTER OF APPOINTMENT AND ALSO OUR
CONSULTANCY AGREEMENT PREVIOUSLY SUBMITTED.

MANY THANKS

On Wed, Feb 4, 2015 at 4:39 AM, cywong@chinaenergyfund.org <cywong@chinaenergyfund.org> wrote:
Dear Dr. Gadio,

Attached please find the letter of appointment 2015. Please provide me an **address for courier**. I will post two
copies to you. Please sign both and post one back to us.

Here is our address:
China Energy Fund Committee
Room 3401-08, 34/F, Convention Plaza Office Tower, 1 Harbour Road, Wanchai, Hong Kong.


Thanks
Anna



--
Regards,

Anna Wong
Secretary to Dr. Patrick Ho
Tel: 2655 1689
Fax: 2655 1616
China Energy Fund Committee
Room 3401-08, 34/F, Convention Plaza Office Tower, 1 Harbour Road, Wanchai, Hong Kong




--
Dr. Cheikh Tidiane GADIO,
Ancien ME/MAE
Président de l'IPS (Institut Panafricain de Stratégies)
Cel: (221) 77 574-8703
Work: (221) 33 865-2552

GOVERNMENT
EXHIBIT
104
17 Cr. 779 (LAP)

USAO_SDNY_00613574

Add. 2



**To M. Andrew C.O. LO**
Deputy Secretary General
China Energy Fund Committee

February 4, 2015

**Dear Mr. LO,**

On behalf of Sarata International Consultancy, I acknowledge receipt of your appointment letter and would like to thank CEFC for the trust you have placed on our consultancy Firm. In order for us to accept your appointment of our consultancy to assist you in your future business needs in Africa and to finalize the basis of our future working relationship, I would like to make some important clarifications to items addressed in your letter and suggestions on how to best move forward.

First of all, I would like to recall that Sarata International Consultancy is an international advisory and consultancy firm that facilitates and helps finalize key high valued business deals between international private companies (such as CEFC) and governments and/or governments agencies in Africa. We are able to accomplish this based on our extensive network with the highest government officials and Heads of States throughout the continent. In return for our services, our consultancy is compensated in several forms depending on the business deal, starting with our basic retainer fees that cover our scope of work which we stipulate and finalize with our clients in our consultancy agreements. This basic retainer fees does not of course include any costs burden upon us such as transportation, hotels, etc., CEFC should specify how it will cover these expenses.

In addition, the appointment letter you have addressed to us fails to cover the important points addressed in our proposed

USAO_SDNY_00613575

Add. 3

consultancy agreement and additional protocol we have already submitted to CEFC in December 2014.

Moreover, I would like to address each one of the points covered in the composition of your proposed consulting fees:

Point 1: I accept and thank you for your immediate payment of US $100,000 as a donation to "support my activities towards the formation of an African Union and similar purposes".

Point 2: I must confess that I am very surprised by your proposed US$100, 000 for the initial accomplishments our consultancy has made for CEFC in the 'Chad operations.' In our proposed "Additional PROTOCOL" we clearly state the scope of our mission as:
-Operation 1: SARATA will do the groundwork necessary to organize successful access to His Excellency President Idriss Deby Itno.
-Operation 2: SARATA will establish CEFC as a strategic partner of His Excellency President Idriss Deby Itno and build his trust in CEFC.

Both of these operations have not only been fully and well accomplished, but the results of our encounters with the President have surpassed expectations due to our relationship with him since our consultancy's hard work has enabled CEFC to be offered blocks of Oil for exploration and exploitation purposes and other potential opportunities such as taking shares in the Chad-Cameroon pipeline, etc. Therefore, I believe we should be compensated for now a fair amount of at least US $500,000, as the total opportunity value being given to CEFC due to Sarata International Consultancy is in the multi-millions of dollars (other known consultancy firms have been compensated over 5 million dollars for such great achievements). Also, It is difficult to comprehend a 2 million dollar gift to the President and only one hundred thousand dollar to the facilitator who made all of this possible. Furthermore, you must keep in mind that initial costs for SARATA (Air Transport, hotels and incidentals in Chad) are over 20.000$, which means that CEFC´s compensation is actually 80.000$.

USAO_SDNY_00613576

Add. 4

Point 3: I accept and approve that further sum of US $200,000 be attributed to our consultancy, but it should be given at specific times during 2015 since usually retainer fees are paid January 1st and July 1st. I request that the first instalment be paid during the current month of February 2015 and the second installment be paid in August 2015 to cover remaining part of this working year, the 200.000 $ representing only retainer fees, we need clarifications about financing of operating costs (Travels and Hotels)...

Furthermore, I request that CEFC review and sign our proposed consultancy agreement and additional protocol to establish a legally binding working relationship between our separate entities and come to a fair agreement on the compensation form that will be suitable for our operations in Chad. I believe that upon successful completion of the following 'Operation 3' stated in the additional protocol as securing the offer for the blocks of Oil that shall be attributed to CEFC, we should be compensated by a percentage of the total overall offer or by a pre-negotiated lump sum.

Thanks in advance for your cooperation and we look forward to hearing from you as soon as possible to move things forward on behalf of CEFC in Africa, starting with our existing operations in Chad.

