# No. 19-761

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

v.

CHI PING PATRICK HO, *A/K/A* PATRICK C.P. HO,

*Defendant-Appellant.*

On Appeal from the United States District Court for the Southern District of
New York, No. 1:17-cr-779, Hon. Loretta A. Preska

## REPLY BRIEF OF DEFENDANT-APPELLANT
## CHI PING PATRICK HO

EDWARD Y. KIM
JONATHAN F. BOLZ
KRIEGER KIM & LEWIN LLP
500 Fifth Avenue, 34th Floor
New York, New York 10110
Tel.: (212) 390-9550

BENJAMIN E. ROSENBERG
KATHERINE M. WYMAN
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3622

*Attorneys for Chi Ping Patrick Ho*

## TABLE OF CONTENTS

TABLE OF AUTHORITES ...................................................... ii

Introduction ................................................................1

Argument....................................................................1

POINT I      THERE WAS INSUFFICIENT EVIDENCE THAT HO
             ACTED TO ASSIST A DOMESTIC CONCERN ............................1

POINT II     *JAM* CONTROLS THIS CASE ........................................3

POINT III    WIRES THROUGH THE UNITED STATES ARE NEITHER
             TO IT NOR FROM IT ................................................6

POINT IV     THE TRIAL COURT'S EVIDENTIARY ERRORS REQUIRE
             REVERSAL .........................................................11

       A.    Déby's Statements................................................11

       B.    Boubker's Text Message...........................................17

       C.    The Summary Charts...............................................19

POINT V      THE INDICTMENT WAS REPUGNANT .......................21

POINT VI     SECTIONS 78dd-2 AND 78dd-3 ARE MUTUALLY
             EXCLUSIVE ........................................................23

Conclusion ...................................................................29

i

# TABLE OF AUTHORITIES

**CASES**

*Baugh ex rel. Baugh v. Cuprum S.A. de C.V.*,
730 F.3d 701 (7th Cir. 2013) ...............................................21

*Guerrero-Clavijo v. United States*,
242 F. Supp. 3d 57 (D. Mass. 2017)......................................9

*Jam v. Int'l Fin. Corp*,
139 S. Ct. 759 (2019)...................................................*passim*

*Koons Buick Pontiac GMC, Inc. v. Nigh*,
543 U.S. 50 (2004)..................................................................9

*Lehman v. United States*,
127 F. 41 (2d Cir. 1903) ......................................................22

*Republic of Iraq v. ABB AG*,
768 F.3d 145 (2d Cir. 2014) ................................................24

*Roach v. Morse*,
440 F.3d 53 (2d Cir. 2006) ....................................................8

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders
in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*,
327 F.3d 173 (2d Cir. 2003) ................................................24

*United States v. Aponte*,
31 F.3d 86 (2d Cir. 1994) ....................................................18

*United States v. Bellomo*,
176 F.3d 580 (2d Cir. 1999) ................................................14

*United States v. Blackwood*,
366 F. App'x 207 (2d Cir. 2010) ....................................20, 21

*United States v. Cantrell*,
612 F.2d 509 (10th Cir. 1980) .............................................21

*United States v. Conde*,
309 F. Supp. 2d 510 (S.D.N.Y. 2003) .................................22

*United States v. Coplan,*
    703 F.3d 46 (2d Cir. 2012) ...............................................................14

*United States v. Demott,*
    906 F.3d 231 (2d Cir. 2018) .............................................................12

*United States v. Dinero Express, Inc.,*
    313 F.3d 803 (2d Cir. 2002) .............................................................10

*United States v. Dukagjini,*
    326 F.3d 45 (2d Cir. 2003) ...............................................................17

*United States v. Edelman,*
    726 F.3d 305 (2d Cir. 2013) ...............................................................8

*United States v. Fletcha,*
    539 F.2d 874 (2d Cir. 1976) .............................................................18

*United States v. Guzman,*
    754 F.2d 482 (2d Cir. 1985) .............................................................15

*United States v. Harris,*
    79 F.3d 223 (2d Cir. 1996) .............................................................9, 10

*United States v. Hoskins,*
    902 F.3d 69 (2d Cir. 2018) ...........................................................24, 26

*United States v. Mechanik,*
    475 U.S. 66 (1986)...........................................................................23

*United States v. Moloney,*
    287 F.3d 236 (2d Cir. 2002) .........................................................10, 11

*United States v. Oppedisano,*
    No. 09-cr-0305, 2010 WL 4961663 (E.D.N.Y. Nov. 30, 2010)..........................8

*United States v. Pedroza,*
    750 F.2d 187 (2d Cir. 1984) .............................................................13

*United States v. Reyes,*
    18 F.3d 65 (2d Cir. 1994) ...............................................................13

*United States v. Rubin*,
609 F.2d 51 (2d Cir. 1979) ...................................................................18

*United States v. Sorrentino*,
72 F.3d 294 (2d Cir. 1995) .................................................................15

*United States v. Summers*,
414 F.3d 1287 (10th Cir. 2005) .........................................................14

*United States v. Torres*,
794 F.3d 1053 (9th Cir. 2015) ...........................................................13

*United States v. Yousef*,
327 F.3d 56 (2d Cir. 2003) .................................................................20

*Yates v. United States*,
135 S. Ct. 1074 (2015) ........................................................................24

**STATUTES**

15 U.S.C. § 78dd-2 ..................................................................................1, 3

18 U.S.C. § 1956 ..........................................................................................9

**OTHER AUTHORITIES**

21 C.F.R. § 1308 ..........................................................................................6

11A Cyclopedia of Fed. P. § 42:42 .........................................................22

Fed. R. Evid. 801 ........................................................................................18

S. Rep. No. 105-277 (1998) .....................................................................25

iv

## Introduction

In his opening memorandum, Defendant-Appellant Dr. Patrick Ho demonstrated that his conviction cannot stand due to numerous legal and evidentiary errors. The government's arguments in response do not overcome these errors.