Sincerely,

**Dr. Cheikh Tidiane GADIO,**

President
Sarata International Consultancy

USAO_SDNY_00613577

Add. 5



## <u>CONSULTANCY AGREEMENT</u>

This Agreement is made on <u>December 8, 2014</u> between CEFC ENERGY COMPANY LIMITED, a private collective enterprise incorporated in Shanghai, China, hereinafter called CEFC and SARATA INTERNATIONAL CONSULTANCY FZE – an international consulting and advisory firm incorporated in Ras Al-Khaimah, United Arab Emirates hereinafter called ''SARATA ''

WHEREAS CEFC desires to appoint a Consultant for advisory and consulting services in Africa (hereinafter called Territory*)

AND WHEREAS SARATA International, as a consultant, is willing to provide the services at the terms and conditions mutually agreed hereunder,

**THIS AGREEMENT WITNESSETH THAT**

CEFC hereby appoints SARATA as its Consultant for advisory and consulting services in Africa. SARATA hereby accepts to act as Consultant for CEFC. This Agreement is broadly on the following terms and conditions:

**A)     OBLIGATIONS OF SARATA**

1. Work with a focused plan on set targets country wise. The actual performance Vis-~à-Vis target would be subject to review by CEFC;
2. Provide early information on potential and emerging business Opportunities in the Territory;
3. Arrange for CEFC leadership access to key decision makers like Head of States (President or Prime Ministers;
4. Establish contacts with the potential customers at the appropriate level to enable CEFC to approach them;
5. Facilitate signing of contract between Ministry of Oil / Energy / Mining / Economy and Finance / Infrastructures / Defense and Security and/or any other relevant Government authorities in specified countries of the Territory & CEFC;

USAO_SDNY_00613578

Add. 6



6. Systematic follow up at the level of relevant authorities and from those authorities to the relevant Ministries to rely vital information to CEFC;
7. Facilitate suitable arrangements between partnering countries and CEFC for allocation of soft finance for the specified project from CEFC;
8. Letter from the President/Prime Minister of a specified country requesting soft finance for the prestigious proposal from CEFC;
9. Not to represent any other Company having same and/or similar services and products without prior written approval of CEFC;
10. Maintain confidentiality on all technical and commercial information supplied by CEFC;
11. Not to commit on behalf of CEFC in any matter or incur any liability without prior written consent of CEFC.
12. Keep CEFC informed by a mail on the purpose/ duration of a visit before undertaking visit to a country from the Territory.
13. Submit a brief monthly report on the progress made/ action plan in specified countries of the Territory.

**B)** **OBLIGATIONS OF CEFC:**

CEFC will provide all information/ promotional material (without reserve) to SARATA in respect of its Activities.

CEFC will provide all necessary support to SARATA and the two partners will set a framework for a close and mutually beneficial cooperation in carrying CEFC's objectives in the territory.

**CEFC has agreed with the financial arrangements with SARATA, detailed in an additional Protocol to this Agreement.

**C)** **Trade Secrets and Ethical Standards**

SARATA warrants that in performing the Services, the Consultant will not violate any applicable relevant law or regulation, particularly those relating to trade secrets or unfair competition, or act in breach of the more ethically conservative of either generally established ethical standards of the Consultant's profession or guidance received from CEFC. SARATA agrees to indemnify CEFC for any damages, costs or expenses (including reasonable

USAO_SDNY_00613579

Add. 7



attorney's fees) incurred by CEFC as a result of any such violation or breach by Consultant.

**D)     Independent Status**

SARATA as a Consultant shall be deemed an independent contractor under this Agreement and not an employee of CEFC. SARATA or its nominee shall not be entitled to use CEFC's trademarks in any manner and shall not represent to third parties as if he was an employee of CEFC.

**E)    Dispute Settlement:**

All disputes, which may arise at any time, between the parties, out of or in relation to or in connection with this agreement, or for the breach thereof, shall be settled amicably through negotiations between the parties.

**F)     Arbitration :**

If no amicable settlement is arrived at, then such dispute shall be settled by Arbitration in accordance with the provisions of Arbitration in either China or the UAE and the Arbitration Award shall be final and binding on the parties. The venue of Arbitration will be either in China or UAE.  The Courts of China or UAE shall have exclusive jurisdiction.

**H)    Duration :**

The duration of this Agreement is for a period of THREE YEARS and can be extended through mutual consent in writing. The effective date of this Agreement is December 8, 2014.

The Agreement is subject to review every six months.

USAO_SDNY_00613580

Add. 8



**I)** **\* TERRITORY**

Territory refers to the following countries, but not limited to (subject to review of CEFC): MALI, MAURITANIA, SIERRA LEONE, LIBERIA, GUINEE CONAKRY, GUINEE EQUATORIALE, TCHAD, COTE D'IVOIRE, GABON, ANGOLA, AND MOZAMBIQUE.

**J)** **Termination :**

Either party can terminate this Agreement by giving 60 days (sixty days) notice in writing to the other party and each party will honor the commitments to the other till the expiry of the termination period.

Signed here this day, Monday, December 08, 2014

FOR CEFC ENERGY COMPANY LIMITED     FOR SARRATA INTERNATIONAL LLC

[NAME]                                                    Dr.CHEIKH TIDIANE  GADIO
[TITLE]                                                   CHAIRMAN  & CEO

USAO_SDNY_00613581

Add. 9



**Strictly Private and Confidential**

# ADDITIONAL PROTOCOL

## Overview:

CEFC has decided to start this agreement with SARATA through a series of operations (listed below in detail) in Tchad as its Gateway to the Africa market chosen by CEFC.

**Operations in Tchad:**

**Operation 1:**

SARATA will do the groundwork necessary to organize successful access to His Excellency President Idriss Deby Itno.

**Operation 2:**

SARATA will establish CEFC as a strategic partner of His Excellency President Idriss Deby Itno and build his trust in CEFC.