## Argument

### POINT I

### THERE WAS INSUFFICIENT EVIDENCE THAT HO ACTED TO ASSIST A DOMESTIC CONCERN

On counts 2 and 3, it was the government's burden to prove that Ho was an "officer, director, employee or agent of [a] domestic concern" and that his allegedly wrongful acts were undertaken "*in order to assist such domestic concern*" in "obtaining or retaining business for or with, or directing business to, any person." 15 U.S.C. § 78dd-2 (emphasis added). Ho was an officer of one domestic concern in the case, CEFC USA, but no reasonable finder of fact could conclude that CEFC USA directed business to CEFC Energy, or that Ho assisted CEFC USA to do so.

At trial, the government offered almost no evidence about CEFC USA. Instead, it deliberately conflated two NGOs—CEFC USA (a domestic concern) and CEFC Hong Kong (not a domestic concern)—and continues to do so on appeal. U.S. Br. 3-4 & n.2; *see id.* 23. But the two NGOs were separately incorporated entities,

registered in different jurisdictions, with their own offices and bank accounts. *See, e.g.,* A199-205, A749-52, A761-70; Tr. 890-91.[1]

The government argues that Ho used his positions at the CEFC NGOs to obtain initial meetings with Cheikh Gadio and Samuel Kutesa. U.S. Br. 21-23. But even if that were so, it would mean only that Ho was using his position at an NGO for his own purposes, not that Ho was assisting that NGO.

And the government's argument is not supported by the evidence. As to the Chad Scheme: The government suggests that Vuk Jeremic obtained a meeting with Gadio "by touting Ho's NGO and UN-related work" and that Ho revealed "his true goal" to Gadio at that meeting. *Id.* at 22. But Jeremic testified that he set up the meeting with Gadio for the benefit of the Energy Company, not an NGO, and Gadio

---

[1] None of the evidence cited in the government's brief shows that CEFC Hong Kong and CEFC USA were one and the same. The government points to a "CEFC NGO" website, *see* Add. 13-27, but the website does not appear to relate to CEFC USA: the header (Add. 13) and translated news release headlines (Add. 20-27) refer to "CEFC ***Hong Kong*** Non-Governmental Fund Committee," never to China Energy Fund Committee (USA), Inc. or any other domestic entity. The government also suggests that the CEFC NGOs shared offices in the United States, but there was no evidence that the Virginia office, the registered address of CEFC USA, A203-04, A751, was used by CEFC Hong Kong or for any purpose in connection with the Chad or Uganda Schemes. A New York office was used for a meeting between Ho and Gadio, but that office belonged to a subsidiary of CEFC Energy, A404-06, and only CEFC Energy business was discussed, A253; Tr. 311. The government also points to the fact that Ho attended meetings in New York, but the record does not establish that these meetings were on behalf of CEFC USA.

2

testified that he understood Ho to be speaking for "CEFC, China Energy Fund Company, for-profit organization."  A166-67, A250, A253; Tr. 311.

As to the Uganda Scheme:  The government points to meetings between Ho and Kutesa in New York, and suggests that Ho misused meetings "ostensibly" scheduled for an NGO to further CEFC Energy's projects.  U.S. Br. 23.  That is not evidence that Ho was acting "to assist" CEFC USA.  15 U.S.C. § 78dd-2(a)(1). Rather, it suggests that Ho took advantage of his NGO title.

The government also alleges that Ho "used his NGO position to disguise his $500,000 bribe payment as a purported 'donation,' including by wiring it from CEFC NGO's bank account."  U.S. Br. 23.  But this is a perfect example of the government's attempt improperly to conflate the two NGOs:  The wire in question passed from **CEFC Hong Kong's** account at HSBC Hong Kong to an account identified by Kutesa in Uganda.  A745-48.  CEFC USA had its own accounts, and they were not used.  *See* Tr. 890, 896-98.

In sum, there is not a single piece of evidence (1) that CEFC USA directed business to CEFC Energy, or (2) that Ho assisted CEFC USA to do so.

## POINT II

### *JAM* CONTROLS THIS CASE

In *Jam v. Int'l Fin. Corp*, 139 S. Ct. 759 (2019), the Supreme Court stated that "a statute that refers to another statute by specific title or section number in effect

3

cuts and pastes the referenced statute ***as it existed when the referring statute was enacted, without any subsequent amendments***.*" Id.* at 769 (emphasis added; citation omitted). *Jam* compels the conclusion that the reference in § 1956(c)(7) to the "Foreign Corrupt Practices Act" means the FCPA "as it existed when [§ 1956(c)(7)] was enacted, without any subsequent amendments," *i.e.*, without § 78dd-3. *Id.*

The government argues that *Jam* does not apply because § 1956(c)(7) "is clear on its face," and there is no reason to resort to the reference canon. U.S. Br. 28-29. But there is an ambiguity, and *Jam* resolves it. Section 1956(c)(7) refers to the "Foreign Corrupt Practices Act," and it is not clear (absent the reference canon) whether it refers to (a) the FCPA as it existed when § 1956(c)(7) was amended to reference it, or (b) the FCPA as thereafter amended.