**Operation 3:**

SARATA after successfully achieving access, trust, and securing the offer of 'Block H' to CEFC, has been designated by His Excellency President Idriss Deby Itno as its sole intermediary with CEFC.

**Operation 4:**

CEFC has tasked SARATA to explore and approach His Excellency President Idriss Deby Itno for other business opportunities in Chad, namely Gas, Mining, Infrastructures, Bank & Fiances, Army equipments and needs...

Compensation:
- Operation 1 & 2 having been achieved, CEFC will grant SARATA a lump sum of $ xxxxxxxxxx.

USAO_SDNY_00613582

Add. 10



- Operation 3, if successfully completed, SARATA will be compensated by a percentage or by a pre-negotiated lump sum of $ xxxxxxxxx.

- CEFC & SARATA having overall agreed to an annual retainer fee of $ xxxxxxxx, in addition to buget for operating costs which will allow SARATA to cover expenses related to its operations for CEFC including but not limited to : Airplane tickets, hotel, car rental, and other relevant incidentals, etc.

Signed here this day, Monday, December 08, 2014

FOR CEFC ENERGY COMPANY LIMITED          FOR SARRATA INTERNATIONAL LLC

[NAME]                                    Dr.CHEIKH TIDIANE   GADIO
[TITLE]                                        CHAIRMAN  & CEO

USAO_SDNY_00613583

Add. 11

| | |
|---|---|
| **From:** | hocppatrick <hocppatrick@gmail.com> |
| **To:** | Arthur Kafeero <akafeero@yahoo.co.uk> |
| **Sent:** | 10/7/2014 8:44:51 PM |
| **Subject:** | Re: Hello |

Dear Arthur,

Greetings.
I am back in New York and will be here until Oct 12.
Would be most appreciative if an audience with the PGA could be arranged anytime before my departure. If possible, we would like to extend our most sincere invitation to the PGA to a luncheon meeting.
Please kindly guide us and advise what would be most convenient for his Excellency.
Looking forward to hearing from you .
My cell in the US: 202-316 0468

Best
Patrick

從我的 iPad 傳送

> Arthur Kafeero <akafeero@yahoo.co.uk> 於 2014年9月30日 8:19 寫道:
>
> Dear Patrick,
> It's good to hear from you. We will make arrangements for the meeting and look forward to meeting you. My cell contact is +16464193654.
>
> Regards
>
> Arthur
>
> Sent from my iPhone
>
>> On Sep 29, 2014, at 8:12 PM, hocppatrick <hocppatrick@gmail.com> wrote:
>>
>> Dear Mr. Kafeero,
>>
>> This is Patrick Ho, Deputy Chairman and Secretary General of ChinaEnergy Fund Committee, a Chinese think tank registered in Hong Hong and also in the USA as a public charity. We are also granted special consultative status from UN's Economic and Social Council.
>>
>> We would be most grateful if an appointment could be set up with PGA Kutesa between Oct 8-12, while we are in the US. The purpose of the meeting is to introduce ourself to the PGA, and to extend to His Excellency personally our invitation to him to visit with us in HongKong and in China.
>>
>> Please let us know if further information is needed.
>> I can be reached at 202-316 0468 while in the US
>>
>> Looking forward to hearing from you.
>>
>> Sincerely
>> Patrick HO (Dr.)
>>
>>
>>
>> 從我的 iPad 傳送

GOVERNMENT
EXHIBIT
252
17 Cr. 779 (LAP)

USAO_SDNY_00914150

Add. 12

| | |
|---|---|
| **From:** | head head <head@chinaenergyfund.org> |
| **To:** | isaac kutesa <ikutesa@gmail.com> |
| **BCC:** | yzhang@chinaenergyfund.org |
| **Sent:** | 1/14/2015 9:44:04 PM |
| **Subject:** | Re: Proposed time frame for PGA Visit to China |

Dear Isaac,

Happy New Year to you and your family.
So nice to hear from you and about the proposal.
The proposed time of mid March is very good and it will be after
the two big Meetings (National People's Congress included) in Beijing.
Please confirm the exact dates with us nearer the time.
We will be happy to receive His Excellency and his delegates in Hong Kong,
Shanghai, or in Beijing. Please let us know what he prefers.

On another note, please do let us know what type of input is possible for us
as regards to the various High-Level Thematic Debates and Event for 2015.
We, CEFC, are particularly interested in the April event on Promoting Tolerance and Reconciliation,
the May event on Strengthening Cooperation between the UN and regional and sub-regional organizations,
and the June event on Climate Change.
We intend to organize a side event of a half day Forum of " A China Story III - A Modern Silk Road" to follow either
the April or the May Thematic Debates. Of course, we wish to be guided by your and His Excellency's advice.

Please let us hear from you again.
I intend to be in New York the first week in March, and would appreciate an opportunity to speak and participate
in the High-Level Thematic debate on Advancing Gender equality and empowering of Women in Post-2015 development
agenda.  Please kindly advise if that can be considered.

Best Regards
P HO (Dr.)

2015-01-15 1:14 GMT+08:00 isaac kutesa <ikutesa@gmail.com>:
Dear Dr. Ho,

I hope this email finds you well, I apologize for the lull in communication, the PGA has been largely based in Uganda
and his schedule has been constantly changing.

The reason for this email is to share with you the most up to date availability in the PGA's schedule for the proposed
official visit to China. Given the PGA's commitment to attend the Annual summit of the African Union in Addis
Ababba on the 30th of January as well as the festive season in China as you pointed out starting in early February,
we propose a time frame of mid March for the PGA to officially visit China.
As always we value your advice on the appropriate timing of this trip.