If the government were correct, then the reference canon would be a nullity. The canon comes into play only when a referencing statute names another statute. The government's position appears to be that so long as the name of the referenced statute is clear and unambiguous, there is no need for the reference canon. But the name of the referenced statute will always be unambiguous. As demonstrated above, however, what that name ***refers to*** may be ambiguous, and clarifying that ambiguity is the role of the canon.

The government also argues that the money laundering statute, § 1956, was meant to be "linked" to the FCPA, *see* U.S. Br. 29, and the two are meant to move in tandem. But *Jam* establishes that criminal statutes that refer to other statutes by name do not move in tandem with the named statutes.

The government warns that reading § 1956(c)(7) not to include § 78dd-3 (that is, to read it as *Jam* requires), would lead to "absurd results" because there are many criminal statutes (like 18 U.S.C. § 924(c) and 18 U.S.C. § 1961(1)(B)) that refer to other statutes by name or (more commonly) section number, and if those statutes or sections change, the government argues, the referring statutes must be interpreted to incorporate the changes in the referenced statutes.

There is nothing absurd about the reference canon, and there is no reason to think that the Supreme Court did not mean exactly what it said in *Jam*. Congress can easily amend any referring statute, and, especially when it is dealing with criminal statutes, which are to be read narrowly, it is incumbent upon Congress to do so.

In his opening brief, Ho argued that Congress could have included the phrase "as it may be amended," or similar language to avoid the reference canon, and noted that it had done so on prior occasions. Ho Br. 26 & n.8. The government responds that the instances Ho cited "are from more than seventy years ago, and involved

5

different statutes." U.S. Br. 31-32. But what Congress did seventy years ago it can do again, and what it did to some statutes it can do to others.

The government suggests that statutes that reference controlled substances would be rendered ineffective because new drugs are scheduled as controlled substances "with some frequency." U.S. Br. 30. But new drugs are added by regulation, not statute. *See* 21 C.F.R. § 1308. Similarly the government argues that *Jam* would hinder prosecutions of money laundering to promote arms sales because the United States Munitions List frequently changes. *See* U.S. Br. 30-31. But § 1956(c)(7)(B)(v)(I), which is cited by the government, identifies as a specified unlawful activity an offense involving smuggling of "an item controlled on the United States Munitions List established under section 38 of the Arms Control Act (22 U.S.C. § 2778)." Section 2778, in turn, provides that the United States Munitions List is a matter of presidential regulation; no statutory amendment is needed to change the items on it. *Jam* is not implicated in either scenario.

## POINT III

### WIRES *THROUGH* THE UNITED STATES ARE NEITHER *TO* IT NOR *FROM* IT

Ho moved to dismiss the money laundering charges on the ground that the transactions the government referenced in the indictment were legally deficient because they went **through** the United States, rather than to it or **from** it, as those terms are used in § 1956(a)(2)(A). *See* Dkt.62-64. Ho argued that § 1956(a)(2)(A)

6

applies to transmissions of funds *from* the United States to or through someplace outside of it, or *to* the United States from or through someplace outside of it. Other sections of the statute apply to transmissions of funds *through* the United States. *See* 18 U.S.C. §§ 1956(a)(1), (c)(3). Principles of statutory interpretation show that there is a difference between to, from, and through.

The district court rejected that argument as a matter of law. *See* SPA12-17. It also held:

> Moving away from the technical sufficiency of the indictment, the defendant argues that the government's evidence would be insufficient to demonstrate that the wire transfers at issue went from a place in the United States or to a place in the United States.
>
> The government sets out evidence of three wire transfers that it expects to offer at trial at page 19 of its brief. I will spare the court reporter reading all of the transfers that are alleged here, but counsel and I have discussed the first one, the March 25, 2015 transfer which went from HSBC Hong Kong to HSBC New York, from HSBC New York to Mashreq Bank New York, from Mashreq Bank New York to Mashreq Bank Dubai. Clearly, that was a wire transfer from outside the United States to the United States and a wire transfer from the United States to a place outside of the United States.
>
> This is clearly sufficient under Second Circuit precedent.

SPA13-14. Ho appealed from this ruling. *See* Ho Br. 29-36.

The government argues that Ho's challenge does not present a question of statutory interpretation but rather a sufficiency of the evidence challenge "because Ho does not challenge the District Court's denial of his motion to dismiss the Indictment," and that there was sufficient evidence "which demonstrated that the

funds at issue went to a bank in the United States, and then from that bank to another bank in the United States, and then from that bank to a third bank abroad." U.S. Br. 34 (citation omitted).

This Court's review is *de novo*, because the dispute is over the meaning of the statute and Ho's argument does not turn on the facts about the wire, which are undisputed. *See Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006); *see also United States v. Edelman*, 726 F.3d 305, 308 (2d Cir. 2013). The only question is whether the statutory requirements are satisfied if a transaction's origin and destination were outside the United States, via a waypoint in New York. The trial court said yes, and thus upheld the indictment.

The government suggests that Ho needed to reiterate his previously-rejected interpretation of the statute in a proposed jury instruction (*see* U.S. Br. 34), but preservation rules did not require Ho to reassert an argument that the court had rejected. *See, e.g.*, *Edelman*, 726 F.3d at 308 (reviewing question of statutory interpretation raised in pre-trial motion to dismiss in appeal of trial conviction, without mention of further preservation); *United States v. Oppedisano*, No. 09-cr-0305, 2010 WL 4961663, at *3 (E.D.N.Y. Nov. 30, 2010) (defendant's facial constitutional challenge was preserved "by virtue of this Court's denying his motion to dismiss the indictment"). In light of the district court's rulings, it is hard to imagine what an appropriate jury instruction would have been.