Thank you and I look forward to hearing from you.

Best regards,

Isaac Kutesa.

GOVERNMENT
EXHIBIT
262
17 Cr. 779 (LAP)

USAO_SDNY_00571705

Add. 13

香港中华能源基金会

http://cefc-ngo.co/news.php    Go    NOV    APR    MAY    ○
7 captures                            17
6 Feb 2015 - 17 Apr 2017          2016  2017  2018    About this capture

联系我们 | 收藏本站

香港中华能源基金会
CEFC Hong Kong Non-Governmental Fund Committee

CHINA ENERGY FUND COMMITTEE
CEFC

联合国经济与社会理事会非政府组织

English

| 首页 | 关于本会 | 公共外交 | 新闻中心 | 专家观点 | 能源研究 | 合作联盟 | | 搜索 |

首页 > 新闻中心 > 本会要闻

本会要闻

专题报道

[2017-03-18]香港中华能源基金会代表出席中国发展高层论坛

何志平秘书长在中国发展高层论坛发言 中国发展高层论坛现场3月18日，由国务院发展研究中心主办的中国发展高层论坛在北京召开。香港中华能源基金会常务副主席兼秘书长何志平出席了论坛。中国发展高层论坛围绕于2000年，�games与世界对话。深吕闪。

[2017-02-22]香港中华能源基金会举办第十一期"中美对话"论坛

论坛现场2月22日，香港中华能源基金会香港举办第十一期"中美对话"论坛。美国、法国、伊朗、以色列、印度、日本、朝鲜、朝鲜、澳大利亚、南非等26国驻港总领馆官员、欧盟代表、香港行政会议成员及相关专家学者出席，与会嘉宾围绕"新形势下的中美关系。

[2017-02-02]香港中华能源基金会代表出席美国"国家祈祷早餐会"

美国政要人士、各国政要、国际友人出席"国家祈祷早餐会"2月2日，香港中华能源基金会常务副主席秘书长何志平出席在美国华盛顿举行的2017年"国家祈祷早餐会"。这是美国第65年美国总统唐纳德特朗普人士自宣称的第一个"国家祈祷早餐会"，同时也是基。

[2016-12-14]第二届"UN-CEFC能源可持续发展资助大奖"联合国颁奖

联合国秘书长办公室举行颁奖典礼上将辞 出席颁奖典礼的嘉宾合影 12月14日，由联合国与香港中华能源基金会共同设立的"UN-CEFC能源可持续发展资助大奖"第二届颁奖仪式在联合国总部举行。本届主题为"可持续交通能源"，来自瑞典的科技工业研究院（SINTE.

[2016-12-09]香港中华能源基金会代表出席联合国第11届互联网治理论坛

香港中华能源基金会常务副主席兼秘书长何志平在论坛上发言 12月6日召开时，香港中华能源基金会常务副主席兼秘书、联合国友联网治理论坛"多利益相关方合作"成员组论午本第四等届等祝祝科联和出席联合国第11届互联网治理论坛，并发表演讲。他呼吁国际。

[2016-11-30]香港中华能源基金会在华盛顿举办"一带一路与中美合作"论坛

当地时间30日，由中国国务院发展研究中心力支持，香港中华能源基金会、美国全球安全分析研究所(IAGS)及亚洲协会(Asia Society)联合主办的中美对话专场:"一带一路"与中美合作"论坛在华盛顿举行。皆在提升各界对"一带一路"战略的认识，并帮助为美国。

首页 上一页 1 2 3 4 5 6 ... 下一页 尾页

CEFC成员：  香港中华能源基金会    中国文化院    上海华信公益基金会
© 2013 香港中华能源基金会 版权所有 地址：香港湾仔港湾道1号会展中心办公室大楼34楼1-8号室

GOVERNMENT
EXHIBIT
803
17 Cr. 779 (LAP)

https://web.archive.org/web/20170417133341/http://cefc-ngo.co/news.php[10/1/2018 12:20:33 PM]

Add. 14

香港中華能源基金會

電 話 852 - 26551666 傳 真 852 - 26551616 電 子 郵 箱: info@cefc.org.hk ICP 10040147

香港中华能源基金会　　　　　　Add. 15　　　　　　　　Page 1 of 1

| http://cefc-ngo.php?cid=16&page=2 | Go | MAY | JUN | JUL |
| 1 capture | | ◄ | 24 | ► |
| | | 2015 | 2016 | 2017 |

联系我们 | 收藏本站

| 首页 | 关于本会 | 会员外交 | 新闻中心 | 专家观点 | 能源研究 | 合作联盟 | English |

首页 > 新闻中心 > 本会要闻

**本会要闻**

**专题报道**


**[2016-03-31]香港中华能源基金会代表拜访中国驻联合国总领馆**
美国当地时间2016年3月31日上午，香港中华能源基金会专访美国常驻联合国代表团...


**[2016-03-30]香港中华能源基金会代表拜访中国驻纽约总领事馆后再叙**
美国当地时间2016年3月30日下午，香港中华能源基金会专访纽约...


**[2016-03-30]第二届"UN-CEFC能源大奖"将于11月揭晓**
纽约联合国总部消息...


**[2016-03-26]香港能源基金会召开"一带一路"建设法律研究会**
2016年3月25日...


**[2016-03-16]香港中华能源基金会代表团拜访中国人民外交学会**
外交学会...


**[2016-03-03]香港中华能源基金会召开"一带一路"倡议与美国"门户谈论**
美国国家...

首页 上一页 1 2 3 4 5 6 7 ... 下一页 尾页

**CEFC成员：　香港中华能源基金会　中国文化院　上海华信公益基金会**

© 2013 香港中华能源基金会 版权所有 地址：香港西门港西道1号企业中心办公大楼34楼1-8号室
电话:852 - 26551666 传 真:852 - 26551616 电子邮箱:info@cefc.org.hk ICP:10040147