8

Ho showed that the government's attempt to separate the wire transfer in the case into multiple transactions—including one from Hong Kong to the United States, and another from the United States to Uganda—was foreclosed by 18 U.S.C. § 1956(i)(3). Ho Br. 29-33. The government responds that § 1956(i)(3) does not apply because "[i]t simply provides that venue is proper in any district in which a transaction takes place, in whole or in part." U.S. Br. 35.

But § 1956(i)(3) is not limited to venue. It states: "*[f]or purposes of this section*, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction." (Emphasis added.) The words "this section" mean title 18, United States Code, section 1956. If § 1956(i)(3) had significance only to venue, it would have said "for purposes of this subsection." *See Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60-61 (2004) (describing the hierarchy of statutory structure from sections through subsections, paragraphs, subparagraphs and clauses); *cf.* 18 U.S.C. § 1956(a)(1)(B) ("[f]or purposes of this paragraph . . ."). *See also Guerrero-Clavijo v. United States,* 242 F. Supp. 3d 57, 62-63 (D. Mass. 2017) (relying on § 1956(i)(3) in analyzing whether money laundering counts were duplicitous).

Ho also showed that the government's strategy to separate the wire into discrete transactions was contrary to binding Second Circuit authority. Ho Br. 29, 33-35; *see United States v. Harris*, 79 F.3d 223 (2d Cir. 1996); *United States v.*

9

*Dinero Express, Inc.*, 313 F.3d 803 (2d Cir. 2002); *United States v. Moloney*, 287 F.3d 236 (2d Cir. 2002). Following the district court, the government argues that the *Harris* Court "wasn't really considering the argument that [Ho] makes here." (U.S. Br. 36, quoting district court at SPA 16). But *Harris* was considering ***exactly*** the same argument:

> [Defendant] Harris argues that each time that funds were sent to Switzerland, two transfers took place – one from New York to Connecticut and the other from Connecticut to Switzerland. . . .
>
> * * * *
>
> We disagree because we do not interpret the movements of funds from New York to Connecticut and then from Connecticut to Switzerland as two separate events. While the scheme was implemented in two stages, each stage was an integral part of a single plan to transfer funds "from a place in the United States to or through a place outside the United States.

79 F.3d at 231.

In a further attempt to avoid *Harris*, the government notes that in *Harris* the wire transfer was alleged to be intended to conceal a specified unlawful activity, whereas the wire transfer here was alleged to be intended to further a specified unlawful activity. *See* U.S. Br. 36. According to the government (again quoting the district court), in *Harris* "the Court was attributing the defendant's intent to conceal to both legs of the transaction." *Id.* (quoting the district court at SPA 16). But that is not what the *Harris* Court said, *see supra*, nor is it how *Harris* has been interpreted by this Court. *See Dinero Express, Inc.*, 313 F.3d at 806 ("[W]e held in [*Harris*]

10

that a multi-step plan to transfer money from one location to another should be viewed as a single 'transfer' under § 1956(a)(2)"); *Moloney*, 287 F.3d at 241 ("We have previously held that sequences of steps taken as part of a common scheme constitute one transaction for purposes of the money laundering statute," citing *Harris*).[2]

## POINT IV

## <u>THE TRIAL COURT'S EVIDENTIARY ERRORS REQUIRE REVERSAL</u>

The district court admitted multiple hearsay statements by Chadian president Idriss Déby and a text message from Boubker Gadio, all offered to show that Ho and his associates paid a cash bribe to Déby at their meeting on December 8, 2014. The district court also admitted summary charts of selected text messages and emails. The admission of these materials was erroneous and requires reversal.

### A.    Déby's Statements

*1.     The December 8 Statements:*   The district court permitted Gadio to testify about statements that Déby made to him on December 8, 2014, to the effect that the gift boxes presented by the Chinese delegation contained cash.  It was not clear from the statements whether Déby had seen the cash or simply been told of it. The court admitted the statements on the ground that they were "in the same bucket"

---

[2]     The government does not dispute that a legal defect in Count 8 would render the conviction on Count 6, which charges conspiracy to engage in money laundering (18 U.S.C. § 1956(h)), invalid.  *See* Ho Br. 36-37.

11

as statements that Déby made the next day, in Ho's presence—which the district court also admitted pursuant to Rule 801(d)(2)(B).

The government defends the admissibility of Déby's December 8 statements on the grounds that (a) they were not offered for the truth of the matters asserted but "to put into context and explain what happened next," (b) "many of [them] were in the form of questions or directives" and were therefore not factual assertions, and (c) any error was harmless, because Déby's December 9 statements were properly admitted. U.S. Br. 39-40.

*(a)* Déby's December 8 statements were the essence of the government's case against Ho, and were not offered to place other statements or events in context. The government sought to establish that Ho paid a cash bribe to Déby to benefit CEFC Energy. Gadio's testimony, that Déby told him that the boxes contained cash, was the most important evidence of the alleged bribe. Thus, the crux of the government's case against Ho was hearsay, which did not become admissible simply because it might explain or help the jury understand less important surrounding circumstances. *See, e.g.*, *United States v. Demott*, 906 F.3d 231, 248 (2d Cir. 2018) ("While hearsay may at times be received to explain relevant background circumstances, . . . the propriety of resort to such hearsay depends heavily on whether the probative value of this evidence for its non-hearsay purpose is outweighed by the danger of unfair prejudice resulting from the impermissible

12

hearsay use of the declarant's statement.") (citation and internal quotations omitted); *United States v. Reyes*, 18 F.3d 65, 70 (2d Cir. 1994) ("[I]n some instances, information possessed by investigating agents is received at trial not for the truth of the matter, but as 'background' to explain the investigation . . . . Such evidence can be helpful in clarifying noncontroversial matter without causing unfair prejudice on significant disputed matters.") (citations omitted).