香港中华能源基金会     **Add. 16**     Page 1 of 1

http://cefc-ngo.php/news.php?cid=16&page=3    Go    MAY JUN JUL
1 capture     ◀ **24** ▶
24 Jun 2016     2015 **2016** 2017

联系我们 | 收藏本站

| 首页 | 关于本会 | 会员外交 | 新闻中心 | 专家观点 | 能源研究 | 合作联盟 |

English

首页 > 新闻中心 > 本会要闻    搜索

**本会要闻**

**专题报道**



**[2016-03-02]香港中华能源基金会常务副主席兼秘书长何志平会见英国常驻联合国大使皮特·沃姆森**

香港中华能源基金会常务副主席兼秘书长何志平（右二）与英国常驻联合国大使皮特·沃姆森（右二）进行会谈 2016年3月2日，香港中华能源基金会常务副主席兼秘书长何志平于伦敦会见英国常驻联合国大使皮特·沃姆森彼得-托马斯Peter Thomson）。双...



**[2016-01-26]香港中华能源基金会举办中美对话研讨会**

十二届全国人大外事委员会主任委员、原中国外交部部长李肇星 中国国际问题研究院院长苏格 中国原外交部副部长王英凡 全国人大外事委员会主任委员、原中国外交部副部长 中国驻美大使...



**[2016-01-24]香港中华能源基金会举办中美对话"第九次研讨会**

"中美对话"第九次研讨会参会嘉宾合影及发言名单 2016年1月24日，由香港中华能源基金会主办的"中美对话"第九次研讨会...



**[2016-01-17]香港中华能源基金会代表拜访中国国际问题研究院**

中国国际问题研究院领导与香港中华能源基金会代表合影 2015年12月31日，香港中华能源基金会常务副主席兼秘书长何志平一行拜访中国国际问题研究院...



**[2016-01-17]香港中华能源基金会代表访国务院新闻办公室**

国务院新闻办公室领导主任蒋建国与香港中华能源基金会代表合影 2015年12月29日，香港中华能源基金会常务副主席兼秘书长何志平一行拜访国务院新闻办公室...



**[2016-01-17]香港中华能源基金会代表拜访《参考消息》报社、新华社世界问题研究中心和国家互联网信息办公室**

《参考消息》报社总编辑张铁钢与香港中华能源基金会代表合影 新华社世界问题研究中心心和国家互联网信息办公室...

首页 上一页 **1 2 3 4 5 6 7** ... 下一页 尾页

**CEFC成员：** 香港中华能源基金会 中国文化院 上海华信公益基金会
© 2013 香港中华能源基金会 版权所有 地址：香港湾仔港湾道1号会展中心办公大楼34楼1-8号室
电话:852 - 26551666 传 真:852 - 26551616 电子邮箱:info@cefc.org.hk ICP:10040147

香港中华能源基金会　　　**Add. 17**　　　Page 1 of 1

http://cefc-ngo.php?cid=16&page=4　　Go　　MAY **JUN** JUL
◄ **24** ►
1 capture　　　　　　　　　　2015 **2016** 2017

联系我们 | 收藏本站

English

首页　关于本会　会员外交　**新闻中心**　专家观点　能源研究　合作联盟　　　　搜索

首页 > 新闻中心 > 本会要闻

本会要闻

专题报道



[2016-01-12]香港中华能源基金会秘书长列志平会晤中国外交部驻港公署特派员实情

[2016-01-05]香港中华能源基金会代表出席联合国信息社会世界高峰会议

[2016-01-05]香港中华能源基金会代表出席"一带一路"战略与21世纪能源高峰论坛

[2016-01-05]巴基斯坦参议员、巴工学会主席程沙希望造访香港中华能源基金会

[2015-12-05]香港中华能源基金会代表团出席加拿大全国旅游年会

[2015-11-29]中华能源基金会举办"两岸法律研讨会"吸取新经验

首页 上一页 1 2 3 4 5 6 7 ... 下一页 尾页

**CEFC成员：**　香港中华能源基金会　中国文化院　上海华信公益基金会
© 2013 香港中华能源基金会 版权所有 地址：香港西行港湾道1号会展中心办公大楼34楼1-4号室
电话:852 - 26551666 传 真:852 - 26551616 电子邮箱:info@cefc.org.hk ICP:10040147

香港中华能源基金会      **Add. 18**      Page 1 of 1



https://web.archive.org/web/20160624090733/http://cefc-ngo.co/news.php?cid=16&page=5    10/1/2018

香港中华能源基金会     **Add. 19**     Page 1 of 1

http://cefc-ngo.co/news.php?cid=16&page=6   Go   MAY **JUN** JUL

◀ **24** ▶

1 capture    2015 **2016** 2017

联系我们 | 收藏本站

首页   关于本会   会员外交   新闻中心   专家观点   能源研究   合作联盟

English

搜索

首页 > 新闻中心 > 本会新闻

**本会新闻**

专题报道



**[2015-10-03]以史为鉴 共创和平未来 ——香港中华能源基金会在美举办"纪念二战结束七十周年和平论坛"**

参加�de欢迎ceremony和会议ceremony已近，美国时间10月3日，香港中华能源基金会在美国纽约联合国大学举办"纪念二战结束七十周年和平论坛"，以"记住历史、开创未来"。来自中美及海内外多位专家学者出席论坛探讨世界和平发展的路径，并发出爱护地球共守和平的呼吁。