*United States v. Pedroza*, cited by the government, is in accord. In that case, the Court rejected the government's argument that certain hearsay statements were "properly admitted as 'background,'" where in fact they were plainly offered for the truth of the matter asserted: "there was no purpose for the hearsay testimony except for its truth." 750 F.2d 187, 200 (2d Cir. 1984).

(b) That some of Déby's statements were phrased in the form of questions should not allow the government to skirt the hearsay rule. For example, Gadio testified that Déby asked, "Do you know that the . . . gift box I received, some of them had money, cash in them?" A294. The meaningful content of Déby's statements was the embedded assertion of fact—that the boxes contained cash—and anyone would understand that they were intended to assert that fact. Many questions contain implicit factual assertions, and there is no "question-mark" exception to the hearsay rule. *See United States v. Torres*, 794 F.3d 1053, 1061 (9th Cir. 2015) (affirming exclusion of questions as hearsay and holding that "[b]ecause there may

13

be instances where a party attempts to admit hearsay by cloaking statements under the guise of a question, the focus of the inquiry should be on what the declarant intended to say, whether implied or directly asserted"); *United States v. Summers*, 414 F.3d 1287, 1300 (10th Cir. 2005) (holding that a suspect's question was hearsay where it contained an implicit inculpatory assertion).[3] Déby's questions contained an assertion crucial to the government–that the boxes contained cash–and they were offered to establish the truth of that assertion.[4]

(c)     Without Déby's December 8 statements, the government would have had precious little to establish the payment of a cash bribe, and their erroneous admission cannot be called harmless.   The admission of Déby's December 9 statements does not excuse the error, because they also should not have been admitted, as set forth below.

2.     *The December 9 Statements:*  The district court also permitted Gadio to testify about statements Déby made to Ho and others on December 9, 2014, to the effect that Déby's security told him that the boxes contained cash.   The court

---

[3]     Although the Second Circuit has said that "[a]n inquiry is not an 'assertion,'" *see United States v. Coplan*, 703 F.3d 46, 84 (2d Cir. 2012), there is no reason to extend this rule to inquiries that are mere shells for factual assertions and plainly offered for the truth of those underlying assertions.

[4]     The government cites *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) for the point that directives are not factual assertions.  U.S. Br. 39.  The disputed statements in this case were not directives.

admitted these statements pursuant to Rule 801(d)(2)(B) on the ground that Ho adopted them by saying that he was "impressed" with Déby. *See* SPA19.

Regarding the application of Rule 801(d)(2)(B), the government simply restates the district court's conclusions without responding to Ho's argument that his statements are best viewed as a diplomatic attempt to smooth over conflict, and not a specific manifestation of belief in the truth of Déby's characterization of the boxes. *Compare* Ho Br. 39-40, *with* U.S. Br. 40-41. Instead, the government argues that Déby's statements were admissible as "necessary to understanding Ho's immediate response" or—in what amounts to the same thing—as probative of Ho's state of mind. *See* U.S. Br. 40-41. But Ho's being "impressed" with Déby's alleged refusal to accept a bribe says nothing about whether Ho agreed with Déby's representations, or whether Ho had been aware of the alleged bribe before it was made.[5] This is

---

[5] The cases cited by the government are inapposite. *United States v. Sorrentino*, 72 F.3d 294 (2d Cir. 1995), involved a taped conversation between the defendant and a non-testifying confidential informant. *Id.* at 296, 298. Unlike here, the conversation was one-to-one, and, by virtue of the tape recording, there was no question about what was said. *See id.* The risk of misunderstanding or misapprehension by the jurors was minimal, and it would have been impossible to play the tape with only one side of the conversation. *United States v. Guzman*, 754 F.2d 482 (2d Cir. 1985), involved testimony by a law enforcement officer about his questioning of the defendant. *Id.* at 485, 487. The defendant's statements, made in the context of a post-arrest interview of the defendant, were about the whereabouts of his alleged co-conspirators, and the officer's testimony was necessary to understand why the defendant made those statements. *See id.* Ho's statement that he was "impressed" by Déby was an ambiguous comment under very different circumstances.

another example of the government attempting to justify the admission of highly prejudicial hearsay under the guise of "context."

The government argues that any error was harmless because there was other evidence of the donation. U.S. Br. 42. But the very evidence that the government cites undermines its argument, because none of it mentions that the donation was paid in cash, or that Ho was a party to it.

- *The donation letter*: As the government itself repeatedly emphasized, the "donation letter" suggested that CEFC Energy intended to pledge funds to the people of Chad for charitable purposes, not that CEFC Energy had already presented funds to the president in cash. *See* Tr. 707 ("[W]e wish to make a donation of USD 2 million to the people of Chad at your personal disposal . . . ."); *see also* A582-85 (final donation letter).

- *The lack of publicity about the gift*: That there was no publicity about the gift was not inconsistent with a pledged donation by CEFC Energy: While the government showed that Ho publicized charitable donations "if it reflected well on the NGO," Tr. 230, it did not show that Ho publicized CEFC Energy's charitable giving. Furthermore, the lack of publicity about the gift says nothing about the form of the gift or its method of delivery, both of which are key parts of Déby's statements emphasized by the government.

16

- *Gadio's correspondence*: Gadio's reference to a "2 million dollar gift to the president" in correspondence seeking additional pay, Tr. 531, was also consistent with a donation to Chad placed at the president's disposal, *see* A585, yet took on different meaning when Gadio was permitted to testify that what he meant by that was "money that was brought to the president in gift box." Tr. 531.