**[2015-09-16]【媒体聚焦】新华网：在个由中国民间机构参与并赞助的国际大奖揭晓**

来源：http://world.huanqiu.com/hot/2015-09/7493393.html 新华网纽约9月14日电（记者陈建设）第一个由中国民间机构参与并赞助的国际大奖9月14日在纽约联合国总部揭晓。联合国秘书长潘基文、第69届联合国大会主席库尔特等出席颁奖活动，全球的参赛者。



**[2015-08-28]2015论源论坛暨国际能源问题研究中心成立二周年纪念会议召开**

2015能源论坛在上海交大举行 108手位专家学者、政府官员出席。聚光聚焦企业 国际能源问题研究中心的联合主办机构企业8月14日，由香港中华能源基金会国际能源问题研究中心及合作的联系研究会心成立二周年纪念会议在上海交通大学隆重举办。全球的参赛。



**[2015-07-27]香港中华能源基金会参加联合国第三次发展筹资国际大会**

香港中华能源基金会参加联合国第三次发展筹资大会 联合国第394届大主席主席萨博默尔基金会（左二）听取发言不能正发挥举行长会于7月17日，联合国第三次发展筹资国际大会在埃塞俄比亚首都召开历时全程召开。出席的官员、全体代表的重大。



**[2015-07-27]"UN-CEFC能源大奖"顾问委员会成员在京参加香港中华能源基金会招待会**

香港中华能源基金会代表人出席参与会议主席9月14日11日。香港中华能源基金会召开招待会。感谢"UN-CEFC能源问责管促进发展进入大奖"顾问委员会成员及各选国后中的出席集合。顾问委员会新出席招待会中活召开会，都以提升，推动世界发展能建过程可持续发展。国际能源顾委成员A9多。

**[2015-07-27]首届百万能源大奖9月开启 千联合国发展峰会上揭幕**

首届能源大奖评选标准拳会审议通过—届44联合正是共举。香港中华能源基金会是共导全联合国第394届大会主席库尔特基金会（左二）与联合国第394届大会主席库尔特基金会（左二）。顾问委员会新出席会心活召会，都以提升，顾问委员会新出席招待会同心活召会，都以提升。顾问委员会新出席招待会同心活召会。国际能源顾委成员A9多…"UN-CEFC能源。

首页 上一页 3 4 5 **6** 7 8 9 … 下一页 尾页

**CEFC成员：** 香港中华能源基金会   中国文化院   上海华信公益基金会

© 2013 香港中华能源基金会 版权所有 地址：香港湾仔港湾道1号会展中心办公大楼34楼1-8号室

电 话:852 - 26551666 传 真:852 - 26551616 电子邮箱:info@cefc.org.hk ICP:10040147

Add. 20

```
*******************************************************
```
**Translation for *United States v. Chi Ping Patrick Ho*, 17 Cr. 779 (LAP)**
```
*******************************************************
```

**CHINA ENERGY FUND COMMITTEE**

NGO of Economic and Social Council of the United Nations

### News Center

[2017-03-18] CEFC Hong Kong Non-Governmental Fund Committee Delegates Attended the China Development Forum

[2017-02-22] CEFC Hong Kong Non-Governmental Fund Committee Held the 11th "China-US Dialogue" Forum

[2017-02-02] CEFC Hong Kong Non-Governmental Fund Committee Delegates Attended U.S. "National Prayer Breakfast"

[2016-12-14] The 2nd "UN-CEFC Energy Sustainable Development Subsidy Award" United Nations Awards

[2016-12-09] CEFC Hong Kong Non-Governmental Fund Committee Delegates Attended the 11th Annual Internet Governance Forum of the United Nations

[2016-11-30] CEFC Hong Kong Non-Governmental Fund Committee Held "One Belt One Road and China-US Cooperation" Forum in Washington, D.C.

**1** 2 3 4 5 6



GOVERNMENT
EXHIBIT
803-TX
17 Cr. 779 (LAP)

Add. 21

[2016-03-31] CEFC Hong Kong Non-Governmental Fund Committee Delegates Visited United Nations Chinese Ambassador Liu Jie Yi

[2016-03-30] CEFC Hong Kong Non-Governmental Fund Committee Delegates Visited the Chinese Consulate General Ambassador Zhang Qi Yue in New York

[2016-03-30] The 2nd "UN-CEFC Energy Award" Will Be Announced In November

[2016-03-26] CEFC Hong Kong Non-Governmental Fund Committee Jointly Organized the "One Belt One Road" Construction Law Research Association

[2016-03-16] CEFC Hong Kong Non-Governmental Fund Committee Delegates Visited Chinese People's Diplomatic Association

[2016-03-03] CEFC Hong Kong Non-Governmental Fund Committee Held a "'One Belt One Road' Initiative and the United States" Closed-door Symposium

1 2 3 4 5 6 7

Add. 22

[2016-03-02] CEFC Hong Kong Non-Governmental Fund Committee Executive
Vice President and Secretary General Patrick Ho (He Zhiping) Met With Peter
Thomson, Permanent Representative of Fiji of United Nations

[2016-01-26] CEFC Hong Kong Non-Governmental Fund Committee Held a
Seminar on "China-US Dialogue"

[2016-01-24] CEFC Hong Kong Non-Governmental Fund Committee Held the 9th
Seminar on "China-US Dialogue"

[2016-01-17] CEFC Hong Kong Non-Governmental Fund Committee Delegates
Visited China Institute of International Studies