The erroneous admission of Déby's statements could be harmless only if it was "'highly probable' that the error did not affect the verdict." *United States v. Dukagjini*, 326 F.3d 45, 61 (2d Cir. 2003) (quoted in Ho Br. 44), but there can be no such assurance in this case. In its jury addresses, the government repeatedly emphasized that the donation was made in cash, and that this proved wrongful intent. A446-47, A453. The only evidence that the donation was in cash came from Déby's erroneously-admitted statements.

## B. Boubker's Text Message

Following the December 9 meeting, which Boubker had not attended, Boubker sent his father, Gadio, a text message that said, "their attempt to buy the president to put us to the side did not work." A736. The district court admitted the statement pursuant to Rule 801(d)(1)(B)(i) as a prior consistent statement ***of Gadio***.

The government argues that the text qualifies as a prior consistent statement of Gadio because Gadio adopted it through silence. *See* U.S. Br. 43-44. In support

17

of this argument, the government cites a single case in which a third party statement adopted by a witness was admitted as a prior consistent statement. *See id.* at 43 (citing *United States v. Rubin*, 609 F.2d 51, 62 (2d Cir. 1979)). But in that case, the statements were interview notes that were ***expressly*** adopted by the witness immediately after the interview, and this Court did not reach the issue of whether the statements were admissible as prior consistent statements because the defendant had waived his objections. *See Rubin*, 609 F.2d at 57-58, 61-62.

The Federal Rules exclude from the definition of hearsay adopted admissions offered against an opposing party. Fed. R. Evid. 801(d)(2)(B). Gadio was not an opposing party, and the statement was not offered against him. Moreover, even if the adoptive admissions rule were applicable, silence is, at best, a "fairly weak" indicator of adoptions.[6] *See* Fed. R. Evid. 801 Advisory Committee's Notes to 1972 Proposed Rules.

The government points to no evidence about the particulars of Boubker's text that would support the inference that Gadio's failure to respond manifested adoption. Under the government's theory, every unanswered text, email, or phone message sent by a non-testifying individual could be an adoption by a testifying witness of

---

[6] The government cites *United States v. Aponte*, 31 F.3d 86 (2d Cir. 1994), and *United States v. Fletcha*, 539 F.2d 874 (2d Cir. 1976), in support of the proposition that one may adopt another's statement by silence. U.S. Br. 43. In both cases, the statement was offered on the basis that it was adopted by the ***defendant***, and the inference of adoption was far stronger than it is here.

any representations set forth in the text, email or message. Thus, silence from a testifying witness would compel the wholesale admission of out-of-court statements made by others, without any indicia of reliability. The theory is untenable.

Equally untenable is the government's argument that the admission of the text message was harmless. Certainly, the government thought that Boubker's text was powerful evidence, as it mentioned the text repeatedly in its summation. A455-56, A537, A542. Although the government points to other documentary evidence that it contends established the same point (*see* U.S. Br. 44), none of those documents allege an attempted bribe. And the text message was the only piece of evidence the government identified in its rebuttal summation as ***contemporaneous*** corroboration of Gadio's testimony. *See* A455-456, A537.

## C.    The Summary Charts

The government dismisses Ho's objection to its use of summary charts as "meritless," but fails to engage with the issues presented in his brief. The charts did not merely reduce voluminous evidence into a form that could be conveniently examined by the jury, as Rule 1006 contemplates. Rather, the government selected and curated excerpts of emails and text messages, excising context, in order to present a narrative of the case that it hoped the jury would adopt. This is the essence of a demonstrative exhibit, which could be presented to the jury pursuant to Rule 611(a), but should not have been provided to the jury during its deliberations.

19

The government cites two cases in defense of its charts, but neither case establishes that an advocacy document, like the charts at issue here, is admissible under Rule 1006.  In *United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) and *United States v. Blackwood*, 366 F. App'x 207 (2d Cir. 2010), this Court affirmed the admission of charts summarizing phone records.  There is no indication that either chart included a narrative presentation excerpting quotes of the government's choosing.  In *Blackwood*, the chart summarized information concerning "well over 100 telephone calls spanning three days [among] four individuals," specifically including "the pattern and timing of telephone calls among the co-conspirators on the three crucial days of the charged conspiracy."  366 F. App'x 207 at 212.  The chart purported to list information concerning *all* phone calls during a given period, not selected calls that the government found especially supportive of its case.  *See id.* (noting "the accidental omission of one phone call"); *see also Yousef*, 327 F. 3d at 157 (chart "highlight[ed] certain patterns of telephone calls").  By analogy, if the government had listed the date of each communication between Ho and Gadio, placing them in chronological order and providing exhibit numbers, the resulting chart might have aided the jury's examination of admitted evidence without crossing the line into advocacy.  *Blackwood* is further distinguishable because "the charts were never provided to the jury."  366 F. App'x 207 at 212.

20

The admission of the charts was not harmless. With the charts, the government effectively "accompan[ied] the jury into the deliberation room to help the jurors best view and understand the evidence in the light most favorable to [its case]." *Baugh ex rel. Baugh v. Cuprum S.A. de C.V.*, 730 F.3d 701, 708 (7th Cir. 2013). The government observes, in a footnote, that Ho's challenge to the summary charts is the "only evidentiary claim raised by Ho that pertains to the Uganda Scheme." U.S. Br. 45 n.11. That of course is correct—because the government presented *no* direct testimony from Kutesa, his wife, or any witnesses involved in the Uganda Scheme. The summary chart was the only documentary evidence related to the Uganda Scheme that the jury consulted in its deliberations. *See* A554.