[2016-01-17] CEFC Hong Kong Non-Governmental Fund Committee Delegates
Visited the State Council Information Office

[2016-01-17] CEFC Hong Kong Non-Governmental Fund Committee Delegates
Visited the "Reference News" newspaper, Xinhua News Agency World Problem
Research Center and the National Internet Information Office

1 2 **3** 4 5 6 7

Add. 23

[2016-01-12] Patrick Ho (He Zhiping), Secretary General of CEFC Hong Kong Non-Governmental Fund Committee, met with Song Zhe, Special Commissioner of the Ministry of Foreign Affairs of Hong Kong

[2016-01-05] CEFC Hong Kong Non-Governmental Fund Committee Delegates Attended the World Summit on the Information Society

[2016-01-05] CEFC Hong Kong Non-Governmental Fund Committee Delegates attended "One Belt One Road" Initiative and the 21st Century Energy Summit

[2016-01-05] Senator of Pakistan, President of the Pakistan-China Society Mushahid Visited CEFC Hong Kong Non-Governmental Fund Committee

[2015-12-05] CEFC Hong Kong Non-Governmental Fund Committee Delegates Attended Canada National Tourism Annual Conference

[2015-11-29] CEFC Hong Kong Non-Governmental Fund Committee Held "Cross-Strait Legal Seminar" Welcome Reception

1 2 3 4 5 6 7

Add. 24

[2015-11-29] CEFC Hong Kong Non-Governmental Fund Committee Delegates
Attended Israel's "2015 Energy Conference"

[2015-11-09] Albanian Prime Minister Eddie Rama Art Exhibition Opens in Hong
Kong

[2015-11-09] Chairman Oren of the US-China Relations Committee Visited CEFC
Hong Kong Non-Governmental Fund Committee International Center

[2015-11-09] CEFC Hong Kong Non-Governmental Fund Committee Delegates
and Albanian Prime Minister Talked About Energy "New Silk Road"

[2015-10-24] In-depth Exchange of Consensus - CEFC Hong Kong Non-
Governmental Fund Committee Successfully Hosted the 3rd Asia-Pacific Forum

[2015-10-05] Warning of the "Thucydides Trap" Management Differences To
Achieve Win-win Cooperation - CEFC Hong Kong Non-Governmental Fund
Committee Held the 8th "China-US Dialogue Seminar" in Washington, D.C.

Add. 25

[2015-10-03] Take History As a Way to Create a Peaceful Future - CEFC Hong Kong Non-Governmental Fund Committee held a "Peace Ceremony to Commemorate the 70th Anniversary of the End of World War II" in the United States

[2015-09-16] [Media Focus] Xinhua Net: The United Nations Energy Awards Participated and Sponsored By Private Institutions from China for the First Time

[2015-08-28] 2015 Energy Forum and International Energy Research Center Held Its 3rd Anniversary Conference

[2015-07-27] CEFC Hong Kong Non-Governmental Fund Committee participated in the 3rd Development Financing of the United Nations International Conference

[2015-07-27] "UN-CEFC Energy Awards" Advisory Committee Members Attended the Hong Kong China Energy Foundation Reception in Beijing

[2015-07-27] The first Million Energy Awards Will Be Presented at the UN Development Summit in September

Add. 26

## Chi Ping Patrick Ho Trips to U.S. Sept. 2014 - Dec. 2016

| Date of Defendant's Entrance to U.S. (GX 902) | Date of Defendant's Exit from U.S. (GX 902) | Entry Stamp on Defendant's Passport (GX 901) | Record of NYC Hotel Booking | Record of UN Entry (GX 2301) | Selected Emails or Text Messages Sent From Defendant |
|---|---|---|---|---|---|
| 9/21/2014 | 10/12/2014 | Pg. 14 | Residence Inn 9/21/2014 - 10/1/2014 10/7/2014 - 10/11/2014 (GX 2102) | 10/9/2014 | GX 1 GX 6 GX 78 GX 251 GX 252 |
| 11/12/2014 | 11/22/2014 | Pg. 7 | Residence Inn 11/12/2014 - 11/22/2014 (GX 2102) | 11/14/2014 11/17/2014 | GX 45 GX 50 GX 1046 GX 1048 |
| 12/4/2014 | 12/7/2014 | Pg. 15 | Residence Inn 12/4/2014 - 12/7/2014 (GX 2102) | 12/5/2014 | GX 260 |
| 3/3/2015 | 3/15/2015 | Pg. 7 | Residence Inn 3/3/2015 - 3/15/2015 (GX 2102) | 3/4/2015 3/6/2015 3/9/2015 | GX 111 GX 112 |
| 4/18/2015 | 4/26/2015 | Pg. 7 | Millennium 4/17/2015 - 4/21/2015 4/22/2015 - 4/26/2015 (GX 2101) Residence Inn 4/24/2015 - 4/26/2015 (GX 2102) | 4/21/2015 | GX 138 GX 139 |
| 9/29/2015 | 10/11/2015 | Pg. 18 | | | |
| 10/26/2015 | 10/27/2015 | Pg. 20 | | | GX 177 |
| 2/22/2016 | 3/5/2016 | Pg. 19 | Residence Inn 2/27/2016 - 3/9/2016 (GX 2102) | 3/2/2016 | GX 284 GX 286 |
| 3/27/2016 | 3/31/2016 | | Millennium 3/27/2016 - 3/31/2016 (GX 2101) | 3/28/2016 3/30/2016 | GX 291 |
| 4/18/2016 | 4/28/2016 | Pg. 18 | Millennium 4/18/2016 - 4/22/2016 (GX 2101) Residence Inn 4/22/2016 - 4/25/2016 (GX 2102) | 4/20/2016 4/27/2016 | GX 294 |
| 10/27/2016 | 10/31/2016 | Pg. 20 | Residence Inn 10/27/2016 - 10/31/2016 (GX 2102) | | |
| 12/13/2016 | 12/15/2016 | Pg. 18 | | | |