## POINT V

## <u>THE INDICTMENT WAS REPUGNANT</u>

The indictment charges three times that Ho was a "domestic concern," exposing him to liability under § 78dd-2, and yet counts 4 and 5 charged him under § 78dd-3, which by its terms exempts domestic concerns from liability. The indictment is therefore repugnant. Ho should not have been required to stand trial on contradictory allegations, and counts 4 and 5 should have been dismissed. *See* Ho Br. 50-52; *United States v. Cantrell*, 612 F.2d 509, 511 (10th Cir. 1980) (reversing part of a conviction because of a contradictory indictment); *see also Lehman v. United States*, 127 F. 41, 45 (2d Cir. 1903) ("It is essential that the charge

21

should not be repugnant or inconsistent with itself, for the law will not permit of absurdity and contradiction in legal proceedings" lest the contradiction "vitiate said count."); *United States v. Conde*, 309 F. Supp. 2d 510, 511-512 (S.D.N.Y. 2003) (dismissing a count in an indictment as contradicted by another count); 11A Cyclopedia of Fed. P. § 42:42 (3d ed. 2019) ("An indictment is defective if it contains logically inconsistent counts.") (citing *Lehman* and *Conde*).

The government notes that "it is a common practice for indictments to track a statute in the conjunctive and this Court has approved of the practice for decades." U.S. Br. 50. That misses the point: Certainly the grand jury *may* charge in the conjunctive, and the indictment *may* track the statutory language—but that does not mean that the allegations in the indictment are meaningless and without effect. The government does not cite a single case in which, in one part of an indictment, the grand jury charges (repeatedly) a fact that renders the defendant exempt from prosecution for a crime that the very same grand jury in the very same indictment charges against the defendant.

The government instead cites cases for the point that indictments may allege several means of committing the charged crime in the conjunctive, and the jury need only find one of those means—that is, it may be charged to the petit jury in the disjunctive—without creating variance or amendment. *See* U.S. Br. 50 (citing *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008); *United States v. McDonough*,

22

56 F.3d 381 (2d Cir. 1995); *United States v. Astolas*, 487 F.2d 275 (2d Cir. 1973)).

Ho has no quarrel with this proposition, but it has nothing to do with this case. None

of those cases involved mutually exclusive statutory provisions, and none involved

explicit contradictions in an indictment. They simply do not touch on the issue here:

a facially contradictory indictment.

Nor is it any answer to say that the petit jury's verdict can render harmless a

procedural error in the grand jury's process. *See* U.S. Br. 51 (citing *United States v.*

*Mechanik*, 475 U.S. 66, 67 (1986)). A procedural error in the grand jury's process

(such as the presence of an unauthorized person in the grand jury, or a violation of

grand jury secrecy rules) is a far cry from a fundamental contradiction in the

indictment itself—while the former may have "the theoretical potential to affect the

grand jury's determination whether to indict," *Mechanik*, 475 U.S. at 70, the latter

goes to the heart of the grand jury's assignment and suggests that the grand jury may

have misapprehended, or been instructed incorrectly on, the elements necessary to

establish criminal liability.

## POINT VI

## SECTIONS 78dd-2 AND 78dd-3 ARE MUTUALLY EXCLUSIVE

The legislative history of § 78dd-3, which was enacted 21 years after § 78dd-

2, shows that Congress intended §§ 78dd-2 and 78dd-3 to be mutually exclusive,

*i.e.*, that one charged to have violated one statute could not be charged with violating

the other.  *See* Ho Br. 52-55.  The government argues that (a) it is inappropriate to consider the legislative history because there is no ambiguity in the statutory language, (b) the legislative history does not establish the point that Ho asserts, and (c) §§ 78dd-2 and 78dd-3 cannot be mutually exclusive because that would lead to "absurd results."  U.S. Br. 52-55.

(a)     *Reference to the FCPA's legislative history is appropriate.*  This Court has interpreted the FCPA on several occasions, and has used legislative history to help it.  *See, e.g., United States v. Hoskins*, 902 F.3d 69, 85-95 (2d Cir. 2018); *Republic of Iraq v. ABB AG*, 768 F.3d 145, 171 (2d Cir. 2014); *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173, 182 (2d Cir. 2003).  There is no reason not to do so here as well.

The government replies that the FCPA is unambiguous.  But even though each word in a statute is itself plain, context can create ambiguity.  *See, e.g.*, *Yates v. United States*, 135 S. Ct. 1074, 1082 (2015).  That is precisely the case here: "the broader context of the statute as a whole," *id.*, reveals three separate categories of liability—issuers, § 78dd-1; domestic concerns and their agents, § 78dd-2; and anyone else and their agents, § 78dd-3.  It is no answer to say that statutory provisions often overlap, because § 78dd-3 explicitly carves out persons who fall within §§ 78dd-1 and 78dd-2.  That structural demarcation creates an ambiguity

24

about the liability of a domestic concern's agents—who are explicitly covered by § 78dd-2 and by the structure of the FCPA appear intended to be removed from § 78dd-3. It thus is entirely appropriate to refer to legislative history.