GOVERNMENT EXHIBIT 2603 17-Cr-779 (LAP)

Add. 27

| | |
|---|---|
| **From:** | CEFC <yzhang@chinaenergyfund.org> |
| **To:** | Head <head@chinaenergyfund.org> |
| **Sent:** | 12/2/2014 5:39:34 PM |
| **Subject:** | Re: Appointments in NYC |

Dear Boss,

I talked with Issac last week. The PGA will travel to Peru on Dec 6. He is available to meet you at 12:30pm on Dec 5 at his office. But you will participate in the first meeting of Advisory Council and the followed official lunch from 10 am to 2:30pm.

Today Issac suggested you come over to the PGA's residence for the 3pm meeting. I am awaiting further information.

Thanks

Sent from my iPad

> On 2014年12月2日, at 上午11:46, Head <head@chinaenergyfund.org> wrote:
>
> Please make appointments for me while I am in NY.
> PGA, office visit ?Friday pm?
> Liu Yadong, late Friday pm after PGA meeting
> Thanks
>
> 從我的 iPad 傳送

GOVERNMENT
EXHIBIT
259
17 Cr. 779 (LAP)

USAO_SDNY_00570115

Add. 28

| From: | 何志平 <cpho@chinaenergyfund.org> |
| --- | --- |
| To: | 張雅 <yzhang@chinaenergyfund.org> |
| Sent: | 2/3/2015 10:59:04 AM |
| Subject: | Fwd: Hello from China Energy Fund Committee |

---------- Forwarded message ----------
From: **Arthur Kafeero** <akafeero@yahoo.co.uk>
Date: 2015-02-03 20:13 GMT+08:00
Subject: Re: Hello from China Energy Fund Committee
To: 何志平 <cpho@chinaenergyfund.org>

Dear Patrick,
Thank you again for your interest in supporting and participating in the upcoming PGA events. We look forward to hearing more about this when you come to New York. The focus on 'accessibility to energy' is a good one during the debate on Gender Equality and Women's Empowerment in March. We will send you an invitation and arrange a meeting with PGA while you are here.

Arthur

Sent from my iPad

> On Feb 3, 2015, at 5:46 AM, 何志平 <cpho@chinaenergyfund.org> wrote:
>
> Dear Arthur,
>
> Greetings from Hong Kong.
> I hope this email finds you in the pink of health and prosperity.
>
> Since the last time we met in New York City last year, we at the China Energy Fund Committee
> have come up with a few initiatives which align well with the overall vision of the PGA. I am eager to discuss these
> and other matters of interests with you and the President
>
> I understand that the PGA is organizing a thematic debate on March 6, 2015 on the empowerment
> of women, and I am most interested to deliver a statement in this debate on "empowerment of women
> through accessibility to energy".
>
> I would appreciate very much if I could receive an invitation to speak in this debate, and to meet with the President
> during the time that I am in town.
>
> I appreciate your guidance and assistance in advance.
>
> Best regards,
>
> Patrick HO (Dr.)

GOVERNMENT
EXHIBIT
264
17 Cr. 779 (LAP)

USAO_SDNY_00573030

# Add. 29

| | |
|---|---|
| **From:** | hocppatrick <hocppatrick@gmail.com> |
| **To:** | Arthur Kafeero <akafeero@yahoo.co.uk> |
| **Sent:** | 2/21/2015 11:24:02 PM |
| **Subject:** | Re: Phone contact |

Dear Arthur,

Thank you so much for the telephone call.

I wish to take this opportunity to confirm our most cordial invitation to the PGA to visit with us in China.

If such a visit is an official one, then we hope the PGA can give us one or two days to do an unofficial visit with us in Shanghai, Beijing, or in Hong Kong, and we are ready to be responsible for the cost of that part of the visit.
And if the PGA prefers to make this visit entirely unofficial, we hope that we could be involved in organizing his activities of the visit, and we will be happy to bear the costs of such visit.

We shall need a letter from your office announcing the PGA's decision to visit China, and/or a copy of a correspondence with the Chinese Mission about the visit, so that we can expedite the parts involving protocol. The most pertinent task right now is for the PGA to fix the date and length of the visit.

I shall be in New York March 4-12, and would appreciate an opportunity to meet with the PGA and you soonest to get things rolling.
Any further information and thought about this impending visit will be very much appreciated. We could communicate through emails to lay the ground work for our meeting in person in NY.

Again, thank you for the call.

Best,
Patrick

從我的 iPad 傳送

Arthur Kafeero <akafeero@yahoo.co.uk> 於 2015年2月22日 09:19 寫道：

Dear Patrick,
Can I have your phone number again. Somehow I can't find the earlier email you sent with it.

Regards

Arthur

Sent from my iPhone

On Feb 20, 2015, at 5:33 PM, ARTHUR KAFEERO <akafeero@yahoo.co.uk> wrote:

Dear Patrick,
attached is the invitation for the 6 March event. We look forward to seeing you in New York. I will try calling you tomorrow regarding the planned visit by PGA.

regards

Arthur
<20150220123810.pdf>

**GOVERNMENT EXHIBIT 266**

17 Cr. 779 (LAP)

USAO_SDNY_00573740