(b) *The legislative history supports Ho.* The Senate Committee Report for § 78dd-3 states that it was intended to provide for penalties "over persons not covered under" § 78dd-2. S. Rep. No. 105-277 at *5 (1998) (quoted in Ho Br. 52-53); *see also id.* at *2-3 (explaining that § 78dd-3 "expands the FCPA's coverage to include" foreign persons who commit acts in the United States in furtherance of a foreign bribe). The government argues that this language "does not mean that Congress intended to preclude prosecution [of persons covered by § 78dd-3] under sections already in force," that is § 78dd-2. U.S. Br. 53. The government notes that there is no prohibition on having two criminal statutes that effectively cover the same conduct, and that Congress should be presumed to know that such double-dipping is permissible. *See id.*

The government's interpretation blinks reality: § 78dd-3 **begins** by saying it does not apply to most (if not all) entities covered by §§ 78dd-1 and 78dd-2. Nor does the government cite a single piece of legislative history that challenges the proposition that the intent of the legislators in enacting § 78dd-3 was to cover those who were ***not*** covered by § 78dd-2—an intent obvious from the face of the statute

25

as well.  Given that intent, the government's observation that Congress could have enacted two statutes to punish the same conduct is irrelevant.

*Hoskins* states that § 78dd-3 applies to persons "not within any of the aforementioned categories," referring to §§ 78dd-1 and 78dd-2.  902 F.3d at 85 (quoted in Ho Br. 54; U.S. Br. 54).  The government contends that this clear language should be ignored because it "concerned something not at issue in the case," U.S. Br. 54, but this Court's words should not be taken so lightly.  *Hoskins* was a thorough opinion concerning the scope of the FCPA.  *See* 902 F.3d at 83-95.  It analyzed the language, structure and legislative history of the FCPA, including the 1989 amendments that introduced § 78dd-3 and the OECD Convention that led to those amendments.  The *Hoskins* Court's words were the carefully considered result of that analysis.

(c)    *The proper reading of §§ 78dd-2 and 78dd-3 does not lead to "absurd results."*  The government argues that reading §§ 78dd-2 and 78dd-3 as mutually exclusive would lead to "absurd results," because it would prevent some defendants, whom the government evidently believes should be prosecuted, from being prosecuted under the FCPA.  *See* U.S. Br. 54.

That the interpretation of a criminal statute leads to the government being unable to prosecute someone that it wishes to prosecute hardly makes the interpretation "absurd."  It simply means that the particular statute does not cover

26

everyone, or all of the behavior, that the government wants it to. Federal criminal statutes are required to be read narrowly, not to cover every conceivable wrong the prosecutor might wish punished. *See Yates*, *supra*.

Furthermore, the government's hypothetical is almost certainly wrong. The government writes:

> [U]nder Ho's interpretation, if two foreign citizens ("D1" and "D2") traveled to the United States and, while here, paid a $2 million cash bribe to a UN official, and D1 did so on behalf of a U.S. company, while D2 did so on behalf of a foreign company, D1 could not be charged with violating the FCPA because, as an agent of a domestic concern, he could only be charged under Section 78dd-2, and that statute requires the use of interstate commerce in furtherance of the bribe.

U.S. Br. 54. Surely, any prosecutor worth her salt would argue that D1's travel to the United States was "interstate commerce in furtherance of the bribe." *Id.* And if the court were to find no interstate commerce, then the case could be prosecuted by state authorities.

Ho argued that the legal defects in the indictment relating to § 78dd-3 required dismissal of counts 4 and 5, and of count 1, which charges a conspiracy (18 U.S.C. § 371) the object of which was to violate both §§ 78dd-2 and 78dd-3. *See* Ho Br. 55. The government points out that the jury was polled upon the return of its general verdict, and that it found that Ho had conspired to violate both objects. Thus, the government argues, any legal defect relating to § 78dd-3 would not require reversal of count 1. *See* U.S. Br. 55. The government ignores that the counts of the

27

indictment that underlie the § 78dd-2 object of the conspiracy (counts 2 and 3) are also defective because, as demonstrated above, there was no evidence that Ho assisted a domestic concern. *See* Point I, *supra*. Where there was insufficient evidence that Ho acted to assist a domestic concern, there was also insufficient evidence that he conspired with someone to do so.

## **Conclusion**

For the foregoing reasons, and for the reasons set forth in Ho's opening brief, (1) the judgment of conviction should be vacated, (2) counts 1, 4, 5, 6, and 8 should be dismissed, and (3) the Clerk of the Court should be directed to enter a judgment of acquittal as to counts 2 and 3.

Dated:  October 30, 2019

Respectfully submitted,

By:   */s/ Benjamin E. Rosenberg*
DECHERT LLP

Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Tel.: (212) 698-3622
Fax: (212) 698-3599
benjamin.rosenberg@dechert.com
katherine.wyman@dechert.com

KRIEGER KIM & LEWIN LLP
500 Fifth Avenue, 34th Floor
New York, New York 10110
Tel.: (212) 390-9550
Edward.Kim@KKLllp.com
Jonathan.Bolz@KKLllp.com

*Attorneys for Appellant Chi Ping*
*Patrick Ho*

## CERTIFICATE OF COMPLIANCE

Pursuant to the Federal Rules of Appellate Procedure 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation.

1. This brief complies with the type-volume limitation of Second Circuit Local Rule 32.1, because this brief contains 6,985 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate procedure 32(a)(6), because this brief has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

Dated: October 30, 2019   /s/ Benjamin E. Rosenberg   

               *Counsel for Appellant Chi Ping*
               *Patrick Ho*

# CERTIFICATE OF SERVICE

I certify that, on October 30, 2019, a copy of the foregoing Brief of Defendant-Appellant Chi Ping Patrick Ho was filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit and served on the parties through the Court's electronic filing system. I further certify that all parties required to be served have been served.

Dated: October 30, 2019        /s/ Benjamin E. Rosenberg

*Counsel for Appellant Chi Ping Patrick Ho